UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :
                                  :
          v.                      :        No. 3:02CR258 (EBB)
                                  :
NOEL DAVILA                       :
                                  :
                                  :

## RULING ON DEFENDANT'S MOTIONS FOR JUDGMENT OF ACQUITTAL

On September 11, 2002, a federal grand jury returned a two-count Indictment against Defendant Noel Davila ("Davila"), charging the Defendant with threatening the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a, and delivery of a threat through the United States Mail in violation of 18 U.S.C. § 876. Pursuant to FED. R. CRIM. P. 29(a), Davila moved for judgment of acquittal on both counts of the Indictment at the close of the Government's evidence at trial on June 25, 2004 and filed a written motion and memorandum in support [Doc. No. 73 and Doc. No. 74]. The Court reserved decision on the motion. On June 28, 2004, the jury found Davila guilty on both of the counts alleged in the Indictment. Davila filed a motion for extension of time to renew his motion for judgment of acquittal on July 2, 2004, and filed a Supplemental Motion for Judgment of Acquittal and memorandum in support on July 9, 2004 [Doc. No. 89 and Doc. No. 90]. For the reasons stated below, Davila's motions for judgment of acquittal [Doc. Nos. 73 and 89] are DENIED.

I. <u>BACKGROUND</u>

A. The Indictment

The Indictment charged Davila with sending a letter containing a white powdery substance that was represented to be anthrax along with threatening writing to the Connecticut State's Attorney's Office in the Fairfield County Courthouse in Bridgeport.

Count One charged Davila with knowingly and intentionally, and without lawful authority, threatening the use of a weapon of mass destruction, namely a biological agent, toxin or vector, against persons within the United States, namely members and employees of the Connecticut State's Attorney's Office in Bridgeport, which threat affected interstate commerce and which threatened use would have affected interstate commerce, all in violation of 18 U.S.C. § 2332a.

Count Two charged Davila with willfully and knowingly causing an envelope containing a white powdery substance represented to be anthrax, and a letter, which together threatened to injure the person of another, to be delivered by the U.S. Postal Service to the Connecticut State's Attorney's Office in Bridgeport, all in violation of 18 U.S.C. § 876.

B. Evidence Adduced at Trial[1]

The Government's prosecution of Davila was based on an envelope mailed from the Cheshire Correctional Institution, addressed to the Connecticut State's Attorney's Office in Bridgeport, containing a white powdery substance; a piece of paper with "foreign handwriting" and prayers written on it; and another piece of paper bearing the words "ANTRAX A.K.A. Bin Laden."

At trial, the Government presented testimony from eighteen witnesses, as well as extensive documentary evidence, including tape-recorded conversations between the Defendant and a cooperating witness. Viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences in the Government's favor, the evidence at trial established, *inter alia*, the following:

Following proceedings with the Bridgeport State's Attorney's Office in 2000 and 2001, Davila filed a grievance and federal lawsuit against Stephen Sedensky, the state prosecutor from that office who handled the prosecutions of Defendant in those prior matters. Both the grievance and lawsuit were dismissed as without merit. Thereafter, on August 18, 2002, while

---

[1] This summary of facts is prepared from the Court's trial notes, and the facts as recounted in the Government and Defense counsel briefs, without the aid of a trial transcript.

incarcerated at the Cheshire Correctional Institution, Davila sent an envelope containing a white powdery substance; a piece of paper with "foreign handwriting" and prayers in English written on it; and another piece of paper, folded in half with the sides folded in to make a pouch, with the words "ANTRAX A.K.A. Bin Laden" written on it.  The envelope had "LEGAL MAIL" written on the front, bore the return address "H. GORDON #200993  900 HIGLAND AVE. CHESHIRE Ct. 06410," and was addressed, in block handwriting, to "STATE ATT. SUPERIOR COURT 1061 MAIN ST. BRIDGEPORT CT. 06604."  The envelope was received at the Bridgeport State's Attorney's Office on August 20, 2002, was brought to the front office area by Administrative Assistant Annette Stufan, and opened by her co-worker Ruthann Haug, who saw the two pieces of paper with the writing, and white powder in the envelope.  She notified her two co-workers, and the three left the office area immediately and notified a supervising attorney of the incident.

The mailing resulted in a full HazMat response from the Connecticut State Police Emergency Services Unit and the FBI, and caused the front office area of the State's Attorneys' Office to be closed for approximately two and a half days while the toxicology tests on the powder were conducted by the Connecticut Department of Public Health's BioResponse Laboratory.  The

4

powdery substance tested negative for anthrax.

The three administrative assistants who worked in the front office area testified at trial that they were concerned after the incident, and each took particular precautionary steps and did not return to work until they received word that the substance in the mailing was not in fact anthrax.  One worker took Cipro, an antibiotic effective against anthrax, and all testified that they either changed their clothes, showered, washed their hands, or consulted others for advice as a result of the incident.

Testimony from Ricardo Quental, Lead Manager of Distribution Operations for the Wallingford, Connecticut, Postal Processing Facility, and Brian Donnelly, FBI Special Agent, established the effect the mailing would have had on interstate commerce had the threatening mailing actually contained anthrax spores.  Mr. Quental's testimony was based upon an actual anthrax incident at the Wallingford Facility in the fall of 2001 where 60% of the facility was shut down once it was determined that the anthrax-contaminated mail which caused the death of an elderly Connecticut woman in November of 2001 had been processed at the Wallingford facility.  Testing at the facility revealed the presence of anthrax spores, and mail was diverted to facilities outside Connecticut for at least three weeks.  Mr. Quental testified that, had the mailing at issue here tested positive for

anthrax, mail, including commercial mail, would have been diverted to facilities outside Connecticut, slowing down the processing of such mail. Agent Donnelly testified that there would have been a response to the incident from outside the State of Connecticut, including the shipment of antibiotics to Connecticut on trucks traveling from the national strategic stockpile of antibiotics, located outside the state.

Further, testimony from three inmates at the Cheshire Correctional Facility established that Davila sent the mailing, and included a description of his efforts to avoid detection, including wearing plastic bags on his hands to prevent fingerprints, using the name and identification number of another inmate on the return address of the envelope, disguising his handwriting on the mailing, and sealing the envelope with water rather than saliva to prevent detection of DNA. Davila's cellmate, Christopher Blacker, testified that he got down from his bunk bed to use the toilet, and saw the Defendant writing "ANTRAX A.K.A. Bin Laden" on a piece of paper. Blacker also testified that the Defendant had plastic bags on his hands and put the writing on the bed, showed it to Blacker, and said, "This way there will be no fingerprints." Blacker further testified that Davila asked him for an envelope and, when he could not provide one, the Defendant requested and received an envelope

from inmate Anthony Michael Young.  Davila picked up the
envelope, which Young had slid under the door to him, with
plastic bags covering his hands.  Davila then addressed the
envelope, in block lettering, to the State's Attorney's Office in
Bridgeport, writing the words "LEGAL MAIL" on the envelope.
Blacker testified that Davila then folded up the piece of paper
that had "ANTRAX A.K.A. Bin Laden" written upon it into a sort of
pouch, and poured a lot of talcum powder into the pouch.  Blacker
told Davila that it probably would not fit into the envelope with
that amount of powder in it, and it would look like a lot of
cocaine powder, so Davila dumped some of the powder into the
toilet.  The Defendant then wet a piece of toilet paper with
water from the sink in his cell, and rubbed the wet toilet paper
on the glue to seal the envelope.  He said to his cellmate
Blacker, "See cellie, no DNA."

     Anthony Michael Young, housed at the time in the same
cellblock as the Defendant, testified that he saw Davila with a
bottle of powder in his hands, which were covered with plastic
bags.  Davila asked Young to get him an envelope, which Young
then got from another inmate, and slid under the door to Davila's
cell. Davila later asked Young to mail the letter for him, and
slid the letter, wrapped in toilet paper, under the door.  Young
testified that he picked the envelope up by the toilet paper and

put it in the mailbox.   After the incident at the State's Attorney's Office was reported on the local news, Davila joked with Young, telling him that his (Young's) prints were found on the envelope.

The evidence at trial also established that the Defendant was the only one of the inmates involved in the incident who had prior matters with the Bridgeport State's Attorney's Office.

The evidence at trial also included consensual tape recordings of the Defendant made on August 26, 2002 and August 30, 2002, after his cellmate Blacker consented to wearing a wire, in which the Defendant discussed the steps he took to send the mailing, and his efforts at avoiding detection.   Among other things, the tape recordings revealed the following: that Davila acknowledged that he sent the anthrax note to a courthouse; that he discussed how law enforcement would not be able to trace the mailing back to the Cheshire facility because of the efforts he made to avoid leaving any trace of DNA on the mailing, including his use of water rather than saliva to seal the envelope; and that he rubbed his fingers across the envelope to seal it without leaving an identifying fingerprint.

Finally, the evidence at trial included testimony from DNA and handwriting analysis experts from the State Forensic Science

Laboratory confirming that the lack of forensic evidence was consistent with the Defendant's efforts to prevent detection.[2]

C.  The Jury's Verdict

On June 28, 2004, a jury of twelve unanimously found Mr. Davila guilty as to Count One, threatening the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a, and Count Two, delivery of a threat through the United States Mail in violation of 18 U.S.C. § 876.

## II.  STANDARD OF REVIEW

Rule 29(a) of the Federal Rules of Criminal Procedure provides, in pertinent part, that the Court, on the Defendant's motion, "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).  A district court can enter a judgment of acquittal where the evidence is insufficient "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  See also United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

---

[2] The Defendant's motion does not contest the sufficiency of the evidence that Defendant sent the letter.

When considering a motion for a judgment of acquittal, "the court must be careful to avoid usurping the role of the jury." Id. at 129. The court must give "full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact" in determining whether a reasonable mind might fairly conclude guilt beyond a reasonable doubt was established upon the evidence. Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)). A Rule 29 motion does not give the trial court "an opportunity to substitute its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." Id. (internal quotations and citation omitted).

The Court "consider[s] the evidence in its totality, not in isolation," United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) (internal citation omitted) and "the government need not 'exclude every reasonable hypothesis other than that of guilt.'" Guadagna at 130 (quoting Holland v. United States, 348 U.S. 121, 139 (1954)). In addition, a jury is entitled to reach its verdict based "entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995) (citations omitted). A defendant therefore "shoulders a heavy burden" in bringing a challenge to the weight of the evidence supporting a conviction. Autuori, 212 F.3d at 114 (internal quotations and

10

citation omitted).

III. <u>DISCUSSION</u>

A.  Sufficiency of the evidence that Defendant threatened to use a weapon of mass destruction[3] in Count One and that the mailing was a true threat

In support of his Motion for Judgment of Acquittal, the Defendant argues that the Government failed to put forth sufficient evidence that he "threatened to use" a weapon of mass destruction, and that the mailing at issue was a "true threat." Specifically, Defendant asserts that the statutory language mandates that the Government prove that he "threatened to use" a weapon of mass destruction in the future, namely that he threatened to actively employ anthrax in the future. Defendant asserts that his actions could be construed only as a warning because there was no evidence presented at trial of a threat of future action.  Defendant also specifically argues that the mailing of talcum powder, along with non-threatening words, could not reasonably be seen as a mailing of a true threat.

---

[3] In his Motion for Judgment of Acquittal [Doc. No. 73] Defendant argues that the Government presented insufficient evidence that Defendant "threatened the use of" a weapon of mass destruction. However, in his supporting memorandum of law [Doc. No. 74], Defendant argues that the Government failed to present sufficient evidence that Defendant "threatened to use" a weapon of mass destruction.  This Court addresses the argument as briefed by Defendant.

"Threatens to use"

Title 18 U.S.C. § 2332a was amended in December of 2004 but, at the time Davila was indicted and convicted, 18 U.S.C. § 2332a(a)(2) provided, in relevant part, that a federal criminal act is committed by:

> A person, who, without lawful authority, uses, threatens, or attempts or conspires to use, a weapon of mass destruction . . . against any person within the United States, and the results of such use affect interstate or foreign commerce or, in the case of a threat, attempt, or conspiracy, would have affected interstate or foreign commerce.

18 U.S.C. § 2332a(a)(2) (2002).

In Count One of the indictment, the Government alleged the following:

> On or about August 18, 2002, in the District of Connecticut, NOEL DAVILA, a/k/a "Monk," the defendant herein, did knowingly and intentionally and without lawful authority, *threaten the use of* a weapon of mass destruction, that is, a biological agent, toxin or vector, against persons within the United States, namely members and employees of the Connecticut State's Attorney's Office at Bridgeport, which threat affected interstate commerce and which threatened use would have affected interstate commerce.

In violation of Title 18 United States Code, Section 2332a (emphasis added).

Davila argues that the plain language of 18 U.S.C. § 2332a(a) makes it a criminal act only where someone "threatens to use" a weapon of mass destruction in the future, and urges this

12

Court to adopt the reasoning in <u>United States v. Taylor,</u> No. 02CR73 (RPP), 2003 WL 22073040, * (S.D.N.Y. Sept. 5, 2003), an unpublished opinion from the Southern District of New York.  In <u>Taylor,</u> the trial court construed the language of 18 U.S.C. § 2332a(a) as requiring evidence that defendant threatened "active employment of something in the future."  <u>Id.</u> at *8.

The Government asserts that the plain language of 18 U.S.C. § 2332a(a) prohibits threatening a weapon of mass destruction, with no requirement that it be a threat of future action, and that the Judge in <u>Taylor</u> erroneously read the language "threaten to use" into the statute.  The Government reads the statute as criminalizing only the actions of "a person, who, without lawful authority:"

> 1) ". . . uses, . . . , a weapon of mass destruction . . . "
> 2) ". . . , threatens, . . . , a weapon of mass destruction . . . ";
> 3) ". . ., or attempts or conspires to use, a weapon of mass destruction . . . "

18 U.S.C. § 2332a(a) (2002).  Under the Government's reading of the statute, "to use" only modifies "attempts or conspires," not "threatens."  Government's Response to Defendant's Motions for Judgment of Acquittal and New Trial at 26-27 ("Government's Response").

Furthermore, the Government advised this court by letter on August 31, 2004 that a recent Fifth Circuit decision provides

further support for its position.[4]  In <u>United States v. Reynolds,</u> the Fifth Circuit held that threatening the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a(a) does not require evidence of a future act.  381 F.3d 404, 406 (5th Cir. 2004), *cert. denied*, 125 S. Ct. 922, 2005 U.S. LEXIS 172 (2005). Defendant responded by letter to the Court on September 2, 2004 [Doc. No. 130] , asserting that the Fifth Circuit was wrong in its interpretation of the statute.  Reynolds's petition for writ of certiorari was denied by the Supreme Court on January 10, 2005.

The Second Circuit has not construed the meaning of "threatens" under 18 U.S.C. § 2332a and the Defendant has offered no support for his position that § 2332a(a)(2) requires evidence of prospective action other than the unpublished District Court opinion in <u>Taylor</u>.

In <u>Taylor,</u> the Government moved for a pre-trial ruling on the sufficiency of the stipulated record from the trial of co-defendant Dewansingh to support the indictment charging Taylor under 18 U.S.C. § 2332a.  Dewansingh's motion for judgment of acquittal following the close of the government's evidence had been granted orally because the court found that the threatening note left by Dewansingh stating "Anthrax is here [i]n ABC" "was a

---

[4] <u>See</u> correspondence from Stephen B. Reynolds to the Court, dated August 31, 2004 [Doc. No. 129].

14

statement that an act had already been done," rather than a "threat to do an act that would be harmful at once or in the future," which, the <u>Taylor</u> court reasoned, was required by the statute. <u>Taylor</u>, 2003 WL 22073040 at *2. In response to the Government's motion for a pre-trial ruling, Taylor moved for judgment of acquittal on both counts of the indictment, and the Court granted Defendant's motion. <u>Id.</u> at *8 - *9. In <u>Taylor</u>, the Indictment charged that the defendant and her co-defendant "unlawfully, willfully, and knowingly *threatened to use* a weapon of mass destruction" by leaving a threatening note in the store in which they worked. <u>Id.</u> at *1[5] (emphasis added). In granting Taylor's Rule 29 motion, the court reasoned that "the word 'threatens,' taken in conjunction with the words 'to use,' require active employment of something in the future," and the sole evidence at trial, the note stating "Anthrax is here [i]n ABC," merely demonstrated action that had already been taken. <u>Id.</u> at *8. There was nothing accompanying the note, and no indication that any threat would be forthcoming.

---

[5] "The object of the conspiracy was to '*threaten to use* a weapon of mass destruction . . . against persons within the United States, and the results of such threatened use would have affected interstate and foreign commerce.' Count Two charged that Defendant and Dewansingh 'unlawfully, willfully, and knowingly *threatened to use* a weapon of mass destruction . . . against persons within the United States, and that the results of such threatened use would have affected interstate and foreign commerce,' in violation of 18 U.S.C. § § 2332a(a)(2) and 2." <u>United States v. Taylor</u>, No. 02CR73(RPP), 2003 WL 22073040, *, *1 (S.D.N.Y. Sept. 5, 2003) (emphasis added).

In contrast, in Reynolds, the Fifth Circuit upheld the defendant's conviction under 18 U.S.C.§ 2332a for threatening to use a weapon of mass destruction. 381 F.3d 404. Reynolds had been involved in an ongoing dispute with his mortgage company over his payments. He called the mortgage company to access the automated account system, was denied access because of his payment delinquency, and was instead transferred to a customer service representative. Upon being connected, he yelled into the telephone, "I just dumped anthrax in your air conditioner." Id. at 405. He was convicted under § 2332a and sentenced to 51 months in prison. On appeal, Reynolds argued that the phrase "threaten to use" in section 2332a prohibits only threats of future use of a weapon of mass destruction, and therefore his statement indicating a past act did not fall within the prohibitions of the statute. Id. at 406. The Fifth Circuit rejected this argument, and held that nothing in section 2332a demands evidence of a prospective threat. Id. ("We have found no credible support for a definition of "threat" that requires reference to a future act.") Id. The Reynolds court held that the proper definition of a "threat" was a communication that "'in its context has a reasonable tendency to create apprehension that its originator will act according to its tenor.'" Id. (quoting United States v. Myers, 104 F.3d 76, 79 (5th Cir. 1997)).

16

And most recently, in <u>United States v. Zavrel</u>, 384 F.3d 130 (3d Cir. 2004), the Third Circuit Court of Appeals held, in construing similar language in 18 U.S.C. § 876, that a "threat to injure" need not necessarily be a prospective threat.[6]  Zavrel had mailed 17 envelopes containing a white powdery substance (cornstarch) she intended to resemble anthrax to local officials, the President of the United States, and school and hospital workers.  While the Defendant conceded that her letters were immediately harmful to the recipients, she argued that § 876 does not prohibit "the mailing of injurious materials;" it only prohibits prospective threats to injure.  <u>Id.</u> at 135.  As here, the only support the defendant in <u>Zavrel</u> put forth for this proposition was the unpublished <u>Taylor</u> ruling.  <u>Id.</u> at 136.  In rejecting this argument, the Third Circuit noted that the District Court's instructions to the jury defined a "threat" as follows:

> A threat is a serious statement or communication which expresses an intention to inflict injury *at once or in the future* as distinguished from idle or careless talk, exaggeration or something said in a joking manner.  A statement or communication is a threat if it was made under such circumstances that a reasonable person hearing or reading the statement or receiving the

---

[6] 18 U.S.C. § 876(c) provides, in relevant part, that "Whoever knowingly so deposits or causes to be delivered . . . any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing . . . any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both."  18 U.S.C. § 876(c).

communication would understand it as a serious expression of intent to inflict injury. <u>Id.</u>[7]

The <u>Zavrel</u> court declined to "decide the issue definitively," and held that "[a] reasonable person opening an envelope containing a white powdery substance, during the anthrax crisis in this country, would doubtless fear immediate [as well as] future injury." <u>Id.</u>  The court further noted that mailing real anthrax or something intended to represent anthrax is analogous to mailing a bomb or a dead animal; the fact that some of the contents may be immediately injurious "does not alter the fact that the sender in each case intends to communicate prospective harm as well." <u>Id.</u> at 137.  The <u>Zavrel</u> court compared its interpretation favorably with the Second Circuit's definition of "threat" in <u>United States v. Malik</u>, 16 F.3d 45 (2d Cir.) <i>cert. denied</i>, 513 U.S. 968 (1994).

In <u>Malik</u>, the Second Circuit approved the trial court's charge to the jury regarding "a threat" under 18 U.S.C. § 876, which substantially tracked the language in <u>United States v. Kelner</u>, 534 F.2d 1020, 1024-28 (2d Cir. 1976).  In <u>Kelner</u>, the Second Circuit declined to hold that the defendant's actions were protected political expressions where he made statements during a televised interview that he planned to attempt to assassinate the

---

[7] The court's jury instruction regarding a "threat" in <u>Zavrel</u> is substantially similar to this court's instruction in the present case.

leader of the Palestinian Liberation Organization. Id. The Court held that, under 18 U.S.C. § 875, "[s]o long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution, the statute may be properly applied." Id. at 1027.

Statutory Interpretation

The starting point in statutory interpretation is the language of the statute itself. United States v. Lucien, 347 F.3d 45, 51 (2d Cir. 2003) ("It is axiomatic that statutory interpretation begins with the language of the statute."). Id. Title 18 U.S.C. § 2332a does not define the terms "threatens" or "use." In the absence of a specific statutory definition, words will be interpreted as taking their "ordinary, contemporary, common meaning." Harris v. Sullivan, 968 F.2d 263, 265 (2d Cir. 1992) (citing Perrin v. United States, 444 U.S. 37, 42 (1979)). "Where the text of a statute is unambiguous, judicial inquiry ends." Lucien, 347 F.3d at 51. However, where the plain meaning remains unclear, courts will use the canons of statutory interpretation to resolve any lingering ambiguity. United States v. Dauray, 215 F.3d 257 (2d Cir. 2000). Accord United States v.

19

_Turkette_, 452 U.S. 576, 580 (1981).[8]  If, after this review, the Court cannot resolve the ambiguity in the statutory language, a court may then look to the legislative history.  _Toibb v. Radloff_, 501 U.S. 157, 162 (1991).  But _see_ _Koons Buick Pontiac GMC, Inc. v. Nigh_, 125 S. Ct. 460, 470, 2004 U.S. LEXIS 7979 (2004) (Stevens, J. concurring)("In recent years the Court has suggested that we should only look at legislative history for the purpose of resolving textual ambiguities or to avoid absurdities. It would be wiser to acknowledge that it is always appropriate to consider all available evidence of Congress's true intent when interpreting its work product.  Common sense is often more reliable than rote repetition of canons of statutory construction.").  _See_ _also_ _Id._ n.1 (citing _United States v. Fisher_, 6 U.S. 358, 2 Cranch 358, 386 (1805) ("Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived.")).

The doctrine of lenity requires that statutory ambiguity be resolved in favor of the defendant in criminal prosecutions. _Dauray_, 215 F. 3d at 264.  However, this doctrine will only apply

---

[8] "In determining the scope of a statute, we look first to its language.  If the statutory language is unambiguous, in the absence of 'a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive.'  Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistencies in the statute must be dealt with."  _United States v. Turkette_, 452 U.S. 576, 580 (1981) (citations omitted).

as a last resort, Id. (citing United States v. Hescorp, Heavy
Equip. Sales Corp., 801 F.2d 70, 77 (2d Cir. 1986)), where
ambiguities in the statute persist "even after resort to 'the
language and structure, legislative history, and motivating
policies' of the statute." Id. (quoting Moskal v. United States,
498 U.S. 103, 108 (1990) (citation omitted)). "[B]ecause the
meaning of language is inherently contextual," the doctrine of
lenity will not be applied "merely because it was possible to
articulate a construction more narrow than that urged by the
Government." Id.

    1. Plain meaning

    The starting point in this Court's analysis is the plain
meaning of the statutory language. In section 2332a, Congress
criminalizes behavior where a person, "without lawful authority,
uses, *threatens,* or attempts or conspires to use, *a weapon of
mass destruction*." 18 U.S.C. § 2332a(a) (2002) (emphasis added).
There is no indication in the literal language of the statute
that "threatens" contemplates only future action. Indeed,
someone who "threatens" can be threatening harmful action
presently or in the future. Among the several definitions of the
word "threaten" in the Oxford English Dictionary, Second Edition,
are the following: 1) to press, urge, force; 2) to try to
influence a person by menaces; to utter or hold out a threat

against; to declare one's intention of inflicting injury upon; to menace.  Among the several definitions in Webster's Third New International Dictionary, Unabridged, are: 1) to announce as intended or possible; 2) to utter threats against; promise punishment, reprisal or other distress to.  These definitions do not clarify the statutory language, as there is no indication that only future action is contemplated when one "threatens."

2. Canons of construction

Where, as here, the language of the statute remains ambiguous after an examination of the plain meaning, the Court will turn to the canons of statutory interpretation to attempt to resolve the ambiguity.  Turkette, 452 U.S. at 580.

a. Statutory structure

Statutory interpretation is a "holistic endeavor."  Koons Buick, 125 S. Ct. at 466.  "The meaning of statutory language, plain or not, depends on context."  Bailey v. United States, 516 U.S. 137, 145 (1995) (citation omitted).  A court must read each term to have meaning, and "[j]udges should hesitate . . . to treat [as surplusage] statutory terms in any setting, and resistance should be heightened when the words describe an element of a criminal offense."  Id. (citing Ratzlaf v. United States, 510 U.S. 135, 140-41 (1994)) (second alteration in original).

22

Under the Government's reading of § 2332a(a), the words "to use" do not modify the word "threatens," and the statute therefore should read that "any person who . . . threatens . . . a weapon of mass destruction . . . shall be imprisoned." However, this would appear to be an untenable position, since Public Law 103-322, Sec. 60023, states that Title 18 of the United States Code is to be amended by adding a new section entitled "§ 2332a. Use of weapons of mass destruction." Pub. L. 103-322, Title VI, § 60023(a). Furthermore, § 2332a(b) provides that "[a]ny national of the United States who, without lawful authority, uses, or threatens, attempts, or conspires to use, a weapon of mass destruction . . . outside of the United States shall be imprisoned." As the Government notes in its brief, the words "to use" seem to modify the word "threatens" under § 2332a(b). Government's Response at 27. It would make little sense for this Court to discern that Congress intended to criminalize threatening a weapon of mass destruction where a national of the United States makes such a threat outside the United States and yet discern that Congress did not intend to criminalize threatening a weapon of mass destruction against a national of the United States or within the United States under § 2332a(a). Koons Buick, 125 S. Ct. at 467 ("A provision that may seem ambiguous in isolation is often clarified by the remainder

of the statutory scheme."). Thus, taken as a whole, section 2332a prohibits threats to use a weapon of mass destruction as well as attempts to use, actual use, and conspiracy to use such weapons. "There is no canon against using common sense in construing laws as saying what they obviously mean." Id. 125 S. Ct. at 469.

b. Avoiding an Absurd Result

Furthermore, in determining the scope of statutory language, "absurd results are to be avoided." Turkette, 452 U.S. at 580. If adherence to the literal language of the statute leads to absurd results, "and thus impute[s] to Congress an irrational purpose, [such an interpretation] should be spurned." Adams-Mitchell Co. v. Cambridge Distributing Co., 189 F.2d 913, 923 (2d Cir. 1951).

Under the Government's reading, section 2332a prohibits a person from "threatening" a weapon of mass destruction against any person within the United States, or against a national of the United States while outside the United States, but does not prohibit "threatening to use" a weapon of mass destruction against such persons, even as it prohibits a national of the United States from threatening to use a weapon of mass destruction outside of the United States. It would be absurd to suggest Congress was not concerned with individuals threatening

to use such weapons both at home and abroad, and both against American nationals and against all others.[9]

Under the Defendant's reading, Congress intended to prohibit a person from threatening to use a weapon of mass destruction only if such threats were prospective in nature. Under this interpretation, had Mr. Davila simply mailed a note, and nothing more, saying something to the effect that "I will be mailing anthrax to your offices tomorrow," his actions would fall under the scope of this statute, while his mailing of an envelope containing a white powdery substance, a piece of paper with the

_____

[9] Furthermore, it is untenable for the Government to argue that "to use" is not modified by "threatens" when the jury was charged as follows, and there is no exception to this portion of the charge by the Government in the record:
COUNT ONE: ELEMENTS OF THE OFFENSE
To find the defendant guilty of the crime of threatening the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a, as charged in Count One, you must find that the government has proven each of the following elements beyond a reasonable doubt:
First:      That the defendant did *threaten to use* a weapon of mass destruction against any person within the United States;
Second:     That he did so knowingly, intentionally and without lawful authority; and
Third:      That, had the defendant used a weapon of mass destruction as threatened, the results of such use would have affected interstate commerce.
FIRST ELEMENT - THREAT
The first element that the government must establish beyond a reasonable doubt is that the defendant *threatened to use* a weapon of mass destruction against any person within the United States. Whether a given writing constitutes a true threat is an issue of fact for you, the jury, to decide.
 . . .
FIRST ELEMENT - USE
The government must prove beyond a reasonable doubt that the defendant *threatened to use* a weapon of mass destruction against any person within the United States. To "use" means "to convert to one's service," "to employ," "to avail oneself of," and "to carry out a purpose or action by means of."
 . . .
Jury Instructions, United States v. Davila, 3:02CR258(EBB) (emphasis added). See Jury Trial Excerpt, June 28, 2004, United States v. Davila, 3:02CR258(EBB).

words "ANTRAX A.K.A. Bin Laden" written on it and another piece of paper with "foreign handwriting" and prayers written on it would not fall under the scope of the statute. Such a result would also be absurd. See Hall v. Earthlink Network, Inc., 396 F.3d 500, 505 (2d Cir. 2005) (quoting American Tobacco Co. v. Patterson, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.")). And, even if Congress intended to criminalize only future threats, Davila's actions, at the time they were undertaken, were threats of future harm. He filled the envelope with white powder and threatening writing and mailed it, knowing that once it arrived at its destination, a day or more in the future, it would cause fear and harm. His cellmate, Christopher Blacker, testified that Davila told him that he was sending the mailing because he wanted to shake up the State's Attorney's Office. At the time of his actions therefore, his was a threat of future harm.

   3. Legislative History

   When ambiguity remains after resort to the canons of construction and a review of the plain language, a court will examine the legislative history to "discover the design of the legislature." Fisher, 2 Cranch at 386. In this instance, a review of the legislative history resolves any ambiguity whether

26

the statute seeks to criminalize threats to use weapons of mass destruction under both sections 2332a(a) and (b). As originally enacted, 18 U.S.C. 2332a(a) provided that "[a] person who uses, or attempts or conspires to use, a weapon of mass destruction . . . against any person within the United States . . . shall be imprisoned." 18 U.S.C. 2332a (1994). See also Pub.L. 103-322, Title VI, § 60023(a) ("Violent Crime Control and Law Enforcement Act of 1994"). Under the 1994 legislation, there was no subsection 2332a(b). By 1995, both houses of Congress began discussion in committee regarding amendments to section 2332a to "provide[] for criminal prosecution for threats of use of weapons of mass destruction." H.R. Rep. 104-383, 104th Cong. (1995).[10] See also 141 Cong. Rec. S2502, S2525 (daily ed. Jan. 30, 1995) (describing the amendments to section 2332a as "add[ing] coverage for threats to the weapons of mass destruction statute").[11]

---

[10] "Sec. 107. Expansion and modifications of weapons of mass destruction statute. This section amends Section 2332a of title 18, United States Code. It provides for criminal prosecution for threats of use of weapons of mass destruction. It also inserts an interstate or foreign commerce jurisdictional element. New Subsection (b) of Section 2332a will authorize a penalty of death for the use, attempted use, threatened use, or conspiracy use, [sic] such a weapon by a U.S. national outside the United States that results in the death to any other person beside the offender." H.R. Rep. 104-383, 104th Cong. (1995).

[11] "Section 602. This section would add coverage for threats to the weapons of mass destruction statute (18 U.S.C. § 2332a). The offense of using a weapon of mass destruction (or attempting or conspiring to use such a weapon) was created by section 60023 of the Violent Crime Control and Law Enforcement Act of 1994 . . . [h]owever, no threat offense was included. A threat to use such a weapon is a foreseeable tactic to be employed by a terrorist group. . . . Accordingly, it seems clearly appropriate to make threatening to use a weapon of mass destruction a federal offense." 141 Cong. Rec. S2502, S2525 (daily ed. Jan. 30, 1995). See also 141 Cong. Rec. S6202 (daily ed. May 5, 1995).

Public Law 104-132, the Antiterrorism and Effective Death Penalty Act of 1996, amended section 2332a in 1996 by inserting "threatens," before "attempts or conspires to use, a weapon of mass destruction." H.R. REP. 104-383. The final House Conference Report that accompanied the 1996 amendments stated the following: "This section *criminalizes a threat to use* a weapon of mass destruction, extends the prohibition to the use of such weapons by U.S. nationals overseas, and clarifies that any chemical weapon is included in the definition of weapon of mass destruction or destructive device." H.R. CONF. REP. 104-518, *reprinted in* 1996 U.S.C.C.A.N. 944, 956 (emphasis added). Since "[t]he conference report is generally the most reliable evidence in legislative history of congressional intent because it represents the final statement of the terms agreed to by both houses," Auburn Housing Auth. v. Martinez, 277 F.3d 138, 147(2d Cir. 2002), and the final House Conference Report clearly indicates that Congress sought to prohibit threats to use a weapon of mass destruction, this Court finds that Congress intended to criminalize threats to use weapons of mass destruction in section 2332a. See also 142 CONG. REC. H2247, H2263 (daily ed. Mar. 14, 1996) (statement of Rep. Jackson-Lee) ("[The] bill also extends the law regarding weapons of mass destruction to include threatened use of weapons of mass

28

destruction, as well as cases involving a U.S. national outside of the United States."). Indeed, as introduced during Senate statements on the Violent Crime Control and Law Enforcement Improvement Act of 1995, S. 3, the proposed amendment of section 2332a read as follows: "Sec. 723. Threatening to Use a Weapon of Mass Destruction. Section 2332a(a) of Title 18, United States Code, is amended by inserting 'or threatens' before 'or attempts or conspires to use, a weapon of mass destruction.'" 141 CONG. REC. S53, S75, S90 (daily ed. Jan. 4, 1995). Although this was not the final language adopted, this language is further evidence of Congressional intent to criminalize threats to use a weapon of mass destruction.

However, nothing in the statutory language or the legislative history mandates that such threats to use weapons of mass destruction be threats of future conduct. Congress was concerned that the statute as written in 1994 failed to proscribe threats to use such weapons, and there is no indication that Congressional concern centered only upon threats of future action.

4. Doctrine of Lenity

The doctrine of lenity is to be applied only where ambiguities persist even after a review of the statutory language, the structure of the statute, and the legislative

history.  "[The] rule . . . only serves as an aid for resolving an ambiguity; it is not to be used to beget one." Turkette, 452 U.S. at 587.  Here, Congressional intent was clear:  there was a desire to strengthen existing prohibitions against the use of weapons of mass destruction following the events in Oklahoma City by specifically prohibiting threats to use such weapons.[12]  A threat to use a weapon of mass destruction was seen as a foreseeable tactic to be used by a terrorist group, and Congress sought to proscribe such threats at any time they occurred. "'The canon in favor of strict construction [of criminal statutes] is not an inexorable command to override common sense and evident statutory purpose. . . .  Nor does it demand that a statute be given the 'narrowest meaning;' it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers.'"  Id. (quoting United States v. Moore, 423 U.S. 122, 145 (1975) (citation omitted, alterations in original)).

It is this Court's responsibility to "remain faithful to Congress's words expressed in the whole statutory scheme[,] . . . and harmonize the provisions [of 18 U.S.C. § 2332a] if possible."

---

[12] See 141 CONG. REC. S6202 (daily ed. May 5, 1995) (statement of Sen. Daschle on the Omnibus Counterterrorism Act of 1995) ("Mr. President, since the terrible bombing in Oklahoma City more than 2 weeks ago, we have been forced to consider what the society should do in self-defense against potentially deadly maniacs who think that killing defenseless people is a way to send a political message or effect political change.").

Auburn Housing Auth., 277 F.3d at 149-50.  Mindful that due process requires that a defendant be given "fair warning of the conduct that makes a crime" under the statute, this Court finds that § 2332a adequately apprised Defendant that Congress sought to make any and all threats to use a weapon of mass destruction a crime punishable by imprisonment.  Dauray, 215 F.3d at 264 (quoting Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964)).  Defendant's actions were "plainly and unmistakably within the provisions of [this] statute," Id. (quoting United States v. Plaza Health Labs., Inc., 3 F.3d 643, 649 (2d Cir. 1993) (citation omitted)), and therefore, this Court finds that the evidence was sufficient that Defendant threatened to use a weapon of mass destruction.

"True threat"

Defendant also argues that the mailing at issue was not a "true threat" under Second Circuit case law.  Defendant asserts that "a letter addressed to no specific person, containing baby powder, and a note with the words 'Antrax' and 'Bin Laden,' along with other nonsensical writings, cannot rationally be found to be a threat."  Defendant's Memorandum in Support of Motion for Judgment of Acquittal ("Defendant's Mem.") at 7-8.  In Kelner, the Second Circuit held that a "true threat" under 18 U.S.C. § 875 is one that, "on its face and in the circumstances in which

it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." 534 F.2d at 1027. See also United States v. Sovie, 122 F.3d 122, 125 (2d Cir. 1997); Malik, 16 F.3d at 51 (citing with approval a jury charge under 18 U.S.C. § 876 which followed the Kelner construction of "threat").

The question of whether a particular writing is a "true threat" is an issue of fact for the jury. Malik, 16 F.3d at 49 (citing United States v. Lincoln, 589 F.2d 379, 381-82 (8th Cir. 1979) (citation omitted)). See also United States v. Francis, 164 F.3d 120, 124 n.4 (2d Cir. 1999) (noting that whether a defendant's communication is a true threat rather than protected First Amendment speech is a threshold question of law, while the question of whether a reasonable person would interpret a communication as a true threat is a question of fact for the jury). The test in this Circuit is an objective one: "whether 'an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury.'" Malik, 16 F.3d at 49 (quoting United States v. Maisonet, 484 F.2d 1356, 1358 (4th Cir. 1973), cert. denied, 415 U.S. 933 (1974); Sovie, 122 F.3d at 125.

Moreover, the "absence of explicitly threatening language

32

does not preclude the finding of a threat." <u>Malik</u>, 16 F.3d at 49

(citing <u>United States v. Prochaska</u>, 222 F.2d 1 (7th Cir. 1955)).

A mailing cannot be separated from the circumstances in which it

is sent and received, and its effect upon the recipients.  <u>Id.</u> at

50.  While an ambiguous letter standing alone would not meet the

test of a "true threat," "'written words or phrases take their

character as threatening or harmless from the context in which

they are used, measured by the common experience of the society

in which they are published.'" <u>Id.</u> (quoting <u>Prochaska</u>, 222 F.2d

at 2).

Here, the jury heard testimony from administrative assistant

Ruthann Haug that she opened an envelope sent from the Cheshire

Correctional Institution around 3:00 p.m. on August 20, 2002,

addressed to the "STATE ATT. SUPERIOR COURT 1061 MAIN ST.

BRIDGEPORT CT. 06604."  Once she opened the envelope, she saw a

piece of paper with "foreign handwriting" on it.  She then became

"leery," and used a letter opener to take out a second, folded

piece of paper, with "ANTRAX A.K.A. Bin Laden" written upon it.

At that point she noticed a white powdery substance.  She

testified that as soon as she saw the powder she got up

immediately.  She told her two colleagues, Annette Stufan and

Michelle Martino, that they all should leave the office because

there was a powder-like substance in the envelope.  The three

women then left the office and notified Assistant State's
Attorney John Smirga of the situation. Haug testified that she
was "very concerned," about the incident and washed her hands.
She then went with Smirga into the office, showed him the
location of the envelope, and then left the office. She again
washed her hands. She then called home for a change of clothes.
She removed and bagged her clothes, and gave a statement to a
State Police Trooper. She also testified that in her statement
to the Trooper she said that the note read "Anthrax;" only later
did she learn that it actually said "Antrax." She also testified
that she was concerned when she saw people arriving in protective
gear. She left work at approximately 5:30 p.m. and went directly
home. Upon arrival at her home, she took a shower, washed the
clothes into which she had changed, and cleaned her car seats
with alcohol. Furthermore, she called her brother in the fire
department for advice. She testified that she was concerned for
her safety and that of others in the office. Worried that she
might have risked infecting someone else, Haug did not leave her
house until the test results on the powder showed it to be
negative for anthrax. Defendant argues that Haug was not
concerned until she saw officers in "HazMat" suits, and that she
did not think the letter was a true threat when she read it.
Defendant's Mem. at 8. Haug's own actions belie Defendant's

assertion.   Haug stood up immediately after seeing the powdery substance and notified her two colleagues that they should leave the room.   She washed her hands after leaving her office with her colleagues, and washed them again after returning to the office to show supervising attorney John Smirga where she had left the letter.   Furthermore, Smirga testified that when Haug showed him where the letter was, she seemed concerned.   These events occurred before the response from the Connecticut State Police Emergency Services Unit and the Federal Bureau of Investigation.

The jury heard Annette Stufan testify that it was her responsibility to collect the mail from the clerk's office.   She collected the department's mail that afternoon, brought it back to the office, and divided up the mail among her colleagues.   She heard Haug say, "There's powder in this letter."   Stufan testified that she was "concerned," and she left the office and went home.   She then immediately called her doctor and described the events regarding the letter.   The doctor gave her a prescription for Cipro, an antibiotic prescribed for anthrax exposure.   She went immediately to a pharmacy to fill the prescription, and began taking it right away.   Stufan took Cipro for two days.

Michelle Martino testified that Stufan returned with the mail from the clerk's office, and gave the general mail to Haug.

Martino testified that Haug opened a letter from an inmate and showed it to her. The envelope contained a piece of paper with foreign characters on it, a folded piece of paper that said "ANTRAX A.K.A. Bin Laden," and white powder. She testified that she saw the white powder, but did not recall whether it had an odor. She testified that she was concerned and alarmed, and very nervous and somewhat fearful. She had never seen mail with white powder in it before. She testified that she wanted to get away from the powder and tried not to breathe it in. She waited over an hour and then, once the supervising attorney told her the Hazmat team had arrived, they were told they could leave. She went home, changed out of her clothes and showered, and did not return to work for a few days.

Defendant argues that "the baby powder[,] which smelled like baby powder[,] added nothing to the contents of the envelope that would render it a threat." Defendant's Mem. at 8. Neither Smirga nor any one of the three administrative assistants present when the letter was opened testified that the powder smelled like talcum powder.[13]

Defendant asserts that pieces of paper containing only the words "ANTRAX" and "A.K.A. Bin Laden" are merely nonsensical,

---

[13] The facts have been summarized without aid of a trial transcript. The Court has found no testimony in the Court's trial notes from Mr. Smirga, Ms. Haug, Ms. Stufan or Ms. Martino indicating that they recalled a particular smell from the powder.

rather than threatening. Furthermore, Defendant asserts that "the subjective reaction of the reader, when coupled with these meaningless words cannot render a childish hoax an unequivocal threat to employ a weapon of mass destruction." Defendant's Mem. at 7, 11-12. However, "a mailing cannot be separated from the circumstances in which it is sent and received," and in the context of the anthrax scare following the events of September 11, 2001, such words, coupled with a white powdery substance in the envelope, could be interpreted by a reasonable recipient, familiar with the context of the letter, as a threat of injury. Malik, 16 F.3d at 49-50. In that context, the letter was an "unequivocal, unconditional, immediate and specific" threat, conveying a "gravity of purpose and imminent prospect of execution" against the recipient in the State's Attorney's Office in Bridgeport. Kelner, 534 F.2d at 1027; Malik, 16 F.3d at 51. In Zavrel, the Third Circuit upheld the conviction of the defendant under 18 U.S.C. § 876 where cornstarch, unidentified as such, and unaccompanied by any writing, was mailed to local officials. 384 F.3d 130. While cornstarch itself would not be understood as a threat by an ordinary, reasonable person, the Court held that envelopes containing unidentified white powder in October 2001 were "non-verbal messages of the sender's intent to

harm the recipients." <u>Id.</u> at 136.[14]  <u>See also</u> <u>United States v.</u>
<u>Lewis</u>, 220 F. Supp. 2d 548, 557-58 (S.D.W.V. 2002) (holding that
"in the context of the post-September 11 anthrax outbreaks, the
mailing of any powdery substance through the postal system is
clearly capable of being interpreted as a 'threatening'
communication under [18 U.S.C.] sections 876 and 871. . . . and a
reasonable recipient would interpret the mailed communication as
a threat of injury."). As the Second Circuit cautioned in <u>Malik</u>,
with regard to 18 U.S.C. § 876:

> [R]igid adherence to the literal meaning of a
> communication without regard to its reasonable
> connotations derived from its ambience would render the
> statute powerless against the ingenuity of threateners
> who can instill in the victim's mind as clear an
> apprehension of impending injury by an implied menace
> as by a literal threat.  Surely, an equivocal letter
> with equal chances of being interpreted innocuously or
> harmfully should not, in and of itself, convince a jury
> beyond a reasonable doubt that it is a threat. But once
> sufficient extrinsic evidence, capable of showing
> beyond a reasonable doubt that an ordinary and
> reasonable recipient familiar with the context of the
> letter would interpret it as a threat, has been
> adduced[,] the trial court should submit the case to
> the jury.

<u>Malik</u>, 16 F.3d at 50.

In <u>Malik</u>, the Second Circuit noted that the threats
defendant made in one letter, where he threatened, among other
things, to exact "physical personal revenge" against his

---

[14] "In sending a substance meant to resemble anthrax, in envelopes addressed
to various persons, Zavrel intended to convey a message – a message of fear,
fright and alarm."  <u>Zavrel</u>, 384 F.3d 130, 135.

adversaries in various lawsuits, and in another letter, where he referred to violence, saying "two-American Jewish rich person will become armed robbed of 20 thousand cash dollars in replace for my case," were arguably ambiguous.[15]  Id. at 49-50.  However, the Court found that additional evidence, namely the reactions of the recipients, "could and did remove ambiguity by shedding light upon the context[] of the alleged threats."  Id. at 50.  The testimony of the three women who worked in the front office of the Connecticut State's Attorney's Office was highly probative evidence that the mailing was considered a "true threat" in the context of the time.  Here, in light of the "common experience of the society [in which the threat was] published," namely that anthrax mailings had caused a number of deaths in the United States in the months after September 11, 2001, including a death in Connecticut, and that the United States government implicated Osama bin Laden in the September 11th attacks, the mailing sent by Davila less than a year later surely "instill[ed] . . . as

_____

[15] In the letter sent to Judge Thomas P. Griesa, United States District Judge for the Southern District of New York, Malik threatened that he would exact revenge against the defendants in his civil case, and "deal with each of these defendants family and them physically upon his soon prison discharge."  Malik, 16 F.3d at 48.  In the letter Malik sent to the United States Court of Appeals for the Second Circuit, requesting it be delivered to Judges George C. Pratt, J. Daniel Mahoney and John M. Walker, Jr., he threatened that " . . . upon my prison soon release two White American richly having jews money of 20 thousand dollars will become taken from them for you Jewish Judges action of unfairness in this Court My criminal rap sheet is no joke I'm known in prison for a store holdup . . . it'll play likewise with you judges from a Koranic and Torooh perspective that's an eye for an eye and a life for a life."  Id. at 48-49. Both Judge Griesa and Judge Mahoney, the recipients of the letters, regarded the letter they received as threatening.  Id.

clear an apprehension of impending injury by an implied menace"
as it would have if the words had been spelled correctly and were
explicitly threatening, such as: "Anthrax is in this envelope,
bin Laden." Id.

The Defendant further asserts that because the envelope was
postmarked from the Cheshire Correctional Institution, it would
have been clear to a recipient of such a letter that an inmate
"would not have the means to package Anthrax and safely transport
it out of the institution." Defendant's Mem. at 12. However,
the Second Circuit has ruled that "[i]t is not necessary for the
Government to prove that [the defendant] had a specific intent or
a present ability to carry out his threat, but only that he
intended to communicate a threat of injury through means
reasonably adapted to that purpose." Sovie, 122 F.3d at 125
(quoting Kelner, 534 F.2d at 1023). His mailing communicated a
threat regarding anthrax, and thus, whether Defendant actually
had access to anthrax is immaterial.

In viewing the evidence in the light most favorable to the
Government, and drawing all reasonable inferences in the
Government's favor, this Court cannot say that a jury would be
unreasonable to find beyond a reasonable doubt that the Defendant
threatened to use a weapon of mass destruction, and that the
mailing sent by Davila in August of 2002, less than a year after

the events of September 11, 2001 and the ensuing anthrax scare, and nine months after an Oxford, Connecticut woman who was exposed to anthrax through mail delivered to her house died from anthrax, was a true threat.  Defendant's Motion for Judgment of Acquittal on these grounds is DENIED.

B.   Sufficiency of the evidence that Defendant threatened to injure another under Count Two

In further support of his motion for judgment of acquittal, Defendant argues that the Government failed to put forth sufficient evidence that the Defendant threatened to injure another under 18 U.S.C. § 876.  Defendant's supporting memorandum relies upon the same reasons advanced in support of the motion with regard to "threatening to use" a weapon of mass destruction in Count One.   For the same reasons this Court finds the Government put forth sufficient evidence with respect to the threat issues in Count One above, the Court finds that the Government put forth sufficient evidence that Defendant "threatened to injure another," within the meaning of 18 U.S.C. § 876, by threatening to use a weapon of mass destruction.  <u>See</u> <u>supra</u>.  Defendant's Motion for Judgment of Acquittal on this ground is DENIED as to Count Two.

C.  Sufficiency of the evidence that Defendant's actions would have affected interstate commerce

Defendant also moves the Court to set aside the jury's verdict because the Government produced no evidence from which the jury could infer Davila's mailing from the Cheshire Correctional Institution to the Bridgeport State's Attorney's Office on August 20, 2002 would have had a direct effect on interstate commerce.

At the time of Davila's indictment and trial, Title 18, Section 2332a of the United States Code provided, in relevant part, that "a person who, without lawful authority, . . . threatens, . . . to use, a weapon of mass destruction . . . against any person within the United States, and the results of such . . . threat . . . would have affected interstate or foreign commerce" shall be guilty of a crime.  18 U.S.C. § 2332a(a)(2) (2002).

Defendant cites <u>United States v. Morrison</u> for the proposition that federal jurisdiction will not be invoked unless a direct effect on interstate commerce is demonstrated.  529 U.S. 598, 608 (2000).[16]  Defendant argues that the threat here, the

---

[16] In <u>Morrison</u>, the Supreme Court noted that:
"[E]ven [our] modern-era precedents which have expanded congressional power under the Commerce Clause confirm that this power is subject to outer limits. In <u>Jones & Laughlin Steel</u>, the Court warned that the scope of the interstate commerce power 'must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex

mailing sent to the Bridgeport State's Attorney's Office, did not travel in interstate commerce, but only traveled from one location in Connecticut to another.    Defendant further argues that the only evidence related to an effect on interstate commerce presented here was that the post office probably would have shut down after the discovery of anthrax.    Defendant's Mem. at 13-14, 16.    Defendant acknowledges that mail delivery "facilitates commerce," but he argues that "a delay in processing the correspondence generated in connection with commerce of some sort falls short of proving an affect [sic] on interstate commerce" because the post office is not engaged in commerce. Defendant's Mem. at 16.

In Morrison, the Supreme Court held that the federal civil remedy under 42 U.S.C. § 13981 for the victims of gender-motivated violence, the Violence Against Women Act ("VAWA"), was an unconstitutional exercise of Congress's powers under the Commerce Clause, Article I, section 8 of the Constitution.    529 U.S. 598.    The statute at issue in Morrison contained no

---

society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government.'" United States v. Morrison, 529 U.S. 598, 608 (2000) (quoting United States v. Lopez, 514 U.S. 549, 556-57 (1995) (citation omitted).    It does not necessarily follow from this passage that the Court held that only direct effects would merit federal jurisdiction.    Here, Defendant's actions would have impacted the delivery of commercial mail among the states, and would have led to an out-of-state response involving the national strategic stockpile of antibiotics. Such effects on interstate commerce are not "so indirect and remote" that national and local distinctions would be blurred.

jurisdictional element establishing that the federal cause of action was pursuant to Congress's power to regulate interstate commerce under the Commerce Clause. Id. at 613. Similarly, in United States v. Lopez, the Court found the Gun Free School Zones Act, 18 U.S.C. § 922(q), exceeded Congress's Commerce Clause authority. 514 U.S. 549 (1995). As in Morrison, the statute at issue in Lopez, § 922(q), lacked a jurisdictional element "which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." Id. at 561.

While there is no Second Circuit authority on whether 18 U.S.C. § 2332a requires a direct effect on interstate commerce, the Fifth Circuit held that section 2332a does not require an actual or substantial effect on interstate commerce. United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000), reh'g denied, 233 F.3d 576 (5th Cir. 2000), and cert. denied, 532 U.S. 959 (2001). In Wise, Defendants were convicted on two counts of threatening to use a weapon of mass destruction against persons within the United States, for sending emails from a location in Texas to a number of government agencies outside Texas, threatening, among other things, to use "bacteria and/or viruses for the purpose of killing, maiming, and causing great

suffering." Id. at 145-47.[17]  In rejecting Defendants' argument
that the district court erred in refusing to charge the jury that
section 2332a required a substantial effect on interstate
commerce, the Court stated:

> The statute on its face makes clear that, in the case
> of a threat, it applies where the results would have
> affected interstate or foreign commerce. . . . [Section
> 2332a(a)(2)] does not require, in the case of a threat,
> an actual or substantial effect on interstate commerce;
> it requires only a showing that the use [of a weapon of
> mass destruction] would have affected interstate
> commerce.

Id. at 152.  Defendant has not addressed Wise in his motions for
judgment of acquittal.

The only other case to date that has addressed the
interstate commerce element in section 2332a is United States v.
Slaughter, a district court case from Virginia.  116 F. Supp. 2d
688 (W.D.Va. 2000).  There, the district court granted the
defendant's Motion for Judgment of Acquittal because it found
insufficient evidence that Slaughter's threatened use of anthrax,
in letters sent from Virginia to a Virginia prosecutor and a
Kentucky television station, would have affected interstate
commerce.  Id.  The district court noted that "[t]he only
evidence offered to show that the threatened use of anthrax would

---

[17]  Defendants sent threats to the United States Department of Justice, the
DEA, the United States Treasury, the FBI, the United States Customs Service,
the IRS, and the Bureau of Alcohol, Tobacco, and Firearms (BATF).  United
States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000), reh'g denied, 233 F.3d 576
(5th Cir. 2000), and cert. denied, 532 U.S. 959 (2001).

have affected interstate commerce was that an unspecified number of military doctors and scientists would have responded" from Maryland, Id. at 692, while no evidence was presented showing the probable effect of such military personnel on interstate commerce.[18]  However, the Court held that 18 U.S.C. § 2332a only requires that "each act prosecuted would have at least a minimal effect on interstate commerce," because an effect on interstate commerce is included as an element of the offense.  Id. at 691. The district court in Slaughter cited Second Circuit law regarding the Hobbs Act for this proposition. ("Because the statute here includes such a jurisdictional element, the government need only show a minimal effect on interstate commerce." Id.  (citing United States v. Farrish, 122 F.3d 146, 148-49 (2d Cir. 1997)).

The Second Circuit has drawn a distinction between statutes with a jurisdictional element, such as the Hobbs Act, 18 U.S.C. 1951, and the felon-in-possession statute, 18 U.S.C. 922(g), and the statutes at issue in Morrison and Lopez.  In United States v.

_____

[18] In Wise, the Fifth Circuit found that since the emails were received by government agencies outside Texas, "the threat itself crossed state boundaries," and an effect on interstate commerce was therefore demonstrated. 221 F.3d at 152.  In United States v. Slaughter, the district court came to the opposite holding: "The fact that the letters were mailed, and that one of them traveled from Virginia to another state, is of no moment, since the statute requires that the results of the threat would have affected interstate commerce, and not that the threat merely be communicated through interstate commerce."  116 F. Supp. 2d 688, 692 (W.D.Va 2000).  As Davila's threat was not sent interstate, we do not address this issue.

46

Fabian, 312 F.3d 550 (2d Cir. 2002), the Second Circuit rejected the defendant's argument that Lopez and Morrison required the government to prove a "demonstrable economic nexus" with interstate commerce to support Hobbs Act jurisdiction.  Id. at 553-54.  The Court noted that since the Hobbs Act requires a particularized jurisdictional showing, and since the Supreme Court noted with approval that the sections of VAWA containing jurisdictional elements had been upheld in the Courts of Appeals, neither Morrison nor Lopez affects the Second Circuit requirement that "the Government need only show a minimal effect on interstate commerce to support Hobbs Act jurisdiction."  Id. at 554-55.  See also Farrish, 122 F.3d at 148-49 ("The statute at issue in Lopez represented a generalized attempt by Congress to regulate gun possession in the vicinity of schools, without regard to whether individual instances of gun possession were connected in some way to interstate commerce."  Id. at 148); United States v. Angelilli, 660 F.2d 23, 35 (2d Cir. 1981).

> "Our precedent requires the government make only a de minimus showing to establish the necessary nexus for Hobbs Act jurisdiction.  The jurisdictional requirement of the Hobbs Act may be satisfied by a showing of a very slight effect on interstate commerce.  Even a potential or subtle effect on commerce will suffice.  Thus, 'all that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect."

Fabian, 312 F.3d at 554 (quotations and citations omitted).

See also United States v. Silverio, 335 F.3d 183, 186 (2d Cir. 2003); United States v. Jamison, 299 F.3d 114, 118 (2d Cir. 2002). Not only is a slight, possible, potential, or subtle effect on interstate commerce enough to satisfy the jurisdictional element, but the Second Circuit has also held that "[t]he jurisdictional element of a Hobbs Act violation may be satisfied by evidence demonstrating an indirect effect on interstate commerce." United States v. Elias, 285 F.3d 183, 189 (2d Cir. 2002). See also United States v. Jones, 30 F.3d 276, 284-85 (2d Cir. 1994). The jurisdictional element in the Hobbs Act "limits its reach to a discrete set of robberies or acts of extortion that have an explicit connection with or effect on interstate commerce." Farrish, 122 F.3d at 149. The Hobbs Act applies to any person who "in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion." 18 U.S.C. § 1951(a). Arguably, because the Hobbs Act "speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence," Jamison, 299 F.3d at 118 (citation omitted), it would follow that, with such sweeping language, only a de minimus showing would be necessary. However, the standard for meeting the interstate commerce jurisdictional element under the felon-in-

48

possession statute, 18 U.S.C. § 922(g), is also de minimus in the Second Circuit, and there the language sweeps no more broadly than in 18 U.S.C. § 2332a.

Title 18, section 922(g), prohibits any person who has been convicted of a felony to possess a firearm "in or affecting commerce." 18 U.S.C. § 922(g).[19] In United States v. Santiago, the Second Circuit held that section 922(g) avoids the "constitutional deficiencies" in Lopez and Morrison because it has this jurisdictional element, providing a "legitimate nexus with interstate commerce." 238 F.3d 213, 214 (2d Cir. 2001). The Court held that 18 U.S.C. § 922(g) requires the showing of no more than a "minimal nexus" between interstate commerce and possession of a firearm by a convicted felon; a substantial nexus to interstate commerce need not be shown. Id. at 216.

Similarly here, the explicit jurisdictional element in 18 U.S.C. § 2332a allows for a "case-by-case inquiry." Lopez, 514 U.S. at 561. See also Slaughter, 116 F. Supp. 2d at 691. The jurisdictional element ensures that the statute only reaches a "discrete set of [threats to use a weapon of mass destruction] that additionally have an explicit connection with or effect on

---

[19]  18 U.S.C. § 922(g) provides, in pertinent part, that it is unlawful for any person who has been convicted of a felony to "ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g) (2000).

interstate commerce." Morrison, 529 U.S. at 611-12 (quoting Lopez, 514 U.S. at 562). Therefore, "a potential or subtle effect on commerce will suffice," Fabian, 312 F.3d at 554 (quotations and citations omitted), and the effect need not be direct or substantial. Elias, 285 F.3d at 189; Santiago, 238 F.3d at 216.

Here, the evidence at trial was sufficient for a reasonable jury to conclude that, had Defendant's letter actually contained anthrax, there would have been at least a minimal effect on interstate commerce. Ricardo Quental, the Lead Manager of Distribution Operations for the Wallingford, Connecticut Postal Processing Facility, testified that Defendant's letter had been processed at the Wallingford facility. Local mail and incoming mail from every state and country enters the Wallingford facility. On any particular day, thousands of pieces of mail are processed by the facility, including commercial mail originating in Connecticut heading to destinations around the world and commercial mail from around the world addressed to locations in Connecticut. Local mail commingles with incoming mail from around the world during certain points in the processing. Quental testified that Davila's mailing would have commingled with mail from around the world, and the absence of a bar code on Davila's mailing indicated that at some point during processing

50

the letter would have been processed manually.

Quental testified that had Davila's letter tested positive for anthrax, at least a significant portion of the Wallingford facility, if not the whole facility, would likely have been shut down. This 1) would have caused a delay in the processing of interstate mail already in the system, and 2) would have caused the Post Office to divert commercial mail to other processing facilities outside the State of Connecticut. Quental based this conclusion on an actual anthrax incident in the fall of 2001, where the Wallingford facility only ran at 40% capacity after it was determined that anthrax-contaminated mail that caused the death of a Connecticut woman had been processed in the Wallingford facility.[20]

Furthermore, FBI Special Agent Brian Donnelly testified that, had Davila's mailing tested positive for anthrax, antibiotics from the national strategic stockpile of antibiotics, in three locations outside of Connecticut, maintained through purchases from various private pharmaceutical companies throughout the United States, would have been shipped interstate on trucks for distribution in Connecticut. Indeed, these effects

---

[20] Quental testified that after the death of a Connecticut woman in the fall of 2001 was attributed to contaminated mail processed at the Wallingford facility, the facility was screened and tested. Anthrax spores were detected, and the entire facility was decontaminated. Sixty percent of the facility was shut down for a number of weeks, and for at least three weeks some of the mail, including commercial mail, was diverted to processing facilities outside Connecticut.

more than meet the de minimus effect on interstate commerce required for jurisdiction under 18 U.S.C. § 2332a.  The evidence presented here was more extensive than that found insufficient under the de minimus standard in <u>Slaughter</u>.  "[T]he government does not have to prove that identifiable transactions in interstate commerce would be affected, but that there is a probability or likelihood of such an effect." <u>Slaughter</u>, 116 F. Supp 2d at 693.  Here, testimony from Quental and Donnelly as to the probable effect on interstate commerce, based largely on actual experience from an anthrax contamination at the same postal facility, was enough to meet the de minimus standard. "[A]ll that need be shown is the possibility or potential of an effect on interstate commerce, not an actual effect." <u>Fabian</u>, 312 F.3d at 554 (quotations and citations omitted).

In viewing the evidence in the light most favorable to the Government, and drawing all reasonable inferences in the Government's favor, this Court cannot say that the evidence was insufficient for a reasonable jury to find beyond a reasonable doubt that the mailing sent by Davila from the Cheshire Correctional Institution to the Bridgeport State's Attorney's Office on August 20, 2002 would have had a direct effect on interstate commerce had the mailing tested positive for anthrax. Defendant's Motion for Judgment of Acquittal on this ground is

DENIED.

D.  Sufficiency of the evidence regarding the letter's actual effect on interstate commerce

In support of his Supplemental Motion for Judgment of Acquittal, Defendant argues that, because the Government specifically alleged in the Indictment that Davila's threatened use of a weapon of mass destruction "affected interstate commerce and . . . would have affected interstate commerce," it raised its bar of proof beyond that required by the statute, and was therefore required to prove the threatened use of a weapon of mass destruction actually affected interstate commerce. Defendant's Supplemental Memorandum in Support of Motion for Judgment of Acquittal ("Defendant's Supp. Mem.") at 3-5. Defendant further argues that a variance between the Indictment and the Court's instruction to the jury on the element of affecting interstate commerce was prejudicial to his interests, because the Government charged "affected" as well as "would have affected," interstate commerce, but the proof at trial and the Court's instructions to the jury only considered whether Defendant's actions "would have affected" interstate commerce, thereby confusing the jury, and causing the jury to ignore the language of the Indictment.  Defendant's Supp. Mem. at 8 - 9.

At the time of Davila's indictment and trial, Title 18,

Section 2332a of the United States Code provided, in relevant part, that "a person who, without lawful authority, . . . threatens, . . . to use, a weapon of mass destruction . . . against any person within the United States, and the results of such . . . threat . . . would have affected interstate or foreign commerce," shall be guilty of a crime.  18 U.S.C. § 2332a(a)(2) (2002).  Where a threat to use a weapon of mass destruction has been made, section 2332a requires only that the results of the threat would have affected interstate commerce.  The plain language of the statute does not require that the Government prove that the results of the threat actually affected interstate commerce.

An indictment is constructively amended where its terms "are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'"  United States v. Rioux, 97 F.3d 648, 661 (2d Cir. 1996) (quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir. 1988) (citation omitted)).  Provided that a defendant was given notice of the "core of criminality" to be proven at trial, the Second Circuit has "consistently permitted significant flexibility in proof."  United States v. Jesperson, 65 F.3d 993,

1001 (2d Cir. 1995) (citations omitted).  As the Second Circuit
has stated, "while it is the Government's burden to prove the
essential elements of a charged crime, allegations in an
indictment that go beyond the essential elements which are
required for conviction do not increase the Government's burden
[of proof]."  Id. (quoting United States v. Rosenthal, 9 F.3d
1016, 1021 (2d Cir. 1993)).

Furthermore, narrowing the scope of an indictment does not
constructively amend it: "as long as the crime and the elements
of the offense that sustain the conviction are fully and clearly
set out in the indictment, the right to a grand jury is not
normally violated by the fact that the indictment alleges more
crimes or other means of committing the same crime" than that
proved at trial.  United States v. Wallace, 59 F.3d 333, 337 (2d
Cir. 1995) (quoting United States v. Miller, 471 U.S. 130, 136
(1985)).  Cf. Jesperson, 65 F.3d at 1002.  As the Defendant
agrees, the Government may narrow the scope of the indictment by
charging in the conjunctive and proving a particular crime in the
disjunctive, by putting forth evidence that the defendant
committed the crime in merely one of the ways alleged.  United
States v. Coriaty, 300 F.3d 244, 250 (2d Cir. 2002).  "The
general rule is that when a jury returns a guilty verdict on an
indictment charging several acts in the conjunctive, . . . the

55

verdict stands if the evidence is sufficient with respect to any one of the acts charged." Id. (quoting Turner v. United States, 396 U.S. 398, 420 (1970)). See also Rioux, 97 F.3d at 661. Defendant argues that the Government did not charge in the conjunctive because alleging that the "threat affected interstate commerce" is neither an essential element of the crime nor a statutory alternative means of threatening to use a weapon of mass destruction. Defendant's Supp. Mem. at 4. However "[a] part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a useless averment that may be ignored." Coriaty, 300 F.3d at 250 (citing Miller, 471 U.S. at 136).

Alternatively, a variance occurs where the terms of the indictment are unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment. United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994); Wallace, 59 F.3d at 338.

Defendant's only support for his assertion that the Government "raised the bar of proof" by alleging that the threat "affected interstate commerce" and "would have affected interstate commerce," comes from outside the Second Circuit.[21]

---

[21] Defendant cites United States v. Zanghi, 189 F.3d 71, 79 (1st Cir. 1999) to support this proposition, as well as United States v. Tapio, 634 F.2d 1092, 1094 (8th Cir. 1980); United States v. Marolda, 615 F.2d 867, 870-72 (9th Cir. 1980); and United States v. Behenna, 552 F.2d 573 (4th Cir. 1977).

Defendant completely overlooks the Second Circuit holdings in
Wallace, Jesperson, and Rosenthal, and his reliance on United
States v. Zanghi, 189 F.3d 71, 79 (1st Cir. 1999), is misplaced.

In Zanghi, the defendant had been indicted for having "the
intent to engage in conduct constituting tax evasion."  The trial
court's instruction to the jury, that the defendant's sole intent
was tax evasion, required the jury to find a higher *mens rea* than
that charged in the indictment.  Id. at 78-79.  The court held
that where an instruction adds an element to the government's
burden of proof beyond those required by statute, and no timely
objection is made, that instruction becomes the law of the case.
Id. at 79.  This is inapposite to the situation here, where both
the Court's instruction to the jury and the proof at trial
permissibly narrowed the allegations in the Indictment.

In Jesperson, the Second Circuit dismissed the defendant's
argument that the trial judge erred in charging the jury that
they could convict him if they found he submitted a false
document, where the indictment charged him with creating and
producing a false document in response to a subpoena.  65 F.3d at
1001.  Because the court found that a conviction for obstruction
of justice under 18 U.S.C. § 1503 only required an act be done
corruptly with the intent to obstruct justice, it held that
nothing in the statute required the government to prove that a

false document produced to a grand jury was created in response to the subpoena. Id. The Court distinguished the situation in Jesperson, where the proof at trial permissibly narrowed the basis of the indictment, from cases where an indictment is constructively amended, broadening the basis of the indictment and violating the grand jury clause of the Fifth Amendment. Id.

Similarly, in Rosenthal, the Second Circuit rejected the defendant's claim that there was an impermissible amendment of the indictment and a failure of proof that the losses through certain tax trades were "false and fraudulent" where the trial judge omitted the words "false and fraudulent," charged in the indictment, when instructing the jury. There, defendant was charged, among other things, with offering a gratuity in connection with a pension plan investment. The defendant was apprised of the "core of criminality" – that he gave a "thing of value" with intent to influence a fiduciary of the pension plan. Id. at 1022-23. The indictment alleged more than was necessary to charge defendant under 18 U.S.C. 1954, and, as here, regarding Mr. Davila, "the offense proved was fully contained in the indictment." Id. at 1022 (quoting Miller, 471 U.S. at 137). See also Wallace, 59 F.3d at 337-38 (noting the Supreme Court's affirmance of the narrowing of an indictment in Miller, 471 U.S. at 134, where "the facts proved at trial clearly conformed to one

of the theories of the offense contained within that indictment."). Similarly here, the charges in the indictment went beyond the statutory requirement that the results of the threat "would have affected interstate commerce." Allegations in an indictment that go beyond the statutory requirement do not increase the Government's burden of proof. "The words did not, by their averment, become an essential element of the offense required to be proved at trial." Rosenthal, 9 F.3d at 1023.

Defendant further argues that a variance between the Indictment and the Court's instruction to the jury on the issue of affecting interstate commerce was prejudicial to his interests. He cites United States v. Marolda, 615 F.2d 867, 870-72 (9th Cir. 1980) and United States v. Behenna, 552 F.2d 573 (4th Cir. 1977) for support. Behenna and Marolda, both cases where the court found prejudicial error, are distinguishable from the present case. In Behenna, the indictment specifically charged the defendant with "willfully and knowingly" making a false written statement regarding his state of residence while filling out forms related to a purchase of three handguns. 552 F.2d at 574-75. The statute only required proof that the defendant knowingly made a false statement, but because the indictment charged a higher *mens rea*, the Fourth Circuit panel concluded that it was prejudicial error for the trial judge to

59

refuse to give the defendant's requested jury instruction regarding his primary defense to the charge, that his honest, reasonable belief that he was a South Carolina resident enabled him to make the handgun purchases lawfully. Id. at 576.

In Marolda, the indictment charged the defendant with embezzlement from a labor union. He was specifically charged with acting without proper authorization and without benefit to the union, and prepared the bulk of his defense on the issue of authorization. 615 F.2d at 870-71. Under the trial court's jury instruction, however, Marolda could have been convicted if he acted with the specific intent to defraud the union and had no good faith belief that his use of the funds benefited the union. The court treated the indictment language regarding authorization as mere surplusage, and the Ninth Circuit found that this severely prejudiced the Defendant. Id. at 871.

Neither the prejudical variance in Marolda nor the severe prejudice to the defendant in Behanna are similar to the facts here. Even if there had been a variance here, it is well established that a variance is "immaterial – and hence not prejudicial – 'where the indictment and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected

60

against another prosecution for the same offense.'" <u>United States v. Mucciante</u>, 21 F.3d 1228, 1236 (2d Cir. 1994) (citation and quotations omitted). The proof at trial corresponded to the crime charged in the Indictment, so neither a variance nor any prejudice could have arisen. The Indictment charged that Davila threatened the use of a weapon of mass destruction, and Defendant was on notice that one element of that crime was that the threat, if realized, would have affected interstate commerce. In <u>Wallace</u>, the defendant was charged with conspiracy to deposit stolen checks and to receive the proceeds from those checks. The Government's evidence at trial only proved that the defendant conspired to receive the proceeds of the checks. The Court found however, that the narrowing of the indictment by the evidence and the jury charge was permissible because "facts proved at trial clearly conformed to one of the theories of the offense contained within that indictment." 59 F.3d at 337-38 (quoting <u>Miller</u>, 471 U.S. at 136. Here, similarly, rather than proving a different crime, the proof at trial permissibly narrowed the basis for conviction through pleading in the conjunctive.

This Court thus did not err in declining to charge the jury regarding an "actual effect" on interstate commerce. "The rule that a jury's guilty verdict on a conjunctively worded indictment stands if the evidence is sufficient with respect to any of the

acts charged, obviously extends to a trial court's jury instructions in the disjunctive in the context of a conjunctively worded indictment." <u>Coriaty</u>, 300 F.3d at 250 (quoting <u>Rioux</u>, 97 F.3d at 661). Thus, this Court was not required to charge the jury that the Government had to prove that the results of the threat "affected" interstate commerce because the evidence at trial was sufficient to prove the results of the threat "would have affected" interstate commerce.

Defendant's Supplemental Motion for Judgment of Acquittal on this ground is DENIED.

CONCLUSION

Because Defendant Davila has failed to show that the evidence is insufficient to sustain a conviction and that no rational trier of fact could have found the Defendant guilty beyond a reasonable doubt, Defendant's Motion for Judgment of Acquittal [Doc. No. 73] and Supplemental Motion for Judgment of Acquittal [Doc. No. 89] are DENIED.

SO ORDERED.

_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut, this ___ day of March, 2005.