UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:02CR258 (EBB) |
| | : | |
| v. | : | |
| | : | |
| NOEL DAVILA, aka "Monk" | : | MAY 9, 2005 |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND OPPOSITION TO DEFENDANT'S MOTION FOR DOWNWARD DEPARTURES

On June 28, 2004, following a week-long trial, a jury found the defendant, Noel Davila ("Davila"), guilty beyond a reasonable doubt on both counts of a two count indictment, charging him with threatening the use of a weapon of mass destruction in violation of 18 U.S.C. §2332a and delivery of a threat through the U.S. mail in violation of 18 U.S.C. §876, for his sending a threatening, vindictive and quite purposeful letter containing a white powdery substance that was represented to be anthrax to the Connecticut State's Attorney's Office in the Fairfield County Courthouse in Bridgeport – the office that previously prosecuted Davila for several serious and violent crimes for which he was then, and is now, serving time.

In light of Davila's serious and violent criminal past, the Pre-Sentece Report ("PSR") has correctly – and appropriately – determined that Davila is a Career Offender pursuant to U.S.S.G. §4B1.1.  In light of his status as a violent Career Offender, the PSR has therefore assigned Davila a base offense level of 37 and a Criminal History Category VI, resulting in an applicable, albeit advisory, Guidelines range of 360 months to life in prison.

In his objections to the PSR, his sentencing memoranda and his motion for various downward departures, the defendant advocates for a non-Guidelines sentence and urges the Court to depart from the advisory Guidelines range on a variety of grounds.  In those filings, however, the defendant in many ways ignores the gravity and scope of the violent and continuous criminal

history that the defendant has exhibited for more than a dozen years – and which he has continued to exhibit even during efforts to rehabilitate him.

As set forth in the PSR and discussed in greater detail below, among other things, Davila has been convicted of (1) an aggravated, first degree rape of a fifteen year old girl; (2) threatening and reckless endangerment for lunging at his own wife and his children with a knife; and (3) five counts of risk of injury to a minor for his having fired nine shots into a house in Bridgeport in which a man, a woman and five children between the ages of three and nine were present, having dinner. In that case, the Connecticut Superior Court judge – presumably recognizing the violent and recidivist felon appearing for sentencing before the Court – saw fit to run each of Davila's convictions consecutively, for a sentence in excess of fifteen (15) years.

Following that case, Davila – undeterred and apparently vindictive – filed a meritless grievance and a baseless federal lawsuit against the state prosecutor who handled his prior cases. The evidence at trial established that, after both of those matters were dismissed as meritless, Davila remained "pissed" at his former state prosecutor and sent through the mail a threatening, vengeful and quite purposeful letter containing foreign writing, references to Osama bin Laden, and a white powdery substance that was represented to be anthrax. The evidence at trial suggested that the mailing was likewise targeted at the former state prosecutor who handled Davila's prior cases and established that it was sent to the Connecticut State's Attorney's Office in Bridgeport – the office that had previously prosecuted Davila in 1992, 2000 and 2001.

In repeated places, the PSR notes that Davila has squandered prior opportunities to re-acclimate to society; that all efforts to rehabilitate Davila have proven unsuccessful; and that Davila has continued to commit crimes and demonstrate anti-social behavior while incarcerated.

-2-

For example, the PSR poignantly notes that "Davila, while serving several terms of probation in the community, was revoked *on all occasions.*"  PSR ¶94 (emphasis added).  Moreover – in addition to committing his instant crimes of vengeance while incarcerated – Davila has received numerous incident reports, and has been charged with and disciplined for several violations while in custody.  PSR ¶42.

In similarly poignant comments by the mental health professionals who conducted Davila's competency evaluation prior to trial, the defendant was described as "a person who is dissatisfied with life, self-centered, and demanding of others."  The evaluators further noted that Davila "possesses a rebellious and impulsive attitude, has little frustration tolerance, commits anti-social acts, and displays poor judgment.  Individuals with his scores have a narcissistic personality, and are often hostile.  They feel they have been mistreated by others, and blame others for their difficulties."  PSR ¶67.

In light of Davila's pervasive and violent criminal past, as well as his demonstrated and continuous recidivist tendencies, the Government strongly considered filing an information pursuant to 18 U.S.C. §3559(c)(4), to treat Noel Davila ("Davila") as a so-called "three strikes" candidate under 18 U.S.C. §3559(c), making him subject to mandatory life imprisonment.  The Government ultimately decided to forgo such a filing, however, and leave the appropriate sentence to the discretion of this Court.

The Government nevertheless strongly believes that Davila is precisely the type of individual for whom the Career Offender provisions were intended, and that a sentence within the advisory Guidelines range is therefore appropriate.  Among other things, the PSR refers to Davila's record as including "violent" and "barbaric" acts.  PSR ¶93.  The PSR also states that

Davila "has no regard for authority and human life."  Id.  The PSR further notes that "*all attempts to rehabilitate this individual and protect the community [have] proved unsuccessful*,"  PSR ¶ 94 (emphasis added), and describes Davila as "a very dangerous individual who poses a threat to society."  PSR ¶ 93.

For these reasons and the reasons set forth below, the government urges the Court to sentence the defendant within the applicable, albeit advisory Guidelines range and – because Davila's current crimes were perpetrated from jail – to run such sentence consecutively to the time he is already serving, as advised by U.S.S.G. § 5G1.3.

## I.    THE COURT SHOULD IMPOSE A GUIDELINES SENTENCE.

On January 11, 2005, the United States Supreme Court issued its decision in United States v. Booker, 543 U.S. ___, 125 S. Ct. 738, 160 L. Ed. 2d 261 (2005), in which it held that the United States Sentencing Guidelines are no longer mandatory and binding on sentencing courts.  Although the Guidelines in all cases are now advisory and sentences are reviewed for reasonableness, the Guidelines nevertheless continue to be a significant and relevant factor that the sentencing court must consult, along with all of the other factors set forth at 18 U.S.C. §3553(a).  See  United States v. Booker, 543 U.S. ___, 125 S. Ct. 738, 160 L. Ed. 2d 261 (2005); see also United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005) ("the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded.  On the contrary, sentencing judges remain under a duty with respect to the Guidelines – not the previously imposed duty to apply the Guidelines, but the continuing duty to 'consider' them, along with the other factors listed in section 3553(a).").  The Second Circuit has expressly cautioned that "[a] judge cannot satisfy this duty by a general reference to the entirety of the

Guidelines Manual, followed by a decision to impose a 'non-Guidelines sentence.'" <u>Id</u>. at 111;

<u>see</u> <u>also</u> <u>Id</u>. at 113 ("the sentencing judge must consider the Guidelines and all of the other factors

listed in section 3553(a).").

The Court is no doubt aware of the sentencing considerations articulated in <u>Booker</u> and

<u>Crosby</u> and, accordingly, the Government will not set forth an extensive recitation here.  The

Government notes, however, that although the principles discussed in <u>Booker</u> and <u>Crosby</u>

"change the Guidelines from being mandatory to being advisory," <u>Crosby</u>, 397 F.3d at 113, the

Second Circuit has expressly admonished district courts to bear in mind:

> that <u>Booker/Fanfan</u> and Section 3553(a) do more than render the Guidelines a body
> of casual advice, to be consulted or overlooked at the whim of a sentencing judge.
> Thus, it would be a mistake to think that after <u>Booker/Fanfan</u>, district judges may
> return to the sentencing regime that existed before 1987 and exercise unfettered
> discretion to select any sentence within the applicable statutory maximum and
> minimum.  On the contrary, the Supreme Court expects judges faithfully to discharge
> their statutory obligation to "consider" the Guidelines and all of the other factors
> listed in Section 3553(a).

<u>Crosby</u>, 397 F.3d at 113-14; <u>see</u> <u>also</u> <u>United Statesw v. Godding</u>, — F.3d — , 2005 WL 894786

(2d Cir. 2005) (implicitly questioning the reasonableness of a non-Guidelines sentence imposed

by the district court).

## II.  DAVILA QUALIFIES AS A CAREER OFFENDER.

There is no question that Davila qualifies as a career offender.  Under U.S.S.G. §4B1.1, a

defendant is a career offender if he is at least eighteen years old at the time of the instant offense,

the instant offense is a crime of violence or a drug offense, and the defendant has at least two

prior felony convictions for either crimes of violence or drug offenses.

First, Davila's date of birth is December 30, 1970 and he is currently 34 years old. Davila was well over 18 years old at the time he committed the instant offenses, and was similarly well over 18 at the time of the two predicate offenses on which the government relies – his March 26, 1993 conviction for Aggravated Sexual Assault in the First Degree; and any one of his five convictions for Risk of Injury to a Minor on March 2, 2001.

In addition, both the instant offenses and the two predicate felony convictions on which the government relies count as "crimes of violence" under the career offender provisions. U.S.S.G. §4B1.2(a) defines the term "crime of violence" as

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that –
>
> (1)    has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2)    is burglary of a dwelling, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

See U.S.S.G. §4B1.2(a). Application note (1) goes on to explain that a

> "[c]rime of violence" includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling. Other offenses are included as "crimes of violence" if (A) that offense has as an element the use, attempted use, or threatened use of physical force against the person of another, or (B) the conduct set forth (i.e., expressly charged) in the count of which the defendant was convicted involved the use of explosives (including any explosive material or destructive device) or, by its nature, presented a serious potential risk of physical injury to another."

First, Davila's March 26, 1993 conviction for Aggravated Sexual Assault in the First Degree, in violation of Conn. Gen. Stat. §53a-70a, qualifies as a "crime of violence." The offense is punishable by imprisonment for a term exceeding one year – indeed, Davila received a

sentence of ten (10) years in jail, with five (5) years to serve and five (5) years probation.  In addition, the crime "has as an element the use, attempted use, or threatened use of physical force against the person of another," or "otherwise involves conduct that presents a serious potential risk of physical injury to another."  Connecticut General Statutes §53a-70a provides:

(a) A person is guilty of aggravated sexual assault in the first degree when such person commits sexual assault in the first degree as provided in section 53a-70,[1] and

_____

[1]Connecticut General Statutes §53-70 provides:

(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person, or (3) commits sexual assault in the second degree as provided in section 53a-71 and in the commission of such offense is aided by two or more other persons actually present, or (4) engages in sexual intercourse with another person and such other person is mentally incapacitated to the extent that such other person is unable to consent to such sexual intercourse.

(b) (1) Except as provided in subdivision (2) of this subsection, sexual assault in the first degree is a class B felony for which two years of the sentence imposed may not be suspended or reduced by the court or, if the victim of the offense is under ten years of age, for which ten years of the sentence imposed may not be suspended or reduced by the court.

(2) Sexual assault in the first degree is a class A felony if the offense is a violation of subdivision (1) of subsection (a) of this section and the victim of the offense is under sixteen years of age or the offense is a violation of subdivision (2) of subsection (a) of this section. Any person found guilty under said subdivision (1) or (2) shall be sentenced to a term of imprisonment of which ten years of the sentence imposed may not be suspended or reduced by the court if the victim is under ten years of age or of which five years of the sentence imposed may not be suspended or reduced by the court if the victim is under sixteen years of age.

(3) Any person found guilty under this section shall be sentenced to a term of

in the commission of such offense (1) such person uses or is armed with and threatens the use of or displays or represents by such person's words or conduct that such person possesses a deadly weapon, (2) with intent to disfigure the victim seriously and permanently, or to destroy, amputate or disable permanently a member or organ of the victim's body, such person causes such injury to such victim, (3) under circumstances evincing an extreme indifference to human life such person recklessly engages in conduct which creates a risk of death to the victim, and thereby causes serious physical injury to such victim, or (4) such person is aided by two or more other persons actually present . . . .

Perhaps more importantly, "aggravated assault" and "forcible sex offenses" are *expressly* included as "crimes of violence" by Application Note (1) to U.S.S.G. §4B1.2(a).  Accordingly, there is no question that Davila's 1993 aggravated rape conviction qualifies as a crime of violence.  <u>See</u> <u>also</u> Defendant's Memorandum in Support of Objections to Presentence Report dated October 15, 2004 at 21 (crime of Aggravated Sexual Assault in the First Degree "is most certainly a crime of violence because it involves the use and/or threatened use of force against another person.").

Second, any one of Davila's five convictions for Risk of Injury to a Minor on March 2, 2001 qualifies as a second predicate "crime of violence" for Career Offender status.  The offense of Risk of Injury to a Minor in violation of Conn. Gen. Stat. §53-21(1) is punishable by imprisonment for a term exceeding one year, <u>see</u> Conn. Gen. Stat. §§ 53-21(1) and 53a-35a(6) (convictions under Conn. Gen. Stat. §53-21(1) classified as a Class C felony, punishable by a term of "not less than one year nor more than ten years."), and Davila actually received a sentence of two (2) years in jail on each of those counts, to run consecutively.

---

imprisonment and a period of special parole pursuant to subsection (b) of section 53a-28 which together constitute a sentence of at least ten years.

Moreover, the crime of Risk of Injury to a Minor in violation of Conn. Gen. Stat. §53-21(1) "has as an element the use, attempted use, or threatened use of physical force against the person of another," or "otherwise involves conduct that presents a serious potential risk of physical injury to another." Conn. Gen. Stat. §53-21(1) provides:

> (a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . . shall be guilty of a class C felony for a violation of subdivision (1) . . . of this subsection.

The parties have also confirmed that Davila was, in fact, charged with, and convicted of, this subsection of Conn. Gen. Stat. §53-21 in the Amended Prosecutor's Information filed immediately before the defendant's 2001 trial on those, and other, charges. Specifically, each count of Risk of Injury to a Minor tracked the appropriate statutory language and charged Davila with causing and permitting children under the age of sixteen "to be placed in a situation that the life and limb of such child was endangered and the health of such child was likely to be injured, in violation of §53-21(1) of the Connecticut General Statutes." See Amended Substitute Information, attached as Exhibit A to Defendant's Supplemental Sentencing Memorandum dated May 5, 2005. Accordingly there is no question – and appears to be no dispute – that any one of Davila's five convictions for Risk of Injury to a Minor in violation of Conn. Gen. Stat. §53-21(1), qualify as the second predicate crime of violence for career offender status. See Defendant's Supplemental Sentencing Memorandum dated May 5, 2005 at 4, n.1; see also Santa Paola v. Ashcroft, 249 F. Supp. 2d 181, 194 (D. Conn. 2003) (conviction under subsection (1) of Conn. Gen. Stat. §53-21 is a crime of violence).

Finally, both of the instant crimes for which Davila has been convicted – threatening the use of a weapon of mass destruction in violation of 18 U.S.C. §2332a and delivery of a threat through the U.S. mail in violation of 18 U.S.C. §876 – qualify as "crimes of violence." Both are offenses under federal law, punishable by imprisonment for a term exceeding one year – the statutory maximum for threatening the use of a weapon of mass destruction in violation of 18 U.S.C. §2332a is life, and the statutory maximum for delivery of a threat through the U.S. mail in violation of 18 U.S.C. §876(c) is five years.

Just last week, the United States Court of Appeals for the Fifth Circuit rendered its decision in United States v. Guevara, — F.3d — , 2005 WL 1009772 (5th Cir. May 2, 2005), in which it squarely held, among other things, that threatening to use a weapon of mass destruction in violation of 18 U.S.C. §2332a is a "crime of violence" under the Career Offender provisions of the Sentencing Guidelines, and the Court upheld a sentence of *life* imprisonment.

In Guevara, a case bearing striking similarities to the circumstances here, the defendant committed what was referred to as an "anthrax hoax." Id. at *1. In August 2002, Guevara wrote and mailed a letter to United States District Judge Mary Lou Robinson. A court employee retrieved the letter and, recognizing that it was from an inmate, opened the envelope, which contained a white, powdery substance that got onto the employee's fingers. The letter stated:

> Mary Lou Robinson,
>
> I am sick and tired of your games[.] All [A]mericans will die as well as you. You have been now been [sic] exposure [sic] to anthrax.
>
> Mohammed Abdullah.

Id. The substance in the envelope turned out to be harmless hair gel and powdered cleanser. Id.

The incident effectively closed the federal building for a period of time.  Local law enforcement officials with hazardous materials training, bomb squad personnel, and the FBI responded.  The building's air conditioning had to be turned off.  Judge Robinson (the target of the letter) shut down her courtroom. The federal building also housed numerous federal agencies that were required to close for the rest of the day.  Id.

The government charged Guevara with (1) threatening to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a; and (2) mailing a threatening communication in violation of 18 U.S.C. § 876.  Guevara moved for judgment of acquittal at the close of the government's case and at the close of all of the evidence. His motions were denied, and the jury convicted him on both counts.  Id.

Guevara's PSR classified him as a career offender under the Guidelines because he was over eighteen years of age at the time of the crime, he had at least two convictions for crimes of violence, and the probation officer characterized the § 2332a conviction as a crime of violence. Guevara objected to the career offender classification, arguing that the WMD conviction was not a crime of violence.  The district court overruled his objection and, based on his classification as a career offender, imposed a sentence of *life imprisonment.*  Id.

On appeal, Guevara argued that his WMD conviction was improperly classified as a "crime of violence" under U.S.S.G. §4B1.1.  The Fifth Circuit, however, rejected this claim, holding that "Guevara's conviction qualifies as a 'crime of violence' under §4B1.2(a)(1)."  Id. at *4.  The Court explained:

> The guidelines define a "crime of violence" as any offense under federal or state law that is punishable by imprisonment for more than one year that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is the burglary of a dwelling, arson, or extortion, involves the use of explosives or otherwise involves conduct that presents a serious potential risk of

physical injury to another.  U.S.S.G. § 4B1.2(a). . . . .

> Section 2332a contains, as an element, the threatened use of a weapon of mass destruction. The jury was instructed, in relevant part, that to convict, it must find that "[Guevara], without lawful authority, knowingly and intentionally threatened to use a weapon of mass destruction" and that "the nature of the threat was to use the weapon against a third person within the United States." In other words, the jury instructions state[d] precisely the requirements of the statute.

> Given that we uphold the "threat" status of Guevara's anthrax hoax under <u>Reynolds</u>, the only determination we need make is whether, under the guidelines, WMD's are instruments of physical force within the meaning of § 4B1.2(a)(1); we have little problem concluding that they are. We need not look to the indictment, the facts, or anything other than the statute to determine whether § 2332a contains an element that qualifies Guevara's crime as a crime of violence under the guidelines.

<u>Id</u>.  The Court therefore upheld Guevara's sentence, under the career offender provisions, of life in prison.

Applying these principles here, Davila's conviction for threatening the use of a weapon of mass destruction in violation of 18 U.S.C. §2332a likewise counts as a "crime of violence" pursuant to U.S.S.G. §4B1.1(a)(1).  As noted by the Court of Appeals in <u>Guevara</u>, Section 2332a contains, as an element, the threatened use of a weapon of mass destruction.  Moreover, the jury was instructed here that, to convict it had to find that Davila without lawful authority, knowingly and intentionally threatened to use a weapon of mass destruction and that the nature of the threat was to use such weapon against any person within the United States.  <u>See</u> Court's Jury Instructions at 31-37.  Given that this Court has likewise upheld the threat status of Davila's mailing, and given that the only court to have addressed the issue had "little problem" concluding that weapons of mass destruction are instruments of physical force within the meaning of § 4B1.2(a)(1), it is apparent that Davila's conviction for threatening the use of a weapon of mass destruction in violation of 18 U.S.C. §2332a counts as a "crime of violence" pursuant to U.S.S.G. §4B1.1(a)(1).  <u>See Guevara</u>, 2005 WL 1009772 at *4-5 (5th Cir. May 2, 2005).

Similarly, several courts have held that mailing a threatening communication in violation of 18 U.S.C. §876 is also a crime of violence because it likewise "has as an element the use, attempted use, or threatened use of physical force against the person of another."  In those cases, the courts have held that the element regarding the making of the threat, in and of itself, satisfies this definition.  See, e.g., United States v. Price, 155 F.3d, 563, 1998 WL 390572 at **8-9  (4th Cir. 1998):

> Price also asserts that the instant offense is not a felony crime of violence. The statute under which the prosecution was brought, however, (18 U.S.C. § 876) reads as follows:
>
> Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and *containing any threat to injure the person of the addressee or of another*, shall be fined under this title or imprisoned not more than five years, or both. (Emphasis added).
>
> The facts and circumstances of this case unequivocally prove that this letter was indeed a threat of violence . . . and created for the sole purpose of inciting fear and distress in its recipient. The facts show further that the mailing of this letter was met by the very reactions that it sought; by her own testimony, [the victim] became very scared" and apprehensive when she read the letter. For these reasons, the mailing of this letter constitutes a felony crime of violence.

Price, 155 F.3d, 563, 1998 WL 390572 at **8-9  (emphasis in original); see also United States v. Guevara, — F.3d — , 2005 WL 1009772 at *4 (5th Cir. May 2, 2005) ("circuits have determined that mailing a threatening communication under §876 constitutes a crime of violence under §4B1.2(a)(1)); United States v. Williamson, 106 F.3d 394, 1997 WL 51650 (4th Cir. 1997) (court affirms sentence of defendant convicted of mailing threatening communications in violation of 18 U.S.C. §876 who challenged his sentence as a career offender on appeal; implicitly holding that mailing a threatening communication is a "crime of violence" pursuant to

career offender guidelines); United States v. Rosen, 896 F.2d 789, 791 (3d Cir. 1990) (defendant

convicted on a plea of guilty to the charge of sending a threatening communication through the

mail in violation of 18 U.S.C. §876; Court rejected the defendant's claim that, because it did not

involve the use of physical force, the offense was non-violent); United States v. McBroom, 124

F.3d 533 (3d Cir. 1997) (accord); United States v. Left Hand Bull, 901 F.2d 647, 649 (8th Cir.

1990).

Here, Davila was similarly charged with, and convicted of, a violation of 18 U.S.C.

§876(c) which "has as an element the use, attempted use, or threatened use of physical force

against the person of another," or "involves conduct that presents a serious potential risk of

physical injury to another."  Indeed, the indictment specifically charged:

> On or about August 18, 2002, in the District of Connecticut, NOEL DAVILA, a/k/a
> "Monk," the defendant herein, willfully and knowingly did cause to be delivered by
> the U.S. Postal Service to the Connecticut State's Attorney's Office in Bridgeport,
> an envelope containing a white powdery substance represented to be anthrax, and
> a letter, which together with the white powdery substance *threatened to injure the
> person of another*.

See Indictment, Count Two (emphasis added).  The Court need not – and should not – look to the

underlying facts of this case to conclude that Davila's conviction under 18 U.S.C. §876 is also a

crime of violence because it "has as an element the use, attempted use, or threatened use of physical

force against the person of another."

Because Davila's instant crimes each qualify as a crime of violence, and because Davila

was previously convicted on separate occasions of at least two other crimes of violence, he

qualifies as a Career Offender under U.S.S.G. §4B1.1.  Moreover, there appears to be no real

dispute regarding the fact that Davila qualifies as a Career Offender.  See Defendant's

-14-

Supplemental Sentencing Memorandum at 4 and note 1 ("While the defendant initially disputed

the applicability of the career offender provision, U.S.S.G. §4B1.1, it now appears he has the

requisite convictions to classify him as a career offender.").  In light of Davila's status as a

Career Offender, the PSR has correctly calculated Davila's base offense level to be 37 and his

Criminal History Category VI, resulting in an applicable, albeit advisory, Guidelines range of 360

months to life in prison.

## III.  A DOWNWARD DEPARTURE IS NOT REASONABLE.

In his sentencing memoranda, his motion for a downward departure, and his

memorandum in support, the defendant has advanced the following grounds for a downward

departure: (1) that the defendant suffers from a significantly reduced mental capacity that

contributed to the commission of his offenses (U.S.S.G. §5K2.13); (2) that the circumstances of

the defendant's instant offenses are sufficiently atypical to place them "outside the heartland" of

threat cases under 18 U.S.C. §§ 2332a and 876(c); (3) that a combination of such factors warrant

a departure; and/or (4) that Davila's placement in Criminal History Category VI over-represents

the seriousness of his violent criminal past. The government respectfully submits that the

defendant's claims for a downward departure, whether taken alone or collectively, neither

establish nor justify a departure in this case.

### A.  Departures Post-**Booker**

As set forth above, under United States v. Booker, 2005 WL 50108, 543 U.S. ___ (2005),

the United States Sentencing Guidelines are no longer mandatory and binding on sentencing

courts.  Nevertheless, "the district courts, while not bound to apply the Guidelines, must consult

those Guidelines and take them into account when sentencing,"  Booker, 2005 WL 50108 at *27,

-15-

and sentences will be reviewed for "unreasonableness." Id. at *25.

In that regard, the government respectfully submits that the principles set forth in the body of case law that has developed regarding downward departures is instructive as to what the appellate courts might consider "reasonable." Applying those principles here, and in light of the full picture of this defendant, including his violent and continuous criminal history which has continued while in prison, the government respectfully submits that awarding the defendant a "downward departure" would not be reasonable here.

### B. Significantly Reduced Mental Capacity.

1. *A Downward Departure Based on Diminished Capacity Is Not Reasonable Because the Instant Offenses Involved Threats of Violence and Davila's Continuous and Violent Criminal History Indicates a Need to Protect the Public.*

The defendant argues that he should receive a downward departure under U.S.S.G. §5K2.13 on the grounds of diminished capacity. Under U.S.S.G. §5K2.13, however, a downward departure on the grounds of diminished capacity would not be reasonable here because the Guidelines advise, and the pre-Booker case law held, that such a departure was expressly prohibited where, as here, the offense involved threats of violence, or where the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. See U.S.S.G. §5K2.13.

Specifically, under the applicable version of the Guidelines, U.S.S.G. §5K2.13 provided:

A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. *However, the court may not depart below the applicable guideline range if* (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) *the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence*; *or (3) the defendant's criminal history indicates a need to*

-16-

> *incarcerate the defendant to protect the public.*  If a departure is warranted, the extent
> of the departure should reflect the extent to which the reduced mental capacity
> contributed to the commission of the offense.

U.S.S.G. §5K2.13 (November 1, 2002) (emphasis added).

It was well established under pre-<u>Booker</u> case law that "the existence of any one of the

[four] factors set forth under Section 5K2.13 preclude[d] a downward departure." <u>United States</u>

<u>v. Cravens</u>, 275 F.3d 637, 640 (7th Cir. 2001); <u>see</u> <u>also</u> <u>United States v. Hawkins</u>, 78 Fed. Appx.

193, 2003 WL 22366800 at *3 (3d Cir. 2003) ("A sentencing court can depart from a defendant's

guideline range if the defendant committed the charged offense while suffering from a

significantly reduced mental capacity; *provided* that none of the . . . conditions exist . . . . The

district court found that Hawkins was not eligible for a departure because of the second prong of

§5K2.13; the [crimes] involved 'a serious threat of violence.'") (emphasis added).

Moreover, it was equally well established that the factors set forth in 5K2.13 were

*prerequisites*, and a court could therefore end its analysis if any of the enumerated prohibitions

existed.  <u>See</u>, <u>e.g.</u>, ; <u>United States v. Teel</u>, — F. Supp. 2d — , 2003 WL 23024398 at *1 (E.D. Pa.

Dec. 19, 2003) (5K2.13 factors are prerequisites; "Before considering whether [the defendant]

has a significantly reduced mental capacity as a result of these disorders, the court must decide

whether any of the prerequisites listed in Section 5K2.13 preclude him from even seeking a

departure on these grounds.").  Accordingly, if any one of these factors were present, the court

need go no further in denying a departure for diminished capacity.

Although the prohibitions set forth in U.S.S.G. §5K2.13 and the applicable case law are

no longer binding, they strongly suggest that a diminished capacity departure under the

circumstances here would not be reasonable.  In other words, applying those principles here, it

would be unreasonable to award Davila a departure for diminished capacity because the instant offenses involved serious threats of violence and Davila's continuous and violent criminal history indicates a need to protect the public.

   a.  *The Instant Offenses Involved Threats of Violence.*

   A downward departure on the grounds of diminished capacity would not be reasonable here because the offense involved threats of violence.  First, as noted above, under the relevant case law and the Career Offender provisions of the Sentencing Guidelines, both of the instant offenses are characterized as "crimes of violence" under the Guidelines because they "ha[ve] as an element the use, attempted use, or threatened use of physical force against the person of another."  In addition, Davila's offense conduct involved a serious and quite purposeful threat targeted at the offices of his former prosecutor.  Davila's letter contained foreign writing, Quranic prayers in English, references to Osama bin Laden, and a white powdery substance that was represented to be anthrax.  Such a letter, sent in the post 9-11 world and not long after the height of the anthrax scares – and in a state in which a Connecticut resident actually died as a result of tertiary exposure from an anthrax mailing – had its intended effect, and by its very nature, involved a serious threat of physical harm to the person of another.  The evidence at trial established that Davila was "pissed" at his former prosecutor and had every motive to send what was a vindictive and purposeful threat to the State's Attorney's Office in Bridgeport.  The repeated references in Davila's sentencing memoranda to the mailing as a "half-baked" or "silly" hoax, are mischaracterizations made with the benefit of hindsight and long after the evacuation and closure of the Bridgeport State's Attorney's Office, the dispatching of the FBI and the Connecticut State Police Emergency Services Unit, the implementation of decontamination

protocols, the mobilization of the Connecticut Department of Public Health's BioSafety Lab and the concomitant uncertainty and fear experienced by the employees of the State's Attorney's Office who went through decontamination procedures and anxiously awaited test results. Even where, as here, the substance is ultimately determined to be non-toxic or otherwise present no health hazard, the responding personnel and those potentially contaminated, at the time of the incident and for up to 48 to 72 hours later, have no idea whether they are dealing with a hoax or whether they have been exposed to an actual biological or chemical agent.

Davila's mailing was an intentional, vindictive and purposeful threat of harm targeted at the offices of the Bridgeport prosecutor who had previously prosecuted him in 1992, 2000 and 2001. One need look no further than recent events to understand why threats targeted at prosecutors, officers of the court and courthouse personnel should be taken with the utmost seriousness and punished severely. Because the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved a serious, vindictive and purposeful threat directed at the employees of the Bridgeport State's Attorney's Office, a downward departure for diminished mental capacity is not reasonable.

      b.    *Davila's continuous and violent criminal history and the repeated and unsuccessful efforts to rehabilitate him indicate a clear need to incarcerate Davila to protect the public.*

A downward departure based on diminished capacity is also not reasonable because Davila's ongoing and violent criminal history indicates a need to protect the public – indeed, the defendant has continued to commit crimes and demonstrate anti-social behavior even while incarcerated. Because the defendant has argued, however, that there is no need to protect the public from Davila and that his assignment to Criminal History Category VI overstates Davila's

criminal history, the government feels compelled to set forth below the gravity and extent of

Davila's violent criminal past as well as his ongoing criminal and anti-social conduct that he has

demonstrated even while he has been in state custody.

> (i)    *The March 26, 1993 Felony Conviction for Aggravated Rape in the First Degree.*

On March 26, 1993, Davila was convicted of Aggravated Sexual Assault in the First

Degree, in violation of Conn. Gen. Stat. §53a-70a, stemming from an aggravated rape of a fifteen

year old girl that he committed on or about February 24, 1993.  Notably, this charge was not,

"subbed down" to any other offense.  Davila received ten (10) years in jail, with five (5) years to

serve and five (5) years probation.  Copies of certain investigative reports from that offense and

the State Office of Adult Probation's Investigation Reports ("the State PSR") for Noel Davila,

and his co-defendant in that case, Francisco Davila, were obtained and given to the United States

Probation Office.

According to those reports, on February 24, 1993, Trumbull Police were detailed to the

Trumbull Shopping Mall at the request of a "G. Fox" Security Officer.  Upon arrival, officers

were directed to two young females who were reported to be intoxicated and unable to answer

questions.  Officers notified EMS personnel who transported the two females to St. Vincent's

Hospital.  After arrival, both EMS personnel and hospital attendants stated that one of the fifteen-

year-old girls (herein referred to as Victim #1) repeatedly complained of being raped, and that her

private parts hurt.  At St. Vincent's Hospital, the Emergency Room physician reported that

evidence existed to show that both girls had sexual intercourse, and that Victim #2 (also fifteen

years old) had been physically assaulted about the body as well.

On February 25, 1992, the victims visited the Trumbull Police Department and gave sworn statements regarding the events preceding the assaults. The pair gave concurrent statements indicating that they had met some males, including the two suspects, who had introduced themselves as "Frankie" and "Angel" or "Angelo" (later identified as Francisco and Noel Davila, respectively) at the mall on February 23, 1992, one day prior to the assault, at which time Victim #2 gave one of the males her phone number to arrange a date. On February 24, 1992, the victims and three Hispanic males met at the mall at the pre-arranged time. The fivesome went for a ride, dispatching one of the males in the Washington Avenue vicinity. The two victims and two males then proceeded to a liquor store where the two males went in and returned with a bottle of Jack Daniels, which was passed around for everyone to drink. The two victims and two males then proceeded to an empty lot, described as a construction site, at which time sexual advancement and sexual assaults of the two females occurred in the car.

Specifically, according to the statement of Victim #1: "When we got there we kissed, Frankie pulled my jeans off, even though I was telling him not to. After he did this he took my underpants off. I tried to pull them back up, hitting my head on the window as I struggled with him. He then took his pants off and began to have sex with me. I kept saying "stop" but he said "yes, you want this." All the time I was telling him not to. [Victim #2] is in the front seat with Angelo and I heard her saying "no, stop." When Frankie got off of me, I saw that Angelo was pulling [Victim #2's] jeans on. [Victim #2] was not capable of doing it herself, she was so drunk. We went back to Washington Avenue to pick up their cousin, and then they drove us back to the Trumbull Mall, where they let us out near G. Fox . . . ."

Victim #2 later identified the suspects names as "Noel" and "Frankie," indicated that they were brothers, and was able to provide officers with their dates of birth. Victim #2 also picked Francisco and Noel Davila out of a photo array, identified Francisco as the man who raped Victim #1 and identified Noel Davila as the individual who raped her.

In short, Noel Davila, got a fifteen-year-old-girl drunk and raped her in the front seat of a car, in an empty lot, at a construction site, while his brother simultaneously raped another fifteen year old who they had gotten drunk, in the back seat of the car, notwithstanding both victims' repeated requests for the Davilas to stop. According to the incident reports, the teenager Noel Davila raped was so drunk that the defendant, when he was finished, had to pull her jeans back on because the victim was not capable of the teenage girl that Noel Davila raped had been physically assaulted about the body as well.

*(ii) The January 28, 1999 Convictions for Threatening and Reckless Endangerment.*

On January 28, 1999 Davila received the following misdemeanor convictions in connection with a violent October 25, 1998 domestic dispute during which he lunged at his own wife and children with a knife: (1) Threatening, in violation of Conn. Gen. §53a-62 for which Davila received six months jail, six months suspended and two years probation; and (2) Reckless Endangerment, in violation of Conn. Gen. Stat. §53a-63, for which Davila received one year in jail; with one year suspended and two years probation. Davila, who was also out on probation on his aggravated rape conviction at the time of the October 1998 offense, also received two misdemeanor convictions for violation of probation in violation of Conn. Gen. Stat. §53a-32.

According to the October 25, 1998 incident report, police were dispatched to the Davilas' home on a report by Davila's wife, Evette Davila, that her daughter was being threatened and

held by her husband, Noel Davila.  Upon arrival, officers spoke to Evette Davila who stated that

her husband, Noel Davila, had begun an argument with her earlier in the day because he had

come home from work and she was not home.  Noel then began drinking and told Evette that she

had to do everything that he said.  Evette told Noel that, in light of his drinking, she wanted him

out of the house.  According to the incident report, Noel then became "enraged" and began

punching holes in the bedroom wall.  (Officers observed the holes and fresh plaster on the floor).

According to Evette, Noel then picked up a knife and stated to Evette that he "would kill her for

the trouble she's caused."

   According to the incident report, while Evette was holding her children (Noel Davila, Jr.,

then age 6; Hassanis Davila, then age 5; and Ramon Davila, then age 3) in the living room, Noel

Davila lunged at them with the knife and she ran, with the children, into a bedroom and locked

the door.  While locked in the bedroom, Evette called her mother on the phone, who, in turn,

called the police.

   Noel then broke through the door to get to them.  (Officers observed the broken door and

chipped paint).

   According to the incident report, the oldest child, Noel Davila, Jr., age 6, showed officers

how his father had come at them with the knife and stated that he does not like it when his father

drinks.

   (iii)    *The March 2, 2001 Felony Convictions for Risk of Injury to a Minor; Criminal*
          *Possession of a Firearm, Carrying a Firearm; and Reckless Endangerment.*

On March 2, 2001, Davila was convicted of seven felony charges and one misdemeanor

for firing nine shots into a house where a man, his wife and their children were having dinner.

-23-

The incident report, the substance of which is set forth in detail below, described the type of crime as "attempted murder / risk of injury."  In total, Davila was eventually sentenced to fifteen (15) consecutive years in prison, followed by eight years of special parole.

Specifically, following his second trial arising from the May 1, 1999 incident, Davila was convicted of: (1) Risk of Injury, in violation of Conn. Gen. Stat. §53-21(1), for which he received two years incarceration; (2) Risk of Injury in violation of Conn. Gen. Stat. §53-21(1), for which he received another two years incarceration, to run consecutively; (3) Risk of Injury in violation of Conn. Gen. Stat. §53-21(1), for which he received another two years incarceration, consecutive; (4) Risk of Injury in violation of Conn. Gen. Stat. §53-21(1), for which he received another two years incarceration, consecutive; (5)  Risk of Injury in violation of Conn. Gen. Stat. §53-21(1), for which he received another two years incarceration, to run consecutively; (6) Criminal Possession of a Firearm, in violation of Conn. Gen. Stat. §53a-217, for which he received another two years incarceration, to run consecutively; (7) Carrying a Firearm with out a Permit, in violation of Conn. Gen. Stat. §29-35(a), for which Davila received another three years, consecutive; and (8) a misdemeanor conviction for Reckless Endangerment 1, in violation of Conn. Gen. Stat. §53a-63, for which Davila received one year jail, minimum, to run concurrent, and eight years of special parole.

According to the incident report, on the afternoon of Saturday, May 1, 1999, Bridgeport police officers responded to a report of shots fired.  Upon arrival, a Julio Alvarez (a/k/a "Matrooqie") (hereinafter "Alvarez") stated that, while he and his family were preparing for dinner in their kitchen, they heard a knock at the back door of their home.  Alvarez's wife, Angela Velez, went to the door and opened it.  According to Alvarez, a few seconds later, his

wife began screaming and slammed the door shut. Alvarez had his children – Elvin Martez (age 9 at the time); Tamarie Martez (age 8 at the time); Jeffrey Alvarez (age 7 at the time); Maria Martez (age 6 at the time); and Yanille Alvarez (age 3 at the time) – run towards the front of the apartment. From the kitchen, Alvarez peered through the mini blinds of a window and saw a man at the door dressed all in black holding a black handgun. According to Alvarez, the man began firing shots through the window as he was peering out. The children were just barely out of the kitchen and into the living room at this time. Alvarez was able to move away from the shots and he, his wife and the children were not hit. The perpetrator then ran towards the front of the house, but first stopped at the side and fired one more shot into an open side kitchen window, before taking off. Upon checking the interior of the home, officers saw that the kitchen area windows were shattered and there were several holes – in the walls, the refrigerator and a microwave.

A witness outside, Angel Gonzalez, corroborated Alvarez's account. Gonzalez stated that he was walking along the street when he heard shots ring out at the rear of the Alvarez's home. Gonzalez saw a man dressed in a black hooded sweatshirt (with the hood around his head), black pants, and sunglasses, come running from behind the home. He saw the man stop at the side of the home and stick a black handgun in an open window and fire a single shot inside. The man began to run towards the front of the house again, past Gonzalez, crossing the street into the back yards of other homes located on Lexington Avenue, at which point Gonzalez lost sight of him.

Alvarez told officers that, according to his wife, the individual who was at the door firing shots into the home was a man known in the neighborhood by the nickname "Moun"[2] – and that

---

[2] As established at trial, Davila goes by the nickname "Monk."

-25-

"Moun's" sister lived on Lexington Avenue, in the direction that the man had run.

Alvarez's wife, Angela Velez ("Velez") provided further corroboration and identified the perpetrator. Velez confirmed that, when she opened the back door, she saw a man, known in the neighborhood by the nickname "Moun" standing at the door. The man asked her if "Matrooqie" (her husband's nickname) was home. Velez told the man that her husband was having dinner. The man then put his hood over his head and pulled the drawstrings tight around his face to hide it. He then pulled a black handgun out of his waist area. Velez slammed the door shut and began yelling for her husband. According to Velez, she and Alvarez began moving the children away, and while they did so, shots started to be fired into the home. Velez further described the perpetrator as a relatively short Hispanic male, with a thin build and a pony tail, wearing a black hooded sweatshirt, black pants, and sunglasses.

Officers canvassed the area and recovered several shell casings in the rear of the home, as well as several spent rounds in the home.

Officers proceeded to the residence of "Moun's" sister on Lexington Avenue. Moun's sister, Jacqueline Davila, let officers into her home. Officers approached a Hispanic male and asked him if he was "Moun." The man stated "yes, do you have a search warrant?" The man was detained and taken back to the location of the crime, where Angela Velez, identified him as the man she saw at the rear door who then fired the shots into their home.

While speaking with officers, Noel Davila's own sister, Jacqueline Davila, stated that shortly before the officers arrived, she got a knock at her rear door. Upon opening it, she found her brother, Noel Davila there, and he demanded to be let in. Jacqueline Davila let him into the apartment, at which time she saw him reach into his waist area and pull out a black handgun. He

also took off a hooded sweatshirt and sunglasses.  According to Jacqueline Davila, Noel stated to her "Don't you fuck me!" and told her to get him a shirt that he could put on, a request with which she complied.  Noel then proceeded to enter the living room, where she saw him put the gun under a sofa cushion.

Upon checking the sofa, officers recovered a black .9mm Baushka Model 75 handgun, located under the cushion identified by Jacqueline Davila.  On top of the sofa, officers also saw and recovered a black hooded sweatshirt and a pair of sunglasses, both of which Jacqueline Davila confirmed were the items she saw Noel Davila take off.  Jacqueline Davila said that she let officers in so that they could "get her brother," whom, she stated, had threatened to kill her in the past.

Back at the crime scene, officers collected several additional items of physical evidence. Specifically, officers collected, from the rear of the home, nine (9) Winchester .9mm spent shell casings.  From the side of the home officers collected one (1) spent .9mm shell casing.  Officers also collected all the spent bullets that could be located in the home's interior – some of which were on floors; some lodged in walls; and some in stereo speakers.  Eight bullets were recovered in total.

While being booked, Noel Davila's personal belongings were inventoried.  Davila was found to have a paper fold in his pocket that contained a white powder substance which subsequently tested positive for the presence of cocaine.

Davila was charged with Criminal Attempt at Murder; Risk of Injury to a Minor (5 counts); Criminal Use of a Firearm by a Convicted Felon; Reckless Endangerment; Carrying a Pistol without a Permit; and Possession of Narcotics.  As noted above, Davila was ultimately

convicted of five counts of Risk of Injury to a Minor, for causing and permitting children under the age of sixteen "to be placed in a situation that the life and limb of such child[ren] was endangered and the health of such child[ren] was likely to be injured, in violation of §53-21(1) of the Connecticut General Statutes." Davila was also convicted of Criminal Possession of a Firearm, Carrying a Firearm with out a Permit and a misdemeanor conviction for Reckless Endangerment in the First Degree. Likely recognizing the violent recidivist before the court, the sentencing judge saw fit to run the sentence on each of Davila's convictions consecutively, for a total of fifteen (15) years.

      *(iv)*    *Davila has Continued to Commit Crimes and Engage in Anti-Social Behavior Even While Incarcerated.*

Davila's criminal conduct and anti-social behavior has by no means ended with his incarceration. First, there is a clear and ongoing need to protect the public because *Davila has continued to commit crimes from jail.* As noted above, and set forth in detail in the recitation of facts in the government's Response to Defendant Noel Davila's Motions for Judgment of Acquittal and New Trial, following the retrial and conviction of Davila on various crimes for his firing nine shots into a house where a man, his wife and their children were having dinner, Davila filed a vindictive and meritless grievance and a baseless federal lawsuit against the state prosecutor who handled his prior cases. The evidence at trial further established that, after both of those matters were dismissed as meritless, Davila remained "pissed" at his former state prosecutor and sent through the mail – from jail – the threatening, vengeful and quite purposeful letter containing foreign writing, Quranic prayers, references to Osama bin Laden, and a white powdery substance that was represented to be anthrax to the Connecticut State's Attorney's

-28-

Office in Bridgeport – the office that had previously prosecuted him in 1992, 2000 and 2001.

Moreover, in addition to his targeting his former prosecutor and committing the instant crimes of vengeance while incarcerated, Davila, while in jail, "has received 11 incident reports. On June 3, 10, 29, August 5, December 19, 1999 and September 9, 2002, he was charged with disobeying a direct order. On July 15, and July 22, 1999 he was charged with fighting. On March 5, 2001, Mr. Davila was charged with contraband class B. On April 30, 2003, he was charged with self-mutilation and on September 6, 2003, he was charged with flagrant disobeying." PSR ¶42.

Perhaps more importantly, Davila has squandered prior opportunities to re-acclimate to society and *all* efforts to rehabilitate him have failed. The PSR notes that "Davila, while serving several terms of probation in the community, was revoked *on all occasions.*" PSR ¶94 (emphasis added). The mental health professionals who conducted Davila's competency evaluation prior to trial, described Davila as a person who"possesses a rebellious and impulsive attitude, has little frustration tolerance, commits anti-social acts, and displays poor judgment," going on to say that "[i]ndividuals with his scores have a narcissistic personality, and are often hostile. They feel they have been mistreated by others, and blame others for their difficulties." PSR ¶67. The PSR refers to Davila's record as including "violent" and "barbaric" acts, and states that Davila "has no regard for authority and human life." PSR ¶93. The PSR also notes that "*all attempts to rehabilitate this individual and protect the community [have] proved unsuccessful,*" PSR ¶ 94 (emphasis added), and describes Davila as "a very dangerous individual who poses a threat to society." PSR ¶ 93.

-29-

In short, given Davila's extensive and violent criminal past, his continuous and ongoing criminal and anti-social behavior – including his committing additional crimes in jail; and the descriptions of Davila by Probation and treating professionals as someone who is "violent," "barbaric," "hostile" and "a very dangerous individual who poses a threat to society," it cannot seriously be argued that there is no need for further incarceration to protect the public. In short, Davila's continuous, ongoing and violent criminal history indicate a clear need to incarcerate Davila to protect the public and, accordingly, a downward departure for diminished mental capacity would be unreasonable.

> 2.    *Because the Defendant has Failed to Meet His Burden of Establishing a Causal Connection Between any Significantly Reduced Mental Capacity and the Commission of the Instant Offenses, a Departure for Diminished Mental Capacity is not Reasonable.*

Even if the court were to reach the merits of the defendant's claim for a diminished capacity departure, the government respectfully submits that the psychological evaluations do not provide a sufficient legal basis to support a claim for a departure based on diminished capacity and, accordingly, such a departure would be unreasonable.

As noted above, U.S.S.G. 5K2.13 provides, "A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity." U.S.S.G. §5K2.13. "Diminished capacity is an exception to the general rule that '[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable range.'" United States v. Silleg, 311 F.3d 557, 562 (2d Cir. 2002) (quoting U.S.S.G. §5H1.3). The Application Note to section 5K2.13 defines "significantly reduced mental capacity" as meaning that "the defendant, although

convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong." U.S.S.G. §5K2.13, Application Note. Accordingly, "significantly reduced mental capacity" includes both cognitive impairments (i.e., an inability to understand the wrongfulness of the conduct or to exercise the power of reason) and volitional impairments (i.e., an inability to control behavior that the person knows is wrongful). See United States v. McBroom, 124 F.3d 533 (3d Cir. 1997).

A downward departure for diminished capacity requires "reduced mental capacity and a causal link between that reduced capacity and the commission of the charged offense." United States v. Piervinanzi, 23 F.3d 670, 684 (2d Cir. 1994); see also Silleg, 311 F.3d at 562 n.4 and at 564 (2d Cir. 2002); United States v. Prescott, 920 F.2d 139, 145-46 (2d Cir. 1990); United States v. Ventrilla, 233 F.3d 166, 169 (2d Cir. 2000). However, the significantly reduced mental capacity need not be the sole cause or the "but for" cause of the offense conduct. United States v. Sadolsky, 234 F.3d 938, 942-43 (6th Cir. 2000) (discussing law of causation under 5K2.13); United States v. Dyer, 216 F. 3d 568 (7th Cir. 2000) (questioning "but for" causation: "[b]ut for [ defendant's] having been born, he wouldn't have operated a Ponzi scheme; but it would be odd, in fact incorrect, to say that his birth (or the birth of his parents or grandparents) caused his crime."); McBroom, 124 F. 3d at 548, n. 14 (a significantly reduced mental capacity "must be a contributing cause of the offense, but need not be the sole cause."); United States v. Cantu, 12 F.3d 1506, 1515 (9th Cir. 1993) ("other circuits are unanimous in holding that the disorder need be only a contributing cause, not a but-for cause or a sole cause, of the offense").

The defendant bears the burden of proving by a preponderance of the evidence that the circumstances of his case warrant a downward departure.  See United States v. Lebron-Ortiz, 189 F.3d 462 (2d Cir. 1999); cf. United States v. Gambino, 106 F.3d 1105, 1110 (2d Cir. 1997); see also United States v. Anders, 956 F.2d 907, 911 (9th Cir. 1992).  At sentencing, a defendant seeking "to benefit from a particular fact or facts often bears the burden of persuading the court." United States v. Valdovinos-Solonche, 309 F.3d 91, 94 (2d Cir. 2002).  The same allocation of proof applies in the context of a request by the defendant for a departure pursuant to 5K2.13. See United States v. Regan, 989 F.2d 44, 45 (1st Cir. 1993) (defendant has the burden of proof under section 5K2.13).

Applying these principles here, because the defendant has failed to demonstrate that the defendant was suffering from a significantly reduced mental capacity that was *causally connected* to the commission of the instant offenses, such a departure would be unreasonable.

In addition, the government notes, as a practical matter, that a departure for a significantly reduced mental capacity is wholly inconsistent with this defendant's demonstrated manipulative nature, his quite purposeful and vindictive offense conduct, and the relatively sophisticated efforts that the defendant took to avoid detection for his having mailed the threat.  Indeed, from his very first appearance in federal court before United States Magistrate Judge Margolis, the defendant made, in the government's view, demonstrated efforts to manipulate the system – feigning competency issues and pretending that he did not speak or understand English at all (when the consensual recordings introduced at trial clearly demonstrated otherwise).  See also Report of Humberto Temporini, M.D. dated May 9, 2005 at 8 ("There is some evidence that Mr. Davila has a tendency to feign psychiatric disorders.").

Perhaps more importantly, the evidence at trial demonstrated that this defendant was quite savvy and relatively sophisticated in his efforts to avoid detection for sending the threat – and, the consensual recordings established that the defendant was keenly aware of those efforts and he discussed them at some length. The relatively sophisticated steps Davila took to avoid detection included his wearing plastic bags on his hands to prevent fingerprints, using the name and number of another inmate at another facility for the return address, using disguised handwriting for the mailing, sealing the envelope with water with the admitted purpose of preventing DNA analysis, and having another inmate actually drop the letter in the outgoing mail at Davila's behest. On this record, it can hardly be said that Davila had a significantly impaired ability to understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or to control behavior that he knew was wrongful. On the contrary, Davila engaged in quite purposeful and wrongful conduct directed at his former prosecutor – and was keenly aware of it, given the overwhelming evidence that he engaged in relatively sophisticated efforts to disguise or hide his involvement. In short, given the steps Davila took to avoid detection, it cannot be said that Davila was suffering from a diminished mental capacity at the time of his offense and the characterization of Davila's purposeful threat targeted at his former prosecutor as nothing more than a "half-baked hoax" rings hollow.

### C. Heartland Departure / Combination of Factors

Davila argues that his conduct in this case is sufficiently atypical to remove it from the heartland of cases involving threats to use weapons of mass destruction, and therefore, a departure is warranted under U.S.S.G. §5K2.0. The government respectfully submits, however, that the circumstances of Davila's case are actually quite similar to several other cases and,

accordingly, because the facts of Davila's case are not sufficiently extraordinary to remove it from the heartland of cases arising under 18 U.S.C. §2332a, a "heartland departure," would not be reasonable.

U.S.S.G §5K2.0 provides that "the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that would result in a sentence different from that described.'" U.S.S.G. § 5K2.0 (April 30, 2003). The Sentencing Guidelines further provide that:

> An offender characteristic or other circumstance that is, in the Commission's view, "not ordinarily relevant" in determining whether a sentence should be outside the applicable guideline range may be relevant to this determination if such characteristic or circumstance is present to an unusual degree and distinguishes the case from the "heartland" cases covered by the guidelines.

U.S.S.G. § 5K2.0. The commentary immediately following the foregoing policy statement, however, states that "the Commission believes that such cases will be extremely rare." U.S.S.G. § 5K2.0, comment. Moreover, the "heartland" departure has been characterized by the Second Circuit as a departure that is to be reserved for "unusual" cases. See, e.g., United States v. Thorn, 317 F.3d 107, 124-25 (2d Cir. 2003) ("The Supreme Court has clarified, however, that although a district judge retains some discretion in sentencing under the Guidelines, [b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline.") (quoting Koon v. United States, 518 U.S. 81, 98 (1996)); see also United States v. Sentamu, 212 F.3d 127, 134 (2d Cir. 2000) ("Departures from the prescribed Guidelines ranges are allowed only in cases that are unusual.").

-34-

In extraordinary cases, the district court may also downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that "differs significantly from the 'heartland' cases covered by the guidelines." Id. (quoting U.S.S.G. § 5K2.0 cmt.). The combination of factors heartland departure, however, is also considered rare, and reserved for unusual or exceptional cases.

In short, although the Guidelines and the above authority are no longer mandatory, because there is nothing extraordinary about Davila's conduct in this case, the thrust of the above-referenced Guidelines and authority suggest that a "heartland departure" would be unreasonable.

The government is aware of no case law – and the defendant has pointed to none – suggesting that it is unusual or extraordinary to apply 18 U.S.C. § 2332a in this context. Indeed, several cases charging 18 U.S.C. §2332a across the county have involved a defendant sending a threatening anthrax letter to a state prosecutor, an officer of the court, courthouse personnel or judges. See, e.g., United States v. Slaughter, 116 F. Supp. 2d 688, 692 (D. Va. 2000) (defendant mailed threatening letter to state prosecutor, which contained a white powder claimed by Slaughter's letter to be anthrax; judgment of acquittal granted, however, on other grounds – namely, a paucity of evidence of an actual or potential effect on interstate commerce); United States v. Guevara, — F.3d — , 2005 WL 1009772 (5th Cir. May 2, 2005) (upholding life sentence for career offender defendant who sent anthrax letter to federal judge). To the government's knowledge, in none of those cases has a single court held that 18 U.S.C. §2332a was exclusively intended to apply solely to international terrorists. The elements of the statute as charged required the government to prove: (1) "that the defendant did threaten to use a weapon

of mass destruction against any person within the United States;" (2) "that he did so knowingly,

intentionally and without lawful authority;" and (3) "that, had the defendant used a weapon of

mass destruction as threatened, the results of such use would have affected interstate commerce."

Court's Jury Instructions at 32.  The jury reasonably concluded that the government proved each

and every element of the offense.  Moreover, in cases such as Guevara, which bear striking

similarities to the facts here, courts have apparently had little problem with the notion that 18

U.S.C. §2332a is appropriately applied to an inmate who sends an anthrax scare to court

personnel – even where the end result is a life sentence.  Given that the elements of the offense

were met, given that there are several cases across the country that bear striking similarities to

Davila's case, and given the utter paucity of case law suggesting that 18 U.S.C. §2332a should

only be applied to those more traditionally considered terrorists, there is nothing unusual or

exceptional about Davila's circumstances and, therefore, an "outside the heartland" departure

would be unreasonable.

### D.  Criminal History Category VI Does Not Over-Represent Davila's Criminal Past.

The defendant also argues in favor of a downward departure on the grounds that the

applicable criminal history category over-represents the seriousness of Davila's criminal history.

The government respectfully submits that this claim cannot seriously be maintained.

As set forth in great detail above in Section III(B)(1)(b), Davila has a serious and more

importantly, violent, criminal history including the aggravated rape of a fifteen year old girl; an

attack upon his own wife and children with a knife in a drunken rage; and the unloading of nine

shots into a house where a man, a woman and five children were present.

Perhaps more importantly, Davila has continued to commit crimes and engage in anti-

social conduct while in prison, and all efforts to rehabilitate Davila have proven unsuccessful. See, e.g., PSR ¶94 ("Davila, while serving several terms of probation in the community, was revoked *on all occasions.*") (emphasis added); PSR ¶42 (Davila has received 11 incident reports including disobeying a direct order; fighting; possession of contraband; self-mutilation and flagrant disobeying); PSR ¶67 (Davila "possesses a rebellious and impulsive attitude, has little frustration tolerance, commits anti-social acts, and displays poor judgment. Individuals with his scores have a narcissistic personality, and are often hostile."). Indeed, the PSR describes Davila's criminal history as including "violent" and "barbaric" acts from "a very dangerous individual who poses a threat to society." PSR ¶93.

In short, Davila's status as a career offender and his placement in Criminal History Category VI is entirely appropriate and commensurate with the seriousness and violent nature of Davila's criminal past. Davila's circumstances are in no way comparable to the departures contemplated by U.S.S.G. §4A1.3 or United States v. Mishoe, 241 F.3d 214 (2d Cir. 2001). See, e.g., U.S.S.G. §4A1.3 ("There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes. An example might include the case of a defendant with two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period."). Moreover, such a departure necessarily implies that there is little "likelihood that the defendant will commit further crimes." Given that the defendant has continued to commit crimes in jail, it can hardly be said that the defendant exhibits little or no recidivist tendencies.

In short, given Davila's extensive and violent criminal record as well as the fact that he

has continued to commit crimes and engage in anti-social behavior in jail, it cannot be said that Davila's criminal history category significantly over-represents the seriousness of his criminal past or the likelihood that he will commit further crimes. Accordingly, a downward departure on this basis would be unreasonable.

## IV.  A SENTENCE WITHIN THE GUIDELINES RANGE IS WARRANTED.

Davila stands before this court convicted of threatening the use of a weapon of mass destruction and delivery of a threat through the U.S. mail, for his sending a threatening, vindictive and quite purposeful letter containing foreign writing, Quranic prayers in English, references to Osama bin Laden, and a white powdery substance that was represented to be anthrax to the offices of the Assistant State's Attorney who previously prosecuted Davila for several serious and violent crimes for which he was then, and is now, serving time.

The fact that Davila now faces a potential sentence of 360 months to life in prison, however, is driven largely by his status as a violent career offender. Indeed, as noted above, in light of Davila's violent criminal history, as well as his demonstrated and continuous recidivist tendencies, the Government strongly considered filing an information pursuant to 18 U.S.C. §3559(c)(4), to treat Noel Davila ("Davila") as a so-called "three strikes" candidate under 18 U.S.C. §3559(c), making him subject to mandatory life imprisonment. The Government ultimately decided, however, to forgo such a filing and leave the appropriate sentence to the discretion of this Court.

Among the factors that the Court is to consider under 18 U.S.C. §3553(a) in fashioning an appropriate sentence are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed – (A) to reflect the

seriousness of the offense; to promote respect for the law; and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.  See 18 U.S.C. §3553(a).

Davila sent a purposeful and vindictive threat targeted at the offices of the Assistant State's Attorney who prosecuted him in 1992, 2000 and 2001.  He has an extensive and violent criminal past and has continued to commit crimes from prison.  The PSR notes that Davila has been revoked on all occasions when he was on probation; see PSR ¶94 (emphasis added) and describes Davila as the type of person who "possesses a rebellious and impulsive attitude," "commits anti-social acts," and is "often hostile."  PSR ¶67.  The PSR refers to Davila's record as including "violent" and "barbaric" acts, and states that Davila "has no regard for authority and human life."  PSR ¶93.  Because "all attempts to rehabilitate this individual and protect the community [have] proved unsuccessful," PSR ¶ 94, and because Davila is "a very dangerous individual who poses a threat to society," PSR ¶ 93, the government respectfully submits that a sentence within the Guidelines range of 360 months to life is reasonable – and warranted.

Moreover, because failing to do so would send the wrong message and would have little or no deterrent effect to Davila or any others who commit, or consider committing, further crimes from jail, the government respectfully requests that the Court order its sentence to run consecutive to the time that Davila is currently serving, as advised (although no longer mandated) by U.S.S.G. §5G1.3(a).

-39-

## V.  CONCLUSION

For the reasons set forth above, the government respectfully urges the Court to sentence the defendant within the applicable, albeit advisory, guideline range of 360 months to life, to run consecutive to the time that Davila is already serving.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


By:     ANTHONY E. KAPLAN
        ASSISTANT UNITED STATES ATTORNEY
        Federal Bar No. CT08083


For:    STEPHEN B. REYNOLDS
        ASSISTANT UNITED STATES ATTORNEY
        FEDERAL BAR NO. CT19105
        UNITED STATES ATTORNEY'S OFFICE
        915 LAFAYETTE BOULEVARD
        BRIDGEPORT, CT 06604
        (203) 696-3000
        (203) 579-5575 (fax)
        Stephen.Reynolds@usdoj.gov
        ‾‾‾‾‾‾

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a copy of the foregoing was faxed and forwarded by mail on May 9,

2005 to:

        Timothy Pothin, Esq.
        Lynch, Traub, Keefe & Errante
        52 Trumbull Street
        P. O. Box 1612
        New Haven, CT  06510

This is also to certify that a courtesy copy of the foregoing was hand-delivered on May 9,

2005 to:

        The Hon. Ellen Bree Burns
        Senior United States District Judge
        United States Courthouse
        141 Church Street
        New Haven, Connecticut 06510

        Jose Cartagena
        United States Probation Officer
        U.S. Probation Office
        915 Lafayette Boulevard
        Bridgeport, Connecticut 06604

        By:   _____
               ANTHONY E. KAPLAN
               ASSISTANT UNITED STATES ATTORNEY

        For:  _____
               STEPHEN B. REYNOLDS
               ASSISTANT UNITED STATES ATTORNEY