# Yale University

School of Medicine
Department of Psychiatry
Connecticut Mental Health Center
Law and Psychiatry Division
34 Park Street
New Haven, Connecticut 06519-1187

Howard Zonana, M.D., Director

Telephone: 203 974-7158
Fax: 203 974-7177

May 9th, 2005

Timothy Pothin, Esq
Lynch, Traube, Keefe and Errante, P.C.
52 Trumbull Street
New Haven, Connecticut 06506-1612

[Stamp: United States District Court, District of Connecticut, FILED AT NEW HAVEN, May 11, 2005]

RE: Davila, Noel
DOB: 12/30/70
Docket 3:04CR00258(EBB)

Dear Mr. Pothin:

Pursuant to your request for a psychiatric evaluation, I examined Noel Davila on March 11th, 2005 for approximately one hour and fifteen minutes, and again on May 2nd, 2005, for approximately one and a half hour. Both psychiatric interviews took place at the McDougal Correctional Center, in Suffield. CT. Both interviews were conducted primarily in Spanish, as this is Mr. Davila's mother tongue.

The purpose of this evaluation was to determine whether Mr. Davila suffers from any psychiatric disorder that the court might take into consideration at the time of sentencing.

In addition to eliciting information from Mr. Davila, I reviewed the following documents

1- Evidence receipt from the Connecticut Department of Public Safety, Division of Scientific Services, Forensic Sciences Laboratory (Case#ID-02-002497) describing the contents of a threat letter sent with white powder to State's Attorney's Office in Bridgeport, Conn.
2- Copy of a letter written in non-western characters, along with a possible translation performed at the Alingo Translation Agency, dated 9/10/02 and signed by Rabbi Jon-Jay Tilsen.
3- Grand Jury Indictment, US vs. Noel Davila a/k/a "monk", dated 9/13/02
4- Competency to Stand Trial Evaluation, dated 4/10/03, and signed by William J. Ryan, Ph.D., Psychologist, and Anthony Lauricella, Psychology Intern.

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

United States of America v. Noel Davila
Docket 3:04CR00258(EBB)                                                          Psychiatric Evaluation

5- Presentence Report, prepared by Jose L. Cartagena, US Probation Officer and reviewed by Virginia C. Swisher, Supervising US Probation Officer, dated August 13th, 2004.
6- Memorandum in support of Motion for a downward departure, prepared by Timothy Pothin, Esq., dated 10/15/04
7- Connecticut Department of Correction (DOC) medical records

## DIAGNOSTIC IMPRESSION

**Axis I (Major Psychiatric Disorders):**
  Post Traumatic Stress Disorder
  Depressive Disorder Not Otherwise Specified (NOS)
  Anxiety Disorder Not Otherwise Specified (NOS)
  Polysubstance Abuse, in Controlled Environment, in full remission
**Axis II (Personality Disorders):**
  Antisocial Personality Disorder
**Axis III (General Medical Disorders):**
  Left knee injury dating to 1998, Asthma

## FINDINGS

In my opinion, Mr. Davila meets DSM-IV-TR criteria for the above-mentioned psychiatric disorders. The defendant has a significant history of physical and emotional abuse as a child, coupled with the early onset of substance abuse. Mr. Davila described numerous other psychiatric symptoms, some of which were most likely feigned in an attempt to portray himself as more seriously ill. However, these maladaptive attempts at deceit did not have clear or readily apparent secondary gain, such as an improvement in the conditions of his confinement, but rather came across as a feeble stab at obtaining attention, being taken seriously and receiving care.

At the time of this evaluation Mr. Davila had intact reality testing. He was able to understand the charges against him, the nature of the proceedings he was involved in, as well as the current phase of his legal predicament. He was able to provide alternative explanations to the circumstances surrounding his charges, portraying himself in a more favorable light and thus showing evidence of intent to defend himself. Mr. Davila has a history of prior involvements with the law, and was able to adequately describe the roles of different courtroom personnel. Finally, he demonstrated the capacity to form a collaborative working relationship with this writer, therefore showing the ability to work with his attorney if he chooses to do so.

## CONFIDENTIALITY

At the beginning of the interview, Mr. Davila was informed that he was being examined pursuant to his attorney's request for a psychiatric evaluation. He was advised that our discussion would initially be confidential under the Attorney/Client privilege, but that if he or his attorney later requested a written report or testimony our conversations would not remain confidential. He indicated he understood this.

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

## BACKGROUND INFORMATION

Unless noted otherwise, the information presented below was obtained from Mr. Davila or the sources cited above.

Noel Davila is a 34 year old Hispanic American male currently incarcerated at McDougal Correctional Institution, serving a 15 year sentence for unrelated charges.

Mr. Davila was born in Aibonito, Puerto Rico, on December 30th, 1970. He is one of six children born to the union of Francisco Davila and Josefina Rodriguez. Francisco Davila was unemployed, and reportedly supported his family with some form of State assistance. He died when the defendant was 10 or 11 years of age. Josefina Rodriguez is alive and resides in Puerto Rico. She was also unemployed and received some form of State assistance.

There is some conflicting information about Mr. Davila's siblings. The defendant indicated that he was one of "six or seven" children. The presentence report describes five siblings. Francisco Davila is the oldest, and he is reportedly institutionalized in a psychiatric hospital in New York with a diagnosis of schizophrenia. Jeannette Rivera, a hairdresser, lives in Queens, NY; Jaqueline Davila, a nurse, lives in Bridgeport, CT; and Maranjeli and Milagros live in Puerto Rico. Mr. Davila did not authorize me to contact with his siblings or mother to obtain more accurate information.

The defendant described his household as a chaotic and often terrifying place. He indicated that his parents used alcohol and drugs on a regular basis, and that they beat him up on a regular basis without any clear reason other than their being intoxicated. He further explained that his sister Jeanette and he were the two that received most beatings more often, and that this was because "they had it against me". His parents reportedly hit him with all sorts of objects, including belts, ropes and hoses. He also recalled an instance during which his father smacked his head against the floor, making him bleed profusely. These events would usually take place at the home. The following day he would go to school with bruises and cuts, and would tell the teacher that he had gotten into a fight with another child to prevent further physical punishment from his parents. Mr. Davila used to wet his bed as a child, and this was also a reason for further beatings.

In addition to the physical violence towards him, Mr. Davila often witnessed his parents fighting with each other. The defendant recalled one occasion when his father attacked his mother with a kitchen knife.

When Mr. Davila was 11 or 12 years old his father died, reportedly due to the excessive use of drugs and alcohol. His mother then threw him out of the house and he began to use substances in a much larger scale than he had been using previously. Mr. Davila was reluctant to discuss this period of his life, arguing that it "brings back those bad dreams and I get all upset about it". The presentence report describes how the defendant was forced to live in the streets at that early age, often sleeping in friend's houses or garages, as he did not have a supportive network. In addition, he would make money by selling illicit drugs and stealing.

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

Given his difficult living conditions, Mr. Davila was only sporadically attending school. He reported attending school until 11th grade in Puerto Rico, but also that he enrolled in school in Hagerstown, Maryland, at the Highland View Academy, from where he graduated in June of 1990. His school records from Puerto Rico, reviewed for the presentence report, indicate that he had a "C" average, no failing grades and difficulties with behavior and attention. The records from Hagerstown indicate that he was referred to Highland View, a Seventh Day Adventist affiliated school, due to the availability of bilingual services there.

Mr. Davila explained that since he did not have a place to live he would often move between Puerto Rico and the Unites States, where he would stay with relatives. He apparently moved several times between the ages of 15 and 18, spending some periods with his sister Jeanette, who lived in Maryland. At some point his mother moved from Puerto Rico to Bridgeport, Conn., and he was able to move back into her home in Aibonito. Upon returning, approximately a year later, Mr. Davila was thrown out again. Sometime around the age of 18 Mr. Davila moved to Bridgeport, where his sister Jacqueline lived.

During his stay in Bridgeport Mr. Davila met Ivette Aponte, whom he married in January of 1991 according to the presentence report. The couple relocated to Maryland shortly after the wedding, and Mr. Davila obtained employment delivering farm goods. They eventually returned to Connecticut at Ms Aponte's insistence. Mr. Davila indicated that he had been married for approximately 7 or 8 years, that the divorce occurred in 1997 and that he had three children from this union. He acknowledged that the youngest child is not biologically his, but insisted in stating that he loves him as if he was. His oldest child is Noel Davila, who is approximately 13 years of age. His daughter, Hasannies Davila is 11 years old and Ramon Davila, the youngest, is 8 years old. Mr. Davila indicated that he has some contact with his children, and further explained that he had seen them in the immediate past.

Mr. Davila reported that he had several jobs. His first job was in Maryland while attending the Highland View Academy, when he worked in a bakery. Once in Bridgeport he worked as a painter, and as a tire technician at Town Fair Tire. At some point, in 1996, he also worked at a car wash. During a prior incarceration Mr. Davila worked as a maintenance worker, cut hair and attended culinary arts classes. Overall, Mr. Davila was able to maintain gainful employment throughout the time he spent outside correctional facilities.

## PAST LEGAL HISTORY

Mr. Davila has an extensive history of involvement with the law. His first conviction occurred in 1992, when he was sentenced to 10 years of jail, with 5 to serve and 5 of probation due to a sexual assault charge.

In 1998 Mr. Davila was arrested for threatening and reckless endangerment, after a domestic violence incident. In 1999 he was arrested and later convicted of 5 counts of risk of injury to a minor, reckless endangerment, criminal weapons possession and no pistol permit. His sentence

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

consisted of 15 years in jail, followed by 8 years of special parole. At the time of this evaluation Mr. Davila was serving his sentence for the aforementioned charges.

## PAST PSYCHIATRIC HISTORY

Mr. Davila indicated that his first contact with mental health professionals had occurred when he was a child in Puerto Rico and was seen by a social worker for "problems". He explained that he had been referred for those services as a result of his behavior in school, but added that he had not been referred to a psychiatrist and that he had not received psychiatric medication or been admitted to a psychiatric hospital. He was very vague about the type of treatment provided.

Mr. Davila indicated that he had not had further psychiatric contact until 1997 or 1996, when he reportedly received care in Bridgeport. No records are available from this contact and Mr. Davila has provided somewhat conflicting information in this regard. Overall, he has consistently indicated that he was prescribed some for of psychoactive medication used to treat anxiety and/or depression. At one time or another during that period he was (by his own report) treated with Prozac®, Paxil®, Xanax® and/or Haldol®. This information could not be verified. On 5/18/99, while incarcerated at the Walker Correctional Institution, John O'Reilly, a nurse, attempted to verify this history of treatment. Mr. Davila had reported that he was seeing a Dr Duncan, in Bridgeport, but according to Mr. O'Reilly's report there was no information available in the telephone company database on this physician. On 5/8/00, Barbara Phelps, a nurse at Cheshire Correctional Institution also attempted to contact Dr Duncan, with similar results.

Most of the psychiatric care that Mr. Davila underwent took place during his several incarcerations. This treatment, however, appears marred by a profound distrust between the defendant and the department of corrections mental health staff. A review of the records indicates that Mr. Davila was seen by several psychiatrists in the department, in addition to a multitude of social workers, nurses and mental health workers. The notes describe Mr. Davila consistently as "demanding, irritable and litigious", in addition to antisocial, "med[ication] seeking" and "non convincing". Apparently, Mr. Davila would present at the psychiatrist's office with vague and often non-specific complaints, which did not meet clear criteria for a psychiatric diagnosis as per DSM-IV. As a result his diagnosis was often unclear and his complaints were ascribed to the search for sleeping medications.

On 6/4/99, Dr Catherine Lewis found the defendant to have "no evidence of Axis I serious mental illness at this time", as a result she did not prescribe psychiatric medications. On 1/4/00, however, she indicated that Mr. Davila had been diagnosed as having Dysthymia by an outside MD. By then Mr. Davila was taking an antidepressant, Paxil®. A week later, on 1/11/00, she started Valproic Acid, a mood stabilizer, due to Mr. Davila's history of fighting in an attempt at reducing his impulsive aggressive behavior. This medication was discontinued less than a month later by Dr Enyat Khorramzadeh, a psychiatrist affiliated with the department. Dr Khorramzadeh continued seeing Mr. Davila on a regular basis until his transfer out of Cheshire Correctional Institution after being charges with the instant offense. At the time of that offense, Mr. Davila was taking Remeron®, an antidepressant, with fair results.

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

At the time of this evaluation Mr. Davila was not taking any psychiatric medication and provided a convoluted explanation as of to the reasons for this. He explained that the only medication that had been helpful to him were benzodiazepines (such as Valium® and Xanax®) and that the psychiatrist at McDougal CI had refused to prescribe them due to the high cost of these medications. He also indicated that he had stopped taking Effexor®, the antidepressant that Dr Fisher was prescribing. When asked about the reasons for this discontinuation Mr. Davila indicated, "They don't give it to me anymore". On further questioning, he admitted that the medication had been stopped due to his refusal to continue taking it and that he had actually signed a form indicating that such was his wish.

## SUBSTANCE ABUSE HISTORY

Mr. Davila explained that he had started using drugs at an early age. By the time he was 6 or 7 years old he started smoking his parents' cigarettes. By age 8 he was drinking the alcohol that his parents would leave sitting around the house. In fact, he indicated that his parents would often be so inebriated and intoxicated that they would fall asleep and that, at that time, he would drink whatever was left on the table.

By the time he was 11 or 12 years old the defendant started to use marijuana, sniffing glue and paint thinner. He also used cocaine and PCP. He reported that he had not had a period of abstinence outside of jail since that time.

## MENTAL STATUS EXAMINATION

Noel Davila presented for the interviews as well built, 34-year-old, Hispanic male who appeared his stated age. He was dressed in typical Khaki correctional garment and was appropriately groomed for the interview. He sat appropriately in his chair throughout the examination, but appeared fidgety and anxious, and displayed a prominent facial tic. During the second evaluation his behavior was somewhat more restless. He complained of sweating and flushing, and lifted his khaki prison garment frequently. He had several tattoos, and his hair was long and arranged in a ponytail. His speech was of normal volume, although rate and productivity were perhaps somewhat increased. He described his mood as "very bad, anxious". His affect (observed emotional response) was reactive and only minimally congruent with his mood (i.e., he did not appear overtly depressed). He did appear anxious and somewhat uncomfortable. His thought processes were characterized at times by mild circumstantiality, but his responses to questions were generally logical, coherent and goal-directed. He reported auditory hallucinations, in the form of voices that commanded him to engage in violent acts, both against himself and others. At one point in the interview, when this writer confronted him with several inconsistencies found during the examinations Mr. Davila looked up and, as if talking to someone else, asked loudly "why don't you tell that to him so that he can hear you too?". Mr. Davila explained that he could hear the voices of dead people and that this experience was frightening and something he did not want to have. He indicated that "the dead" would command him to do things he did not want to do, like hurting others. When asked about his understanding of this, he was unable to explain these symptoms other than to say that "the dead" had been talking to him for many years and that he had told this to all the psychiatrists that he had seen in DOC. When this writer pointed out that none of them had actually describe these symptoms

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

United States of America v. Noel Davila
Docket 3:04CR00258(EBB)                                                                 Psychiatric Evaluation

in their clinical notes, he explained, "it is because they all cover their asses... I've been telling this to everybody for the longest time". He became angry and hostile with this writer after such interaction. He also reported seeing "shadows that come and go" and indicated that he had these experiences between 4 and 5 times a week. He also indicated that "the dead" moved his belongings in the cell and that they play pranks on him. He reported intermittent passive suicidal ideation, such as wishing he was dying or dead, but denied active suicide planning.

Mr. Davila also reported symptoms of severe anxiety. He explained that he had a hard time talking or thinking about his childhood because it brought back bad memories of the physical violence in his household. He reported having intrusive thoughts and experiencing re-living some of the violent acts that he had both witnessed and been a victim of, the latter coming in the form of nightmares and flashbacks. In addition, he described difficulties with heightened startle reactions, indicating that being accidentally touched by someone often resulted in being scared and fearful of being killed.

The defendant was alert and oriented to place and self. He did not seem to put his best effort forward and often gave approximate but incorrect answers. For example, he indicated that the date of the interview was "April 28th, 2005", when it was 5/2/05. The most significant example of his unwillingness to meaningfully participate in the interview became apparent during a simple memory test. As part of this test, the individual is asked to immediately repeat three words provided by the examiner, to make an effort to remember them and to recall them a few minutes later after a distracting task. Mr. Davila could not immediately restate the words after being provided to him, and continued indicating that he did not remember them even after five repetitions (even individuals with amnesia are able to restate three words since the repetition does not involve memory encoding). While this could point to a serious memory defect, Mr. Davila was able to describe several other facts that indicated that his memory functions was largely preserved and, therefore, that his inability to restate three simple nouns was likely willful. His attention and concentration were also difficult to assess due to his unwillingness to fully cooperate with the mental status examination. He could not perform serial 7's or serial 3's, and was not able to recall more than three digits forward and two in reverse. His long-term memory was intact as evidenced by his ability to remember important personal information that most people would normally recall. His short-term memory was intact difficult to assess given his unwillingness to put his best effort in the test.

Mr. Davila's intelligence and general fund of knowledge was estimated as being in the "below average" range. He could, for example, identify the current American President and his most immediate predecessor in office, but could provide the directions from Hartford to California, an important reason to cook certain foods and who Martin Luther King, Jr., was.

His judgment, as evidenced by his response to a hypothetical social situation, was intact, and was congruent with some of his personality traits. For example, when asked what he would do if he were to find a sealed and addressed envelope on the sidewalk he responded, "open it to see what's inside". He demonstrated a capacity for abstract thought in that he could identify the similarity between four out of five paired objects he was offered, and was able to interpret two proverbs or common sayings in an appropriately abstract manner.

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

United States of America v. Noel Davila
Docket 3:04CR00258(EBB)                                                    Psychiatric Evaluation

8

## CONCLUSION

Noel Davila is a 34 year old Hispanic male, currently incarcerated at the McDougal Correctional Center in Suffield, CT. Mr. Davila is serving lengthy sentence for charges unrelated to the instant offense. On June 28th, 2004 he was found guilty by jury verdict of threatening to use a weapon of mass destruction and mailing threatening communications, after reportedly mailing an envelope filled with white powder to the State's Attorney's Office in Bridgeport, CT. This evaluation was requested by Mr. Davila's counsel, Tim Pothin, Esq.

Mr. Davila has a personal history significant for a chaotic upbringing. He grew up within a dysfunctional family environment in which both parents were substance abusers. Both his siblings and Mr. Davila himself were often victims of physical violence at their hands, as well as witnesses of serious incidents of domestic violence, such as seeing his father assault his mother with a kitchen knife. Mr. Davila would often go to school with cuts and bruises and was forced to make up stories about how they had occurred in order to prevent further violence.

At the age of 6 Mr. Davila began to use cigarettes. By the time he was 8 years old he was using alcohol, and by age 11 or 12 he was using cannabis, PCP and sniffing glue. This drug habit continued, unremitted, throughout his life as Mr. Davila did not have significant periods of sobriety or abstinence outside of prison. Thrown out of his home by his mother at an early age, Mr. Davila grew up in the streets and engaged in illicit activities in order to support himself. This environment undoubtedly contributed to the development of antisocial traits, which he readily displays today.

Mr. Davila was seen by social workers in Puerto Rico, by his own account, but not by a psychiatrist. In fact, it is unclear whether he was ever seen by a mental health professional outside the correctional setting. Once in jail his diagnosis was questioned by several psychiatrists. Overall, most thought that Mr. Davila was suffering from a depressive disorder not otherwise specified, that is, a depressive disorder that did not meet full DSM criteria for a major depressive episode. Other diagnosis considered were anxiety disorder not otherwise specified and post traumatic stress disorder. Mr. Davila was treated with antidepressants and, at one point, was given a short trial of a mood stabilizer in an attempt to diminish his impulsive behavior. The defendant's response to the medication was, at best, fair. Mr. Davila continued endorsing symptoms of depression and anxiety in spite of being treated with adequate doses of medication, which led his prescribers to believe that he was over-reporting his psychiatric maladies in order to obtain medications to sleep. There is some evidence that Mr. Davila has a tendency to feign psychiatric disorders. For example, during the competency evaluation, Mr. Davila underwent some psychological testing (MMPI-2) which showed that he was likely to exaggerate symptoms. Furthermore, during the interviews with this writer, it became apparent that he was not putting his best effort forward as evidenced by his inability to repeat three common nouns even after five instances of repetition. Finally, his dramatic demonstration of his communication with "the dead" was another example of an attempt at making himself appear more psychiatrically ill than he likely is.

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.

The above statement does not contradict the fact that Mr. Davila has some bona fide psychiatric symptoms. He was visibly anxious throughout the interviews and readily admitted to experiencing mood swings, flashbacks and nightmares of past abuse, as well as making efforts to avoid thinking about his childhood due to the distress that it caused. Finally, he also reported a heightened startle reaction whenever someone accidentally touched him. These symptoms are the hallmark of post traumatic stress disorder and, unlike other more colorful psychiatric symptoms, are less likely to be feigned by unsophisticated individuals.

In sum, Mr. Davila clearly meets DSM-IV criteria for post traumatic stress disorder. Unfortunately, his antisocial traits have gotten in the way of obtaining proper treatment for this illness as he often presents with clearly fabricated symptomology that is aimed at obtaining sleep inducing and other sedating medications. At this time, Mr. Davila would likely benefit from a psychopharmacological assessment that would review the need for anti-anxiety medication, as well as individual psychotherapy to enhance his coping skills and diminish his reliance in learned antisocial behaviors.

Sincerely,

Humberto Temporini, MD
Clinical Instructor in Psychiatry, Yale University School of Medicine
Assistant Professor of Psychiatry, University of Connecticut School of Medicine

**CONFIDENTIAL**
The confidentiality of this record is required under Chapter 899 of the Connecticut General Statutes as well as Title 42 of the United States Code. This material shall not be transmitted to anyone without written consent or authorization as provided in these statutes.