*MANDATE*

NHCT- New Haven, CT.
02-cr-258
BURNS

# United States Court of Appeals
## FOR THE
## SECOND CIRCUIT

## JUDGMENT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 30th day of August, two thousand six.

Before:     Hon. Pierre N. Leval,
              Hon. Barrington D. Parker,
                      *Circuit Judges*,

             Hon. William K. Sessions,
                      *District Judge.**

Docket No. 05-2545-cr

---

UNITED STATES OF AMERICA,

            *Appellee*,

            v.

NOEL DAVILA,

            *Defendant-Appellant.*

---

Appeal from the United States District Court for the District of Connecticut.

This cause came on to be heard on the transcript of record from the United States District Court for the District of Connecticut and was argued by counsel.

On consideration whereof, it is hereby ORDERED, ADJUDGED and DECREED that the judgment of said District Court be and it hereby is AFFIRMED in accordance with the opinion of this Court.

                                                   FOR THE COURT:
                                                   ROSEANN B. MACKECHNIE, Clerk
                                                   by

A TRUE COPY
Roseann B. MacKechnie, CLERK
by _____
             DEPUTY CLERK

                                                   Arthur M. Heller
                                                   Motions Staff Attorney

---

*  The Honorable William K. Sessions, Judge of the United States District Court for the District of Vermont, sitting by designation.

ISSUED AS MANDATE: 9/22/06

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2005

(Argued: March 21, 2006                              Decided: August 30, 2006)

Docket No. 05-2545-cr

---

UNITED STATES OF AMERICA,

*Appellee,*

v.

NOEL DAVILA,

*Defendant-Appellant.*

---

B e f o r e :  LEVAL and B.D. PARKER, *Circuit Judges,* and SESSIONS, *District Judge.*[*]

Appeal from defendant-appellant's conviction for threatening to use a weapon of mass destruction and delivering a threat to injure through the U.S. mail.

AFFIRMED.

> STEPHEN B. REYNOLDS, Assistant United States Attorney (Kevin J. O'Connor, United States Attorney for the District of Connecticut, and William J. Nardini, Assistant United States Attorney, *on the brief*), Bridgeport, Connecticut, *for Appellee.*
>
> TIMOTHY P. POTHIN, Lynch, Traub, Keefe & Errante, P.C., New Haven, Connecticut, *for Defendant-Appellant.*

---

[*] The Honorable William K. Sessions III, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

AUG 3 1 2006

1  WILLIAM K. SESSIONS III, *District Judge*:

2  Noel Davila appeals from a judgment of conviction entered in the United States District
3  Court for the District of Connecticut (Ellen Bree Burns, *Judge*). Following a jury trial, Davila
4  was found guilty of threatening to use a weapon of mass destruction and delivering a threat to
5  injure through the U.S. mail. The charges stemmed from a hoax anthrax mailing that Davila, a
6  prison inmate, created and caused to be sent to the State's Attorney's Office in Bridgeport,
7  Connecticut. For the reasons set forth below, we conclude that none of the arguments raised in
8  Davila's appeal warrants reversal of his conviction, and we affirm the judgment of the district
9  court.

10  **Background**

11  **A. Procedural history**

12  In September 2002, Davila was indicted by a federal grand jury on charges of threatening
13  to use a weapon of mass destruction and delivering a threat to injure through the U.S. mail, in
14  violation of 18 U.S.C. §§ 2332a and 876(c). Count One of the indictment charged that Davila
15  had violated section 2332a by threatening the use of a biological agent, toxin, or vector against
16  members and employees of the Connecticut State's Attorney's Office at Bridgeport. It also
17  alleged that the threat affected interstate commerce and that the threatened use would have
18  affected interstate commerce. Count Two charged that Davila had violated section 876(c) by
19  causing to be delivered to the State's Attorney's Office an envelope containing a white powdery
20  substance represented to be anthrax, along with a letter, which together threatened to injure the
21  person of another.

1    Davila pled not guilty to both counts of the indictment, and a jury trial was held from
2    June 21 to 28, 2004. Davila moved for a judgment of acquittal at the close of the government's
3    evidence, and the court reserved decision. After the jury returned a verdict of guilty on both
4    counts, Davila moved for a new trial and filed a supplemental motion for a judgment of acquittal.
5    The court denied Davila's motions in unpublished written rulings dated March 23, 2005.
6    On May 11, 2005, the district court sentenced Davila to a term of imprisonment of 360
7    months on Count One and 60 months on Count Two. The court noted that the length of the
8    sentence was affected by Davila's status as a career offender, and it also emphasized his violent
9    criminal history and his pattern of disobedience during incarceration. The court ordered the
10   sentences to run concurrently with each other and with the state sentence that Davila was already
11   serving. In light of the pre-existing state sentence, the sentence in this case had the effect of
12   adding approximately 17 years to Davila's term of incarceration.
13   Davila filed a timely notice of appeal on May 18, 2005.

14   **B. The evidence at trial**

15   Viewing the evidence in the light most favorable to the government and drawing all
16   reasonable inferences in the government's favor, the following facts were established at Davila's
17   trial. In August 2002, Davila was incarcerated at the Cheshire Correctional Institution in
18   Connecticut. He had made comments to other inmates indicating that he held a grudge against a
19   particular state prosecutor in Bridgeport who had handled cases against him, and he had
20   previously filed a grievance and a lawsuit against that prosecutor. Both the grievance and the
21   lawsuit had been dismissed for lack of merit.
22   On or about August 18, 2002, Davila wrote a note containing the words "ANTRAX" [sic]

1  and "AKA Bin Laden." He folded the note to create a makeshift envelope and placed into it a
2  small quantity of baby powder that had been acquired from the prison commissary. Davila
3  placed the folded note, along with another piece of paper containing writing in a foreign
4  language, into an envelope that was pre-printed with a notation designed to inform the recipient
5  that it had been sent by a correctional inmate. He addressed the envelope to "STATE ATT.
6  SUPERIOR COURT 1061 MAIN ST. BRIDGEPORT CT. 06604." In the space for the return
7  address, he wrote the name "H. Gordon," an inmate number, and the prison's street address. He
8  also included the notation "Legal Mail" in an apparent effort to avoid inspection by prison
9  officials. Davila then gave the envelope to another inmate to place in the mail.
10      On August 20, 2002, Davila's envelope arrived at the State's Attorney's Office in
11  Bridgeport. It was delivered to the front office, which was occupied by a clerical supervisor,
12  Ruthann Haug, and two other employees, Annette Stufan and Michelle Martino. Haug opened
13  the envelope and found the "ANTRAX" note, the foreign writing, and the powder. She
14  exclaimed about the powder to Stufan and Martino, and the three employees immediately left the
15  room and notified their supervisors. Upon learning of Haug's discovery, another employee,
16  Inspector Bill Hughes, came into the office and examined the envelope, causing the powder to
17  spill onto a desk. At that point, Hughes left the room, and the Connecticut State Police were
18  contacted. A full-scale hazardous materials response ensued, with emergency personnel in
19  protective gear arriving to inspect and seal off the area. The front office area of the building was
20  closed for approximately two and a half days until test results were obtained showing that the
21  powder did not contain anthrax or other pathogens.
22      Even though they were aware that the letter bore the return address of a prison inmate,

1   Haug, Stufan, and Martino were concerned about their exposure to the powder, and they took a
2   number of precautionary measures. Haug removed and bagged her clothes, wiped down the
3   inside of her car with alcohol, and stayed in her house while she awaited the test results out of
4   fear that she might infect others. Martino showered, washed her clothes, and remained away
5   from work for a few days; she testified that she was fearful about the possibility of infecting her
6   children. Stufan went home, called a doctor, and began taking the antibiotic Cipro.

7   The government also presented evidence regarding how interstate commerce would have
8   been affected if Davila had actually sent anthrax. A postal manager testified that the mail facility
9   in Wallingford, CT, would have been partially shut down, that interstate mail would have been
10  delayed, and that mail would have been diverted to other facilities outside of Connecticut. He
11  based these predictions on an actual incident in which anthrax-contaminated mail had passed
12  through the Wallingford facility, causing a partial shutdown for a number of weeks. In addition,
13  an official from the Federal Bureau of Investigation testified that if Davila's letter had contained
14  anthrax, the government would have used interstate highways to transport drugs by truck to
15  Connecticut from a national strategic stockpile located outside of Connecticut.

16  **Discussion**

17  Davila appeals the district court's denial of his motions for a judgment of acquittal, citing
18  four alleged errors. He argues that the statutes under which he was convicted criminalized only
19  threats of future action and that his conduct did not fall within this definition; that the letter was
20  insufficiently credible to constitute a "true threat"; that the government failed to establish a
21  sufficient link with interstate commerce, as required by section 2332a; and that the indictment
22  failed to allege that his letter was addressed to a "person," as required by section 876(c).

1   We review the denial of a judgment of acquittal *de novo*. *United States v. Holland*, 381

2   F.3d 80, 86 (2d Cir. 2004). We consider the sufficiency of the evidence according to the same

3   standard that guided the district court: viewing the evidence in the light most favorable to the

4   prosecution and drawing all reasonable inferences in the government's favor, we must determine

5   whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.

6   *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002).

7   **A. Whether sections 2332a and 876(c) criminalize only threats of future action**

8   Davila's first argument is one of statutory interpretation. He reads the phrases "threatens

9   . . . to use" and "threat to injure" in sections 2332a and 876(c) as restricting the scope of those

10   statutes to threats by an individual to engage in future harmful acts. His letter did not constitute

11   such a threat, he argues, because it merely created the false impression that a harmful act had

12   already been committed.

13   At the time that Davila sent his letter in 2002, section 2332a provided that anyone who

> without lawful authority, uses, *threatens, or attempts or conspires to use*, a
> weapon of mass destruction . . . (2) against any person within the United States,
> and the results of such use affect interstate commerce or, in the case of a threat,
> attempt, or conspiracy, would have affected interstate or foreign commerce . . .
> shall be [guilty of a crime].

18 U.S.C. § 2332a(a) (emphasis added). Section 876(c) provided:

> Whoever knowingly [deposits to be mailed or causes to be mailed] any
> communication . . . addressed to any other person and containing . . . any *threat to
> injure* the person of the addressee or of another, shall be [guilty of a crime].

18 U.S.C. § 876(c) (emphasis added). Davila argues that the use of the words "threat" and

"threaten," combined with the infinitives "to use" and "to injure," limits the scope of both

statutes to threats of future conduct on the part of the threatener.

6

1   In construing the language of sections 2332a and 876(c), we begin with the "fundamental principle of statutory construction that the starting point must be the language of the statute itself." *Morenz v. Wilson-Coker*, 415 F.3d 230, 234 (2d Cir. 2005) (internal quotation marks omitted); *see also In re Edelman*, 295 F.3d 171, 177 (2d Cir. 2002) ("Where the statutory terms are clear, our inquiry is at an end.").

Because neither statute defines the words "threat" or "threaten," we give them "their ordinary, contemporary, common meaning." *Id.* at 177 (internal quotation marks omitted). According to the Oxford English Dictionary, a threat is a "denunciation to a person of ill to befall him; esp. a declaration of hostile determination or of loss, pain, punishment, or damage to be inflicted in retribution for or conditionally upon some course; a menace." The American Heritage Dictionary, Fourth Edition, defines the word as "[a]n expression of an intention to inflict pain, injury, evil, or punishment," or "[a]n indication of impending danger or harm." The same dictionary defines the word "threaten," in turn, as "[t]o express a threat against." We do not read these definitions as applying only to announcements of future action. An impression of impending injury is created not only by a communication promising to commit a dangerous act in the future, but also by the delivery of a substance that appears to be injurious. Because Davila created such an impression by mailing powder that he represented to be anthrax, his conduct qualified as a "denunciation to a person of ill to befall him [or her]" and an "indication of impending danger or harm," and as such, it fell within the definition of a threat.

Characterizing Davila's conduct as a threat is also consistent with this court's case law considering the definition of that word. In *United States v. Malik*, 16 F.3d 45 (2d Cir. 1994), we approved of a jury instruction defining a threat as "a statement expressing an intention to inflict

7

bodily harm." *Id.* at 51. In *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976), we held that a threat under 18 U.S.C. § 875(c) was punishable "[s]o long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *Id.* at 1027. Contrary to Davila's contention, nothing in these definitions suggests that they apply only to warnings of future acts. Here, because Davila's mailing was designed to create the impression that it contained a deadly substance, a reasonable jury could have found that it expressed an intention on his part to inflict bodily harm. Similarly, because the delivery of the powder appeared to be an impending execution of a harmful act, a reasonable jury could have found that it conveyed an "imminent prospect of execution."

Davila also argues that regardless of whether the word "threat" by itself implies a requirement of future conduct, such an implication is created by the statutes' use of the infinitives "to use" and "to injure." One connotation of the infinitive is to convey the future tense, and Davila seizes on this connotation to argue that one cannot "threaten to use" a weapon except by announcing that he *will use* a weapon in the future. Davila notes that one district court in this circuit has adopted a similar reading. *See United States v. Taylor*, No. 02CR73, 2003 WL 22073040 (S.D.N.Y. Sept. 5, 2003). In *Taylor*, the defendant had been charged under section 2332a for leaving a note stating that anthrax was on the premises of a store. The court held that this conduct did not fall within the language of the statute, reasoning that

> [t]he word "threatens," taken in conjunction with the words "to use," require active employment of something in the future. Because the Note state[d] . . . that the anthrax has already been placed in ABC Carpet, and because there is no evidence that Defendant was threatening to "actively employ" the anthrax, there is no evidence that Defendant "threatened to use" a weapon of mass destruction.

1 *Id.* at *8.

2 In our view, however, the words "to use" and "to injure" cannot reasonably be limited to the restrictive reading urged by Davila and adopted by the district court in *Taylor*. In common parlance, a construction such as "threaten to use" can serve as a substitute for the phrases "threaten the use of" or "threaten to be using." For example, an individual who makes a phone call making the false claim that she has released a toxic substance into a public water supply can be said to have "threatened to use" the substance.

Both of the Courts of Appeals that have considered the issue presented here have adopted this broader and more natural reading of the phrases "threatens . . . to use" and "threat to injure," concluding that these phrases do not imply any requirement of future action on the defendant's part. The Fifth Circuit held that a defendant was properly convicted under section 2332a for telling a phone representative at his mortgage company, "I just dumped anthrax in your air conditioner." *United States v. Reynolds*, 381 F.3d 404, 405 (5th Cir. 2004). The court held that a "threat" under section 2332a need not contain a reference to a future act. *Id.* at 406. The holding of *Reynolds* was reaffirmed in *United States v. Guevara*, 408 F.3d 252 (5th Cir. 2005), which involved a set of facts almost identical to this case. In *Guevara*, the defendant had mailed a letter to a judge containing a harmless powder and a note stating "you have been now been [*sic*] exposure [*sic*] to anthrax." *Id.* at 255. The court held that section 2332a covered the defendant's conduct, specifically rejecting his argument that the infinitive "to use" connoted a requirement of future action. *Id.* at 257 & n.4.

In *United States v. Zavrel*, 384 F.3d 130 (3d Cir. 2004), the Third Circuit considered and

rejected an argument similar to Davila's in the context of section 876. The defendant had mailed letters containing powdered cornstarch, which she intended to resemble anthrax, to various individuals. Rejecting the defendant's argument that the statute only prohibited threats of future action, the court expressed agreement with the district court's instruction defining a threat as a communication "which expresses an intention to inflict injury at once or in the future." *Id.* at 136. In any event, the court held, even if the statute were construed as prohibiting only threats of future harm, the defendant's conduct still qualified because the people who received the letters would reasonably fear that they would suffer health problems in the future from their exposure. *Id.*

Davila makes much of the fact that after he sent his letter, Congress enacted a statute that was apparently aimed more directly at hoaxes of the type he engaged in. That statute provides:

> Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of [various statutes relating to weapons and explosives, terrorist acts, and related activities] shall [be guilty of a crime].

18 U.S.C. § 1038(a)(1). The legislative history of section 1038 does suggest that Congress sought to address potential limitations in the existing law. A May 2004 report of the House Judiciary Committee stated that "[n]either terrorism hoaxes nor the war time hoaxes are adequately covered by current Federal law," and that "[a] gap exists . . . in the current law because it does not address a hoax related to biological, chemical or nuclear dangers where there is no specific threat." H.R. Rep. 108-505, at 4, 7 (2004).

Davila's reliance on section 1038 and its accompanying legislative history is misplaced

for two reasons. First, the intent of Congress in 2004 is not necessarily indicative of the intent of the earlier Congress that enacted section 2332a. *See Waterkeeper Alliance, Inc. v. E.P.A.*, 399 F.3d 486, 508 (2d Cir. 2005) (noting that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress") (internal quotation marks and emphasis omitted). Congress's perception in 2004 that existing law contained a "gap" was likely influenced by decisions such as *Taylor* that adopted a narrow reading of section 2332a; by itself, this fact does not suggest that the earlier Congress intended section 2332a to exclude conduct such as Davila's. For this reason, it would be inappropriate to read too much into the passage of section 1038(a). Second, to the extent that the legislative history is relevant, it merely indicates that Congress perceived a gap with respect to hoaxes that did not involve a specific threat. In this case, there was ample evidence from which a reasonable jury could conclude that Davila made a specific threat; not only did he bear a grudge against a state prosecutor, but he included a threatening note containing an apparent reference to anthrax.

Because neither the text of the statutes nor Congress's subsequent enactment of section 1038(a) presents adequate support for Davila's narrow reading of sections 2332a and 876, we join our fellow circuits in holding that neither statute requires a threat of future action.

Moreover, in any event, the evidence was sufficient to show a violation of both statutes even if the terms "threaten to use" and "threat to injure" are construed as limited to threats of future conduct. To illustrate by example, in the famous movie *The Godfather* (Paramount Pictures 1972), when the movie producer found in his bed the severed head of his horse, there could be no doubt that the delivery of the horse's head was not merely an announcement of a past act of violence but a threat of a future act of violence. The sending of white powder with a

11

1 reference to anthrax can reasonably be construed as a threat to send real anthrax the next time.

**B. Whether Davila's actions communicated a sufficiently credible threat**

Davila's next argument is that even if an anthrax hoax could theoretically fall within the scope of sections 2332a and 876(c), his conduct cannot have qualified as a true "threat" within the meaning of those statutes because he did not communicate a credible warning of harm. Because the letter was clearly marked as having come from a prison inmate, he argues, no reasonable recipient could have taken it seriously.

In general, "[w]hether a given writing constitutes a threat is an issue of fact for the trial jury." *Malik*, 16 F.3d at 49. "The test is an objective one--namely, whether an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury." *Id.* (internal quotation marks omitted). In making this determination, "proof of the effect of the alleged threat upon the addressee is highly relevant." *Id.*

With these principles in mind, the evidence at trial was more than sufficient to permit a reasonable jury to find that Davila's conduct constituted a threat. The white powder was accompanied by apparent references to anthrax and Osama Bin Laden, and it occurred not long after the well-publicized anthrax attacks of 2001. In this context, a reasonable recipient could have concluded that the mailing threatened injury. The actual effect on the recipients strongly supports this conclusion. After the letter was discovered, State's Attorney's Office personnel evacuated the area, initiated a full-scale emergency response, and kept the area sealed off until the powder could be tested. The employees who were present when the letter arrived were genuinely frightened and took numerous precautions, such as bagging and washing their clothes, limiting contact with others to avoid infecting them, and taking antibiotics.

1   Davila contends that a reasonable recipient could not have taken his letter seriously

2   because it was marked as having been sent by a prison inmate. While this is one factor to

3   consider in determining whether a threat is credible, it does not deserve the weight Davila urges

4   us to assign it. A recipient of a letter such as Davila's could reasonably believe that the sender

5   had obtained access to anthrax or some other dangerous substance, or that he could cause an

6   associate to send it. *Cf., e.g., United States v. Slaughter*, 116 F. Supp. 2d 688, 690 (W.D. Va.

7   2000) (quoting a letter from an inmate stating, "guess what I got over the fence? I got enough

8   [a]nthrax to kill you with, [a]nd it can be done by mail.").

9   **C. Whether there was sufficient evidence of an effect on interstate commerce**

10   Davila's next set of arguments focuses on the jurisdictional element of section 2332a,

11   which provides that a threat to use a weapon of mass destruction is only punishable if the

12   threatened use "would have affected interstate or foreign commerce." 18 U.S.C. § 2332a. Davila

13   argues that the government failed to produce sufficient evidence to satisfy this element. He also

14   argues that because the statute seeks to regulate conduct with only a theoretical or imaginary

15   effect on commerce, it exceeds Congress's power under the Constitution's Commerce Clause.

16   1. Whether the government presented sufficient evidence that commerce would have been
17   affected

18   Because the instant case involves a hoax anthrax mailing, the proper inquiry, as the

19   district court recognized, is whether commerce would have been affected if the letter had actually

20   contained anthrax.[1] Davila contends that the government presented insufficient evidence on this

---

[1] Davila attempts to draw a distinction between different types of threats, arguing that the statute's "would have affected" language applies only to cases involving threats of future action, and that in hoax cases, the proper inquiry is whether the hoax had an actual effect on commerce. The text of the statute provides no basis for making such a distinction, however, and we agree

13

issue. In his view, the testimony from the postal employee and the FBI official regarding the likely impact on the mail and the use of the federal drug stockpile amounted to no more than speculation and fell short of demonstrating that commerce would actually have been affected.

For statutes that contain a jurisdictional element--a category that includes section 2332a as well as the Hobbs Act, 18 U.S.C. § 1951--evidence of even a *de minimis* effect on interstate commerce will satisfy that element. *See United States v. Fabian*, 312 F.3d 550, 554-55 (2d Cir. 2002) (holding that because the Hobbs Act "requir[es] a particularized showing of federal jurisdiction," the government need only prove a minimal effect on interstate commerce); *United States v. Farrish*, 122 F.3d 146, 149 (2d Cir. 1997) (same); *see also Slaughter*, 116 F. Supp. 2d at 691 ("Because [18 U.S.C. § 2332a] includes such a jurisdictional element, the government need only show a minimal effect on interstate commerce.").

Applying this standard, we are satisfied that the evidence in this case was sufficient to satisfy the jurisdictional element. The postal employee's testimony, which was based on experience from an actual anthrax mailing, established that a postal facility would be shut down, requiring interstate mail to be delayed and rerouted. The FBI witness testified that drugs would have to be transported to Connecticut using trucks traveling on the interstate highway system. From this testimony, a reasonable jury could find at least a minimal effect on interstate commerce.

Davila argues that this case is comparable to *Slaughter*, an anthrax hoax case in which the district court found that the "limited set of facts" presented by the government provided

---

with the district court and the other courts that have considered this issue that the proper inquiry is what would have happened if the threat had been real. *See, e.g., Reynolds*, 381 F.3d at 406; *Slaughter*, 116 F. Supp. 2d at 692.

14

insufficient evidence of an impact on interstate commerce. *Id.* at 693. The evidence in this case is considerably more developed than what the government presented in *Slaughter*, however. There, the government established only that if the defendant had actually sent anthrax, military doctors and scientists would have traveled from Maryland to Virginia to assist and investigate; the court noted that there was no evidence "that the military personnel would have had to bring or use supplies that had traveled in interstate commerce, or that they would have traveled in commercial carriers, lodged in hotels, or eaten at restaurants that engage in interstate commerce." *Id.* Here, by contrast, the government relied not on testimony about a military response, but rather on evidence of direct effects on interstate mail and interstate trucking, two areas that are inextricably connected to commerce.

2. Whether the Commerce Clause permits Congress to regulate conduct with only a theoretical effect on commerce

Davila also argues that applying section 2332a to his conduct would violate the Commerce Clause because Congress may not regulate conduct whose only effect on interstate commerce is purely theoretical. It would be proper to consider whether his actions actually affected interstate commerce, he argues, but it is inappropriate to base the exercise of jurisdiction on speculation about would have happened in an alternate scenario.

Davila's argument is unavailing. It is well established that the Commerce Clause permits Congress to criminalize activity that threatens to affect interstate commerce, even if that threat does not materialize in every case. "Congress can constitutionally reach inchoate offenses because these offenses pose a potential threat to interstate commerce; the existence of such a threat ties 'the proscribed conduct to the area of federal concern delineated by the statute.'"

15

1  *United States v. Jannotti*, 673 F.2d 578, 592 (3d Cir. 1982) (quoting *United States v. Feola*, 420

2  U.S. 671, 695 (1975)); *accord United States v. Curcio*, 759 F.2d 237, 241-42 (2d Cir. 1985). We

3  see no material distinction between Congress's authority to criminalize the inchoate offenses of

4  attempt or conspiracy, on one hand, and the perpetration of a hoax, on the other. All of these

5  activities purport to pose a threat to interstate commerce, regardless of whether they are actually

6  capable of being carried out. *See United States v. Clemente*, 22 F.3d 477, 480-81 (2d Cir. 1994)

7  ("'Factual impossibility' is no defense to the inchoate offense of conspiracy under the Hobbs

8  Act.").

9  Davila argues that in light of *United States v. Morrison*, 529 U.S. 598 (2000), and *United*

10 *States v. Lopez*, 514 U.S. 549 (1995), the Commerce Clause must be read as imposing a

11 requirement of something beyond a minimal or theoretical effect on interstate commerce. His

12 reliance on these cases is misplaced. Both *Morrison* and *Lopez* were concerned with statutes that

13 lacked an explicit jurisdictional element. *See Morrison*, 529 U.S. at 613 ("Like the Gun-Free

14 School Zones Act at issue in *Lopez*, § 13981 contains no jurisdictional element establishing that

15 the federal cause of action is in pursuance of Congress' power to regulate interstate commerce.").

16 We have repeatedly recognized that neither *Morrison* nor *Lopez* affects the government's burden

17 with respect to statutes that contain a jurisdictional element. *See, e.g., Fabian*, 312 F.3d at 555

18 ("As the Hobbs Act requires a particularized jurisdictional showing, we find *Morrison* does not

19 affect our requirement that the Government need only show a minimal effect on interstate

20 commerce to support Hobbs Act jurisdiction.") (internal quotation marks omitted); *Farrish*, 122

21 F.3d at 149 (finding that *Lopez* did not affect the Hobbs Act analysis); *United States v. Leslie*,

22 103 F.3d 1093, 1100 (2d Cir. 1997) (concluding that "*Lopez* did not elevate the government's

burden under the money laundering statute"). Because section 2332a, like the Hobbs Act and the money laundering statute, contains a jurisdictional element, *Morrison* and *Lopez* do not require the government to make a heightened showing of an effect on interstate commerce.

**D. Whether the indictment sufficiently alleged that Davila's letter was addressed to a "person," as required by section 876(c)**

Finally, Davila argues that the indictment failed to allege that his letter was addressed to a person, as required by section 876(c). Because he failed to raise this argument below, we consider only whether this constituted plain error. *See United States v. Thomas*, 274 F.3d 655, 666 (2d Cir. 2001) (en banc) (holding that plain error review applies to a challenge to an indictment that is raised for the first time on appeal). To demonstrate plain error, a defendant must show "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Snype*, 441 F.3d 119, 138 (2d Cir. 2006). If all three of these conditions are met, we may exercise our discretion to notice a forfeited error, but only if "(4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

Section 876(c) prohibits mailing "any communication . . . *addressed to any other person and containing* . . . any threat to injure the person of the addressee or of another[.]" 18 U.S.C. § 876(c) (emphasis added). Here, the indictment alleged that Davila "did cause to be delivered by the U.S. Postal Service to the Connecticut State's Attorney's Office in Bridgeport, an envelope containing a white powdery substance represented to be anthrax, and a letter, which together threatened to injure the person of another." He argues that this language is devoid of any allegation that his letter was addressed to a person.

The government first suggests that Davila has waived this argument by failing to raise it

17

before trial. It is true that in general, "a motion alleging a defect in the indictment or information" must be raised before trial. Fed. R. Crim. P. 12(b)(3)(B). However, Rule 12(b)(3)(B) goes on to state that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense." *Id.* An argument that an indictment fails to allege an element of the crime falls into the latter category. *See United States v. Sutton*, 961 F.2d 476, 478-79 (4th Cir. 1992) ("A defense or objection based on the failure of an indictment to allege an essential element of a crime may be raised at any time during the proceedings."). Accordingly, Davila cannot be deemed to have waived his argument.

At the same time, however, "when a challenge is urged for the first time on appeal, indictments and informations are construed more liberally . . . and every intendment is then indulged in support of the sufficiency." *Id.* at 479 (internal quotation marks and alterations omitted); *see also United States v. Watkins*, 709 F.2d 475, 478 n.2 (7th Cir. 1983) (noting that the "interest in judicial efficiency requires that tardily challenged indictments be construed liberally in favor of validity"). Applying this rule of construction, Davila's argument is easily rejected.

It is implicit in the indictment that Davila's envelope was addressed to the Connecticut State's Attorney's Office in Bridgeport; otherwise, he could not have caused the Postal Service to deliver it there. We reject Davila's contention that this address is not a reference to a specific person. While "Connecticut State's Attorney's Office" may be used to refer to an institution, at the same time, the Connecticut State's Attorney is a person, and the words "Connecticut State's Attorney's Office" are reasonably understood to indicate that person's office.

Moreover, even if we were to read the words "Connecticut State's Attorney's Office" as

referring solely to an institution, there is a lack of precedent from which to conclude that this would qualify as plain error. As we observed in *United States v. Whab*, 355 F.3d 155 (2d Cir. 2004):

> For an error to be plain, it must, at a minimum, be clear under current law. We typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court. . . . It may be appropriate for this Court to find an error plain, even in the absence of binding precedent from the Supreme Court or this Circuit, where other circuits have uniformly taken a position on an issue that has never been squarely presented to this Court. We emphasize, however, that such cases are bound to be exceedingly rare.

*Id.* at 158 (internal citations and quotation marks omitted). In this circuit, there is no binding precedent as to whether an institution qualifies as a "person" under section 876, and courts elsewhere are split on the issue. *Compare, e.g., United States v. Bly*, No. 3:04CR00011, 2005 WL 2621996, *5 (W.D. Va. Oct. 14, 2005) (holding that a letter addressed to the University of Virginia was addressed to a "person" within the meaning of section 876), *with United States v. Brownfield*, 130 F. Supp. 2d 1177, 1184 (C.D. Cal. 2001) (concluding that an agency of the U.S. government was not a "person" under the statute). In light of the unclear state of the law, there would be no basis for concluding that Davila suffered plain error even if the indictment failed to allege that his letter was addressed to a specific individual.

## Conclusion

For the reasons given above, we affirm Davila's conviction.