**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA,
*Plaintiff*,

v.

NOEL DAVILA,
*Defendant*.

No. 3:02cr258(MPS)

**RULING ON MOTION FOR COMPASSIONATE RELEASE**

In May 2005, after a jury found him guilty of threatening the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a and delivery of a threat through the United States mail in violation of 18 U.S.C. § 876, defendant Noel Davila was sentenced to 360 months imprisonment to run concurrently with his state sentence. (ECF No. 140.) Davila filed a *pro se* motion under 18 U.S.C. § 3582(c)(1)(A) for a reduction in his term of imprisonment to time served due to the dangers posed by the COVID-19 virus in combination with his underlying health conditions. (ECF No. 161.) After I appointed counsel for Davila, his attorney filed a supplemental motion in support of Davila's request, Davila's most recent medical records, and his disciplinary and programming history. (ECF Nos. 168, 172.) The Government has filed memoranda in opposition. (ECF Nos. 165, 170.) I conducted a hearing via Zoom on January 28, 2021[1] and have carefully considered all of this information. For the reasons that follow, Davila's motion is denied.

**I. Background**[2]

[1] In the hearing notice, I instructed the Government to provide notice to the victims regarding the defendant's motion and of the Zoom hearing, and to invite them to participate, should they wish. At the hearing, counsel for the Government represented that the victims declined to attend the hearing but indicated that they opposed Davila's request for a sentence reduction.

[2] The facts are taken from the Court of Appeals opinion, *United States v. Noel Davila*, 461 F.3d 298 (2d Cir. 2006), the district court's rulings on the defendant's post-verdict motions, ECF Nos. 131, 132, and the PSR.

On September 11, 2002, a federal grand jury returned a two count indictment against Davila charging him with threatening the use of a weapon of mass destruction in violation of 18 U.S.C. § 2332a (count one) and delivery of a threat through the United States mail in violation of 18 U.S.C. § 876 (count two), after the defendant sent a letter containing a white powdery substance that was represented to be anthrax along with threatening writing to the Connecticut State's Attorney's Office in Bridgeport.  The case was assigned to Judge Burns.

In June 2004, Judge Burns presided over a week-long jury trial after which the jury returned a guilty verdict on both counts.  The evidence adduced at trial revealed the following:

In 1993, Davila was convicted of Aggravated Sexual Assault in the First Degree in violation of Conn. Gen. Stat. § 53a-70a following a prosecution by a prosecutor in the Bridgeport State's Attorney's Office.  The same prosecutor subsequently prosecuted him later after Davila fired nine shots into a house in Bridgeport in which a man, a woman, and 5 children between the ages of 3 and 9 were present.  For this conduct, Davila was convicted in 2001 of five counts of risk of injury to a minor in violation of Conn. Gen. Stat. § 53-21(a)(1), reckless endangerment in violation of Conn. Gen. Stat. § 53a-63, criminal possession of a firearm by a convicted felon in violation of Conn. Gen. Stat. § 53a-217, and carrying a pistol without a permit in violation of Conn. Gen. Stat. § 29-35(a), and possession of narcotics in violation of § 21a-279(a).  (PSR ¶¶ 39, 40.)  In total, Davila was sentenced to 15 years, followed by 8 years of special parole.  (PSR ¶ 39.)

He filed a grievance and a lawsuit against the prosecutor, both of which were dismissed. In August 2002, while incarcerated at Cheshire Correctional Institution, Davila made comments to other inmates indicating that he held a grudge against the prosecutor.  Davila began to talk about orchestrating an anthrax scare and spoke with two confidential informants ("CI") about it.  (PSR ¶ 10.)

One CI gave Davila two pieces of paper. (PSR ¶ 11.) One of the papers was a list of inmates and their inmate numbers. (PSR ¶ 11.) Davila asked another CI to get him an envelope. (PSR ¶ 12.) On or about August 18, 2002, Davila wrote a note containing the words "ANTRAX" [sic] and "AKA Bin Laden." He folded the note and placed a small quantity of baby powder in it. He placed the note with another piece of paper containing writing in a foreign language into an envelope and addressed it to the Bridgeport State's Attorney's office. In the space for the return address, he wrote "H. Gordon," an inmate number, and the prison's address. Davila told a CI that he picked that particular inmate because he had a relatively high inmate number (indicating that he has not been in the prison system long) and Davila did not want to cause trouble for someone who had been in the system for a long time. (PSR ¶ 13.) He also wrote "Legal Mail" on the envelope and then gave the envelope to a CI and asked him to mail it for him.

On August 20, 2002, the envelope was delivered to the front desk of State's Attorney's Office in Bridgeport. Three employees were in the area. One opened the envelope, saw the powder, and told the other two. They left and notified their supervisors. Another employee came into the office and examined the envelope, causing the powder to spill onto a desk. The Connecticut State Police were contacted and a full-scale HazMat response ensued. The State’s Attorney’s Office was closed for two and a half days while testing on the substance proceeded. Ultimately, testing determined that the powder was not anthrax.

The three staff members were concerned about their exposure to the powder, and they took a number of precautionary measures. One removed and bagged her clothes, wiped down the inside of her car with alcohol, and stayed in her house while she awaited the test results out of fear that she might infect others. Another showered, washed her clothes, and remained away from work

for a few days; she testified that she was fearful about the possibility of infecting her children. The third went home, called a doctor, and began taking an antibiotic.

At trial, the government presented testimony from eighteen witnesses, as well as extensive documentary evidence. The government's case included testimony from three inmates, which established that Davila sent the envelope and included a description of his elaborate efforts to avoid detection, including wearing plastic bags on his hands to prevent fingerprints, using the name and identification number of another inmate on the return address of the envelope, disguising his handwriting on the mailing, and sealing the envelope with water rather than saliva to prevent detection of DNA. The government also introduced tape recordings of Davila made after his cellmate consented to wearing a wire, in which Davila discussed the steps he took to send the mailing, and his efforts at avoiding detection. Among other things, the tape recordings revealed the following: that Davila acknowledged that he sent the anthrax note to a courthouse; that he discussed how law enforcement would not be able to trace the mailing back to the Cheshire prison because of the efforts he made to avoid leaving any trace of DNA on the mailing, including his use of water rather than saliva to seal the envelope; and that he rubbed his fingers across the envelope to seal it without leaving an identifying fingerprint.

After the jury returned a guilty verdict, Davila filed posttrial motions, which Judge Burns denied. (ECF Nos. 131, 132.)

Because of Davila's extensive criminal history, he was classified as a career offender. (ECF No. 136 at 4.) Based on a total offense level of 37 and a criminal history category of VI, the range under the sentencing guidelines was 360 months to life for count 1 and 60 months for count 2. PSR ¶ 79. On May 11, 2005, Judge Burns sentenced Davila to 360 months on count 1 and 60 months on count 2, to run concurrently. The sentences for counts 1 and 2 were to run concurrently

with Davila's state sentence. (ECF No. 140.) The Court also imposed a 3-year term of supervised release. (ECF No. 140.) His conviction was affirmed on appeal. In August 2020, Davila completed his state sentence. (ECF No. 161 at 43.) He is currently housed at FCI Butner Medium I. His projected date of release is December 29, 2030.[3]

## II. Statutory Framework

Section 3582(c)(1)(A) authorizes courts to modify terms of imprisonment as follows:

> [T]he court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Under this provision, as modified by the First Step Act of 2018, Pub. L. No.115-391, 132 Stat. 5239, I am free "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release." *United States v. Brooker*, No. 19-3218-CR, 2020 WL 5739712, at *7 (2d Cir. Sept. 25, 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."). As a result, because Davila – and not the Bureau of Prisons ("BOP") – brings the instant motion, I am not bound by the Sentencing Commission's outdated policy statement applicable to Section 3582(c)(1)(A), *see* U.S.S.G. § 1B1.13, which the Second Circuit recognized as applying only to motions for sentence reduction brought by the BOP.

[3] Federal Bureau of Prisons, Find an Inmate, https://www.bop.gov/inmateloc (last visited February 8, 2021).

*Brooker*, 2020 WL 5739712, at *1, 6 ("hold[ing] that Application Note 1(D) does not apply to compassionate release motions brought directly to the court by a defendant under the First Step Act . . ."; rather, this Guideline "only [applies] to those motions that the BOP has made" under this Act). However, "[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason." *Brooker*, 2020 WL 5739712, at *8 (citing 28 U.S.C. § 994(t)) (emphasis in original).

Therefore, I may reduce Davila's term of imprisonment, after considering the Section 3553(a) factors, if (1) he has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) I find that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

Davila has submitted evidence that he made a compassionate release request to the Warden, which was denied, and the Government does not dispute that Davila has satisfied the exhaustion requirement. (ECF Nos. 168-1, 170 at 2.) As to the merits of Davila's motion, I find that, when all of the circumstances including the Section 3553(a) factors are considered, he has not shown that a reduction of his term of imprisonment is warranted.

## III. Discussion

Davila argues that he suffers from serious medical conditions that make him particularly suspectible to COVID-19 complications. (ECF No. 161 at 1.)

In 1999, Davila suffered a spinal injury in a motor vehicle accident. His spinal issues have deteriorated since then and he has used a wheelchair for some years.[4] (ECF No. 168 at 22 n.7.)

[4] At the hearing, there was some evidence that he is able to take steps with braces.

Davila, who is now 50 years old,[5] suffers from paraplegia and incomplete quadriparesis[6] due to C4-C6 myelopathy, with Brown-Sequard features. His other medical conditions include asthma, deviated nasal septum, chronic rhinitis, sleep apnea, gastro-esophageal reflux disease with esophagitis, retinopathy, urinary incontinence, neuromuscular dysfunction of the bladder, neurogenic bowel, neuralgia and neuritis, muscle spasms, chronic back and neck pain, and various skin problems. (ECF No. 168 at 16-17.) He also has "decreased lingual coordination and strength, decreased swallow reflex/initiation, [and] decreased laryngeal movement," which makes it difficult for him to swallow his food. *Id.* As a result, he is on a diet of soft foods. *Id.* He is classified as a "complex medical" case. (ECF No. 161 at 18.) In February 2020, the BOP assigned him an inmate companion, who assists Davila with self-care. (ECF Nos. 168 at 21, 37.) A BOP clinical note dated March 27, 2020 described Davila as "highly functioning" notwithstanding that he suffered from a chronic condition. (ECF No. 161 at 47.)

Although he suffers from many health issues, the CDC does not recognize most of them as comorbidities that elevate one's risk of severe illness from COVID-19. Davila argues that he is at high risk for serious illness or death from COVID-19 because of his history of smoking, asthma, deviated septum, and sleep apnea, conditions which affect his ability to breathe. (ECF No. 168 at 18-19.) He also states that his "weakened immune system" due to his use of corticosteroids places him at increased risk. (ECF Nos. 161 at 7, 168 at 19.)

[5] According to the Centers for Disease Control and Prevention ("CDC"), "the risk for severe illness from COVID-19 increases with age, with older adults at highest risk" with the "greatest risk for severe illness from COVID-19" to be "among those aged 85 or older." Centers for Disease Control and Prevention, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited February 7, 2021).

[6] Quadriparesis is a condition characterized by weakness in all four limbs (both arms and both legs). https://www.healthline.com/health/quadriparesis

According to the CDC, "[a]dults of any age with certain underlying medical conditions are at increased risk for severe illness from the virus that causes COVID-19."[7] The CDC has stated that "[b]eing a current or former cigarette smoker increases a person's risk of severe illness from COVID-19." *Id.* Davila's medical records indicate that he started smoking at age 9. (ECF Nos. 161 at 27; 169 at 19; 172-1 at 56.) As a result, I find that he faces an increased risk of severe illness from COVID-19 but even so, as discussed below, the factors set forth in 18 U.S.C. § 3553(a) counsel against his release.

The CDC also has identified medical conditions for which adults *might* be at an increased risk for serve illness from COVID-19. "Moderate to severe asthma" is one of the listed conditions. Davila's medical records indicate he was diagnosed with asthma as a child and that he is prescribed an albuterol inhaler and budesonide. (ECF No. 161 at 16.) There is no indication as to the severity of his asthma[8]. But even assuming it falls within the moderate to severe category, that would not alter my conclusion. The same is true as to his assertion regarding a weakened immune system. And although he suffers from other medical issues including sleep apnea and a deviated septum, the CDC has not identified these conditions as ones associated with an increased risk due to COVID-19.

[7] Centers for Disease Control and Prevention, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited February 7, 2021).

[8] Asthma is categorized as follows:

| | |
|---|---|
| Mild intermittent | Mild symptoms up to two days a week and up to two nights a month |
| Mild persistent | Symptoms more than twice a week, but no more than once in a single day |
| Moderate persistent | Symptoms once a day and more than one night a week |
| Severe persistent | Symptoms throughout the day on most days and frequently at night |

https://www.mayoclinic.org/diseases-conditions/asthma/diagnosis-treatment/drc-20369660

While Davila faces an increased risk from COVID-19 under the CDC guidelines due to his history of smoking and asthma, I find that this risk is insufficient to warrant a reduction in his term of imprisonment when the factors in 18 U.S.C. § 3553(a) are taken into account, as they must be.

As to the nature and circumstances of the offense and characteristics of the defendant, Davila committed a serious crime. As described above, Davila engaged in an elaborate and calculated scheme to target and threaten the prosecutor's office and to avoid detection. He caused panic and fear and the closure of the office for two full days. He enlisted the assistance of other inmates to carry out his plan and committed the offense while serving a significant prison sentence – underscoring that imprisonment was not sufficient to deter him or protect the public from the real danger that he poses. And while he states in his affidavit that he realizes that his actions were "traumatic" and caused the victims pain, ECF No. 168-2, at the same time he downplays his actions by stating in his motion that he did not "display serious intent to harm anyone with 'baby powder,' he was incarcerated at the time the threat was made, there were few persons who received his one letter, and he suffers from psychiatric problems and personality disorders that hamper[] his ability to make reasonable decisions in life."[9] (ECF 161 at 13.) In addition, when speaking of his crime at the hearing on this motion, he spoke primarily about the impact on his family and on himself. I am not persuaded that that he has fully come to terms with either the impact or magnitude of his offense.

His crime was not an aberration. Davila is a career offender with a significant history of violence that evidences that he is a dangerous individual who poses a threat to society.

[9] Davila suffers from anxiety disorder, narcissistic personality disorder, and antisocial personality disorder. (ECF No. 168 at 17.)

In 1993, he and his brother were convicted of raping two 15 year old girls. PSR ¶¶ 37, 93. He was sentenced to 5 years.

In 1998, while on probation, Davila was arrested and charged with 2 counts of risk of injury to a minor, which were substituted to misdemeanor charges of threatening and reckless endangerment. According to the case incident report, Davila, who had been drinking, became enraged at his wife and punched holes in the wall. He then picked up a knife and threatened to kill her. While Mrs. Davila was holding her three children, who were 6, 5, and 3, he lunged at them and she ran with the children into a bedroom and locked the door. Davila broke through the door to get at them. His probation was revoked, and he was sentenced to 6 months. PSR ¶ 38.

In 1999, again while on probation, he was arrested on 7 felony charges arising out his conduct of shooting into a house in which a family was present, for which he was subsequently convicted in 2001. PSR ¶ 39. According to the case incident report, the victim heard a knock at the back door. His wife went to the door and opened it. A few seconds later, she began screaming and slammed the door shut. The victim had his children run to the front of the apartment. The victim peered through the blinds and saw a man at the door dressed in black holding a gun. The man began firing shorts through the window. The man then ran toward the front of the house, stopping at the side and firing an additional shot into a side window. The kitchen area windows were shattered and there were several holes in the walls, refrigerator, and microwave. Davila went to his sister Jacqueline's home and put the gun under a sofa cushion. Jacqueline Davila said she let the officers in so that they could "get her brother," who she said had threatened to kill her in the past. PSR ¶ 39.

The Court also needs to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense. I note that Judge Burns presided over the week long trial at which she had the opportunity to listen to the evidence of Davila's offense. And she wrote extensively about the evidence in her posttrial rulings. As a result, she had a more intimate familiarity than I with the nature and circumstances of the offense, and to some extent, with Davila’s characteristics. After considering all relevant § 3553(a) factors, she determined that a 30 year sentence was sufficient but not greater than necessary to achieve the purposes of sentencing. Her assessment, informed as it was by the trial evidence, weighs heavily in my consideration.

In support of his request, Davila argues that while incarcerated he has made efforts to improve his life, has taken many classes, and has had only one disciplinary incident. (ECF Nos. 161 at 18; 168 at 24.) Although the Court commends his rehabilitative efforts, his overall record is not especially impressive and does not outweigh the countervailing considerations. As to the disciplinary incident, Davila was found guilty of assaulting another inmate in 2018 – when his physical condition was not substantially different than it is now.[10] (ECF No. 177-1 at 3.) The report stated that Davila was arrogant and disrespectful during the interview. (ECF No. 177-1 at 3.) He maintained that he hit the other inmate in self-defense. (*Id*.) Although he couches it as one incident in a 15 year term, when asked about the particulars during the hearing on Zoom, he deflected responsibility and minimized his actions. He complained about not getting what he thought was proper medical treatment for the hand he injured after punching the inmate.

The Court also must consider the need for the sentence imposed to provide the defendant "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Davila argues this factor weighs in favor of release because he is "unlikely

[10] Notes indicates that he was transferred from FMC Rochester due to the fight. (ECF No. 172-1 at 24.)

to get the medical care he needs" from the BOP. (ECF No. 161 at 10.) The record does not bear this out. It is undisputed that Davila suffers from chronic health issues.[11] But the extensive medical records before the Court reflect that he is followed closely and receiving attentive treatment. The BOP has provided a battery of tests, including a barium swallow test, ECF No. 161 at 41, prescribed various medications, and furnished medical devices including a Nebulizer, CPAP machine, hand strengthening device, resistive exercise bands, a Wedge cushion for sleeping to address his GERD, a special pressure reduction mattress, and medical shoes. (ECF No. 172-1.) And as noted, they have provided him with an inmate companion and a special diet. He has been provided with occupational and speech therapy, ECF No. 161 at 50, and the Court notes that a letter from his occupational therapist responding to his concern about the efficacy of therapy evinces a thoughtful, sincere response that shows genuine concern. (ECF No. 172-1 at 76.) Because Davila has not demonstrated that the BOP cannot provide him adequate medical treatment, this factor weighs against a sentence reduction.[12] *See United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522, at *11 (S.D.N.Y. Dec. 9, 2019) (same).

After considering the relevant factors, I conclude that a sentence of time served would not be sufficient to comport with the goals of sentencing, and that the importance of those goals outweighs Davila's medical conditions and the risks from COVID-19. Davila has a significant portion of his federal sentence - close to ten years - remaining on his sentence. At this juncture, to reduce his sentence, which was at the bottom of the sentencing guidelines range, by nearly a decade

---

[11] Nonetheless, at the hearing, Davila presented as animated and vital with a strong voice and presence.

[12] While I appreciate Davila's sisters' willingness to step up and house him, it is not clear that the proposed living arrangement would provide the medical care needed.

would fail to reflect the seriousness of his offense, promote respect for the law, or protect the public from the risk of further dangerous conduct by him.

**However, because Davila has demonstrated that he is at higher risk from COVID-19, I request the Warden at Butner to prioritize him for receipt of a vaccine.**

IT IS SO ORDERED.

________/s/___________
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
February 8, 2021